Reply Date: January 30, 2009
Hearing Date: February 3, 2009 at 10:00 a.m. EST

J. Bruce Miller (Ky. Bar No. 47800)
Michael J. Kitchen (Ky. Bar No. 83945)
**J. BRUCE MILLER LAW GROUP**
605 W. Main St.
Louisville, Kentucky 40202
Telephone: 502-587-0900
Facsimile:  502-587-9008

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**In re:**

**MICHAEL G. TYSON, et.al.,**            **Chapter 11**

                              **Case No. 03-41900 (ALG)**
                **Debtors.**       **(Jointly Administered)**
_____

R. TODD NEILSON, Plan Administrator of The MGT          )
Chapter 11 Liquidating Trust, on behalf of the MGT       )
Chapter 11 LiquidatingTrust and on behalf of Michael     )
G. Tyson, an individual                                  )
                              **Plaintiff**              )
vs.                                                      )**Adv. No. 05-02210 (ALG)**
                                                         )
STRAIGHT-OUT PROMOTIONS, LLC, a Kentucky Limited         )
Liability Company; CHRIS WEBB, an individual;  BREARLY   )
(INTERNATIONAL) LIMITED, a Gibraltar corporation;        )
FRANK WARREN, an individual; SPORTS NETWORK, PLC,        )
a United Kingdom Corporation; MARINETRACK                )
HOLDINGS, PLC, a United Kingdom Corporation SPORTS       )
& LEISURE, BOXING, LTD., a United Kingdom corporation,   )
and EDWARD SIMONS , an individual                        )
                              **Defendants**             )
_____

**REPLY MEMORANDUM**
**SUPPORTING MOTION FOR SUMMARY JUDGMENT**
**BY**
**CROSS-CLAIM PLAINTIFFS, STRAIGHT-OUT PROMOTIONS, LLC AND CHRIS WEBB,**
**AGAINST**
**DEFENDANT, BREARLY (INTERNATIONAL) LTD.**
**AND**
**CROSS-CLAIM DEFENDANTS, FRANK WARREN, SPORTS NETWORK, PLC,**
**MARINETRACK HOLDINGS, PLC, EDWARD SIMONS AND**
**SPORTS & LEISURE, BOXING, LTD.**
_____

## TABLE OF CONTENTS

Page

INTRODUCTION                                                                    3

ARGUMENT                                                                       10

I.      The Opions and Orders of the Kentucky Federal Court are far more
        broadly based and fact intensive than a mere decision upon the dual
        legal issues of venue and jurisdiction                                10

        Prologue                                                              10

        A.      The Kentucky federal court's action/s/                        10

                1.      Summary of Kentucky federal court/s action/s/         17

II.     Examination of Second Circuit case authority as referenced in
        SJMemor and the Response                                             17

III.    United Kingdom's case law concerning the disregard of the
        corporate entity                                                     23

IV.     Summary and Conclusions                                             24

## INTRODUCTION

The Cross-Claim Plaintiffs, Straight-Out Promotions, LLC ("Straight-Out") and its principal, Chris Webb ("Webb")(collectively "the Cross-Claim Plaintiffs"), have filed a Memorandum ("SJMemor") in this proceeding supporting their Motion for Summary Judgment as against the Cross-Claim Defendants, Frank Warren ("Warren"), Sports Network, PLC ("Sports Network"), MarineTrack Holdings, PLC ("MarineTrack"), Sports & Leisure Boxing, Ltd. ("S&L") and Edward Simons ("Simons")(collectively "The Warren Conglomerate").

That SJMemor was an arduously prepared effort to clearly and precisely present this Court with the salient facts as established by the document discovery and deposition testimony in this litigation, the Second Circuit law and *stare decisis* regarding the principles of *res judicata* and offensive collateral estoppel as well as the United Kingdom's law regarding the question of disregarding the corporate entity a/k/a "piercing the corporate veil." The goal was to apply those legal principles to the facts of this case in arguing for a summary judgment holding that under New York and Second Circuit case authority The Warren Conglomerate was in privity with Brearly – and, as such, The Warren Conglomerate is subject to *res judicata* and collateral estoppel in <u>this Court</u> regarding the prior proceedings before the Kentucky federal district court. The decisions about privity and *res judicata* and collateral estoppel as well as the decisions concerning alter ego and piercing of the corporate veil are <u>all decisions to be made by this Court.</u>

The Warren Conglomerate has now filed its Response ("Response"). For some inexplicable reason the Response doesn't reflect an understanding about what the Kentucky federal court did and and didn't do and what is being asked of <u>this Court in this proceeding</u>. It seems as though The Warren Conglomerate is mixing together the issues that are to be decided by the various courts – and this confusion serves to confound the reader.

To be sure, a Response to the Cross-Claim Plaintiffs' SJMemor would be difficult, because the *stare decisis* case authority of the Second Circuit fully supports the propositions of *res judicata* and offensive collateral estoppel that were cited and must be decided <u>by this Court</u>.

Indeed the law of the United Kingdom, also clearly supports the Cross-Claim Plaintiffs' position in that it authorizes a corporate veil's piercing when there has been a fraud committed by the use of the 'veil.'[1]

Being unable to 'directly' challenge the Second Circuit and United Kingdom authorities cited by the Cross-Claim Plaintiffs, The Warren Conglomerate has taken several approaches in their Response. First, as mentioned earlier, it has endeavored to confuse the impact of the Opinions and Orders rendered by the U.S. District Court for the Western District of Kentucky ("Kentucky federal court") by challenging the work of that court as *merely* a banal inquiry into the dual questions of venue and jurisdiction and not dealing with issues of alter ego, privity or piercing the corporate veil.. This approach to what the Kentucky federal court did exhibits an unwillingness to understand the depth of the Kentucky federal court's efforts. This obfuscation will be thoroughly analyzed in Article I, hereafter, because it is essential that <u>this Court</u> accurately understand what the Kentucky federal court did and what it didn't do and what is expected of <u>this Court</u> in this proceeding.

Secondly, The Warren Conglomerate has endeavored to impugn the Cross-Claim Plaintiffs who served as the messenger in <u>this Court</u> by delivering in their SJMemor the disquieting proof that The Conglomerate's duplicitous international fraud has pervaded this entire proceeding including those before the Kentucky federal court as well as <u>this Court</u>. That belittlement is *briefly* discussed in the following numerical segments:

1.      The Warren Conglomerate has apparently taken some form of umbrage over the 'writing style' contained in the SJMemor. The undersigned expresses no apology, of any sort, for its 'brief-writing style' and further notes that this style has been used throughout the forty-five year career of the undersigned in litigating cases before 38 federal court districts

---

[1]      That difficulty is further compounded by the Cross-Claim Plaintiffs' citation at p. 35 (and attachment of the case as Appendix 21) of its SJMemor of a virtually identical case involving a Gibraltar corporation, which came under the control of an English citizen and his company In that case, *Trustor AB v. Smallbone*, the English court pierced the Gibraltar corporation's veil, holding the English citizen and his company liable for deliberately using the Gibraltar corporation as ". . . a device or façade to conceal the true facts, thereby avoiding or concealing any liability of those individuals." **SJMemor at p. 35.**

throughout the United States and has been encouraged by several juridical friends of the undersigned.[2]  Both preferred and encouraged the 'telling of the story' of a lawsuit as opposed to the stylish writing of a Harvard Law Review article as a more interesting and compelling method of brief writing. A lawsuit's story, well told and dramatically staged, oftentimes is difficult to deal with, because the truth becomes so readily apparent.

      2.    Another example of the effort to impugn the messenger's method of brief-writing is the accusation at page 21 of the Response to the SJMemor that:

> "Conspicuously, the sworn deposition testimony of Peter Abbey, Brearly's sole owner, <u>was omitted from the record</u> and the few allegations lodged against the UK Defendants [preferably referenced herein as the Warren Conglomerate] as to their purposed assistance of Brearly are also not supported by sworn statements or other evidence, which would otherwise be admissible under the Federal Rules of Evidence." (See: Response to SJMemor, at p. 21)

This statement is incorrect. Quotes from Abbey's deposition are repeatedly referenced between pages 19-24 in the SJMemor. Those quotes are accurately cited to the appropriate page/s/ in the Abbey deposition.

      Furthermore, at page 19, footnote 16 of the SJMemor, this Court was advised as to **<u>where</u>** the Abbey, Heath and the first Warren depositions can be found <u>in the record of this proceeding</u> – i.e. at Document 42 as Exhibits to a Declaration by Plaintiff Trustee's counsel, Alan Kornfeld. The undersigned states with firm conviction that it would have been *nigh unto ridiculous* to not properly reference Abbey's deposition – because it, along with the deposition of Stephen Heath, Sports Network's In-House (referenced at pp. 24-26 of the SJMemor) and the many documents that have been discovered collectively prove *beyond a shadow of a doubt* that the corporate shell, Brearly, was deliberately subsumed and taken over by The Warren Conglomerate and used by it to perpetrate an international fraud securing the theft of Straight-Out's worldwide television rights to the Tyson/Williams fight.

---

[2]     Namely, the now-deceased former Sixth Circuit Judge, the Hon. Bert Combs and the former Chief Judge, but still a member of the Sixth Circuit, the Hon. Boyce F. Martin.

To alleviate any such further concern, the attached **Appendix 1**, contains the deposition transcript of Peter Abbey, the sole owner of Brearly. It's breath-taking to read; which, due to its brevity, can be accomplished in less than a half an hour.

Another shadow punch is thrown at the messenger, by the Response's assertion at pp.1 with the observation: "Astoundingly, Movants never once cite th standard for summary judgment – presumably because they utterly fail to meet their burden to establish entitlement to summary judgment." Quite frankly, the undersigned is of the opinion that the obligatory citations to *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) are quite useless, because he has yet to appear before a federal judge who didn't understand the propositions contain in those cause, as well as the nuances. The undersigned chose to spend his brief writing moments with a more compelling analysis of the facts – so as to establish there can be no reasonable and unresolved material facts.

3.      The Warren Conglomerate has made much over the *presumed* argument of the Cross-Claim Plaintiffs that the Constitution's Full Faith and Credit Clause "requires a federal court to accord state court judgments the preclusive effect that would be given the judgment by the rendering state." (See: Response at p. 15) Then The Warren Conglomerate cites federal case authority that "[A] federal court is not bound by full faith and credit in considering what preclusionary effect should be given to a judgment of another federal court." (See: Response at p. 15) Those propositions, as cited, are correct. However, they don't apply to the Kentucky federal court's opinion.

As will be discussed hereafter in Article I, the Kentucky federal court's decision interpreting the contractual legal issues before it, was based upon Kentucky state law. That Kentucky state case law cited by the Kentucky federal court are decisions from the Kentucky Supreme Court regarding contract and implied contractual law. They represent the law of Kentucky. Their analysis and interpretation by the Kentucky federal court is entitled to consideration by this Court as being the standing law of Kentucky on the question of the

contract or implied contract before the Kentucky federal court and whether the contracts were breached.

4.      At page 10 of the Response, The Warren Conglomerate insists that Straight-Out has changed its position before this Court from the position it took in the Kentucky federal court, stating that in the Kentucky federal court ". . . none of the Distribution Agreements constituted an agreement between the parties, but that an agreement between Straight-Out and Brearly could be 'implied' from a 'course of dealing.' (See: Response at p. 10) The Conglomerate continues "Yet in this Motion, Movants now claim that the liability they seek to impose on the UK Defendants arises from Brearly's breach of the July 5 Distribution Agreement . . . ." (See: Response at p. 10)

        This is a deliberate 'smoke screen' and it serves no purpose other than to confuse this Court and impeach the efforts of the Cross-Claim Plaintiffs and the Kentucky federal court. The facts are as follows:

- •   The Kentucky federal court determined that there was no mutual agreement between the parties regarding (i) the question of a forum clause in the Distribution Agreement and (ii) there was no signed Distribution Agreement.

- •   The Kentucky federal court did rule that under Kentucky law there was an implied contract between the parties that was ascertainable by their mutual actions and by their documents to the effect that an Advanced Minimum Guarantee was supposed to be forwarded to Straight-Out's bank not less than seven days prior to the fight and it was to be held in escrow and released to Straight-Out the day following the fight upon certification in the local newspaper that the fight occurred. That was the implied contract that Brearly breached. To be sure, the $2.7 million terms for the Advanced Minimum

Guarantee are also contained in other documents (*inter alia* Appendices 4
and 6 to this Reply, which will be subsequently discussed.

5.      Lastly, the Cross-Claim Plaintiffs desire to direct the Court's attention to a
segment of the Response's Fact section, where it is stated:

> In performing services for Sports Network, Simons had no authority
> to bind Sports Network to any contract or agreement. Such decision
> could only be made by Warren. Indeed, only Warren had the
> authority to bind Sports Network. The preceding completely
> describes the business relationship between Warren and Simons

Response at p. 6.

If that is the case, in truth, and if Warren truly objected to Simons' participation
and his In-House counsel, Heath's participation with Straight-Out to create a prizefight between
Tyson and Williams and they continued participation with Brearly to obtain the worldwide
television rights to the fight -- then why didn't Warren stop Simons and demand that Heath
cease from undertaking the venture.

He didn't stop Simons and Heath because Warren was Williams' manager and
he believed that Williams could defeat Tyson (See: Warren depo II, at p. 52) and if he defeated
Tyson, the Williams would be in line for a mega-million dollar fight against the World's
Heavyweight Champion, Vitaly Klitschko – which is exactly what happened. (See: Warren depo
II, at pp. 56-7)

In essence, Warren sought the same thing Richard Nixon sought, 'plausible
deniability' that he had anything to do with the fight <u>and</u> the worldwide television rights, all
the while being the substantial beneficiary of the actions of both Simons <u>and</u> Heath.

But as was testified by Edward Simons' brother Gavin, during the whole time he
was associated with Sports Network, Warren had overall control of those entities. (See: Gavin
Simons' depo at p. 24.

Thirdly, The Warren Conglomerate's Response has adopted another tactic often utilized
by a child. To explain that tactic, we will, metaphorically, name the child, Wendy, which was
the nickname of Dave Thomas' then-eight year old daughter for whom he named his famous

hamburger chain in 1969. Every child, like Wendy, oftentimes will rummage through a jar of jellybeans looking for her favorite flavor. Assuming for the purpose of the discussion that Wendy's favorite jellybean flavor is liquorish, she undertakes her 'task' by separating the liquorish ones and then discarding all the other multiple of flavors. She does this because, to her, the others don't taste as well as the liquorish ones.

In the instance of the Response, the 'separator' wasn't Wendy. It was, instead, The Warren Conglomerate. Needing to find a way through the jellybean jar of Second Circuit *stare decisis* that supports the Cross-Claim Plaintiffs' positions on *res judicata* and offensive collateral estoppel, The Warren Conglomerate <u>either</u> completely ignored the overwhelming Second Circuit case authority, cited at pp. 14-19 of the SJMemor without even a comment <u>or</u> it selected a key quote from a case, ignoring the rest of the language that qualified the selected quote.

And then, after ignoring that the Cross-Claim Plaintiffs' case authority The Warren Conglomerate's Response shouts, as did Clara Pellar's classic advertising bit for Wendy's, "Where's the beef?"

This tactic shall be discussed in Article II and brought to full flower. Without repeating the legal argument made in the SJMemor, this Reply will further attempt to advise The Warren Conglomerate as to the location 'of the beef' in this litigation.

Lastly, Article III will discuss in further detail the extant legal authority in the United Kingdom regarding the disregard of the corporate entity, a/k/a "piercing the corporate veil." Suffice it to say <u>this Court</u> will be well within the law of the United Kingdom, by piercing the veil of Brearly as well as the other corporate entities contained in The Warren Conglomerate to leave them as well as the individual Conglomerate members, Warren and Simons, responsible for the Kentucky federal court judgment and any further judgment <u>this Court</u> renders against The Conglomerate on Plaintiff Neilson's fraud allegations.

---------------------------

The goal of this Reply is to avoid (as much as is possible) repeating the previously cited stream of Second Circuit case authority, by directly confronting The Warren Conglomerate's faulty reasoning.

## **ARGUMENT**

I.    **The Opinions and Orders of the Kentucky Federal Court are far more broadly based and fact intensive than a mere decision upon the dual legal issues of venue and jurisdiction.**

### **Prologue**

Before beginning Article I of the Argument, it is mandatory that any question about what appears to be a mis-impression created by The Warren Conglomerate's Response must be cleared up. That concern centers around the Kentucky federal court, before which was heard in the case of *Straight-Out Promotions, LLC v. Brearly (International) Limited*, Case No. 3:04CV-473-H.

While, to be sure, The Warren Conglomerate avoided shooting an arrow directly at the credibility of the Kentucky federal court, it clearly argued that the court's rulings and reasoning were *limited* to venue and jurisdictional issues and that it never considered other issues such as alter ego or privity of Brearly with The Warren Conglomerate or even the alter ego questions that surround this case. <u>Those insinuations are senseless</u>. They imply that the Kentucky federal court either wasn't capable of or didn't exhaustively examine the facts and issues surrounding the litigation, *beyond* those of venue and jurisdiction. This mis-impression requires <u>immediate</u> correction.

That correction begins in this Prologue with the information that the Kentucky federal court, to wit, the Honorable John G. Heyburn II, has been a federal judge for nearly two decades, has been the presiding Chief Judge of the Western District of Kentucky and sits at the bench with significant acclaim – which has been further affirmed by U. S. Supreme Court Chief Justice John Roberts, who has recently appointed Judge Heyburn as Chairman of the Judicial Panel for Multi-District Litigation. That appointment in and of itself should serve to extinguish *any mis-impression* left by The Warren Conglomerate's Response that the Kentucky federal court is less that capable of handling a complex international case.

That correction will continue in the following sub-section.

A.        **The Kentucky federal court's action/s/: What it Did and Didn't Do**

In deciding the issue of jurisdiction the Kentucky federal court was required to and did examine the the facts surrounding the involvement between Straight-Out and Brearly (International) Limited ("Brearly"), because under the extant law it was required to determine whether Brearly had created sufficient contacts with the Commonwealth of Kentucky so as to ". . . justify the exercise of personal jurisdiction over the defendant [Brearly] pursuant to KRS 454.210(2)(a)(1)-(2) (the Kentucky long-arm statute). (See: Judge Heyburn's April 1, 2005 Memorandum and Order found at Appendix 7 to SJMemor, at p. 1) The Kentucky federal court had many factual items before it; namely:

Exhibits to Straight-Out's initial Complaint, namely:

1.        The June 24, 2004 facsimile transmission on Sports Network stationery from Sports Network's In-House Counsel, Stephen Heath, indicating Heath's plan to travel from London to Louisville to discuss various agreements. Of interest is the wording directly beneath Heath's signature as Sports Network's In-House Counsel, to-wit: A partnership between Frank Warren and Sports & Leisure Boxing, Ltd.

(This letter is attached hereto, for this Court's reference, as **Appendix 2**)

2.        The July 5, 2004 Distribution Agreement between Brearly and Straight-Out requiring the Advance Minimum Guarantee payment from Brearly of $2.7 million with the following language:
4.  Guarantee
   The Distributor (Brearly) guarantees to pay to the Promoter (Straight-Out) the Advance Minimum Guarantee which shall be placed in an escrow account no less than 7 days prior to the Programme [Fight] taking place and shall be released under a letter of credit from the bank which shall stipulate that the Bank shall pay this sum to the account of the promoter . . . upon the bank receiving a certified copy of the Louisville Kentucky local newspaper, announcing the result of the Tyson v. Williams bout.

(This letter is attached hereto, for this Court's reference, as **Appendix 3**)

3.        The June 22, 2004 letter (on Brearly stationery) over the signature, ostensibly, from someone at Brearly to Straight-Out's principal, Webb, advising of Brearly's agreement ". . . to increase our guarantee for payment in respect of the exclusive world wide Media Right . . . to USD $2.7m… "

(This letter is attached hereto for this Court's reference, as **Appendix 4**)[3]

    4.    An email from Heath, Sports Network's In-House Counsel (whose email address was stephenheath@frankwarren.tv.(!!!))

(This email is attached hereto for the Court's reference, as **Appendix 5**)

    5.    The Notice of Irrevocable Authority and Assignment that referenced Brearly's $2.7 million guarantee to Straight-Out.

(This document is attached hereto for this Court's reference, as **Appendix 6**)

After Straight-Out's Complaint the record in *Straight-Out v. Brearly* U.S.D.C.W.D.Ky No. 3:04-CV-473-(H) (which is has been available to The Warren Conglomerate and its counsel since the day of its creation [because Sports Network's In-House Counsel, Stephen Heath participated before the Kentucky federal court, by filing an Affidavit in that proceeding on November 15, 2004 averring *inter alia* that he ". . . was instructed by Defendant Brearly to represent it in contract negotiations with Plaintiff, Straight-Out concerning the Distribution Agreement between Brearly and Straight-Out, which is the subject of the above-captioned action.]) **This Affidavit is attached hereto for this Court's reference, as Appendix 7**). As was referenced in the SJMemor at p. 21, the following colloquy occurred in Abbey's deposition:

    Q:    Did you ever authorize Mr. Heath to perform legal services for Brearly?
    A:    No.
    Q:    Who authorized Mr. Heath to perform legal services for Brearly?
    A:    Edward Simons
    Q:    Do you know what legal services Stephen Heath performed for Brearly?
    A:    No.
    Q:    Did you ever provide any instruction to Mr. Heath in connection with the legal services he performed for Brearly?
    A:    No.
    Q:    Who provided those instructions?
    A:    Edward Simons.
**See: Appendix 1, Abbey Depo. at pp. 28.**

---

[3]    The sole owner of Brearly, Peter Abbey, has testified in this proceeding that he does not recognize the signature on this letter from the ostensible Brearly sender, nor did he prepare the letter, nor does Brearly use the typeface that appears on the letter. Abbey presumes that Edward Simons prepared the letter, because the typeface is similar to that on another Exhibit (#24)(**which is also attached to Appendix 4 for this Court's comparison**). Regarding Exhibit 24, Abbey testified that Edward Simons gave it to him on September 19, 2005 and Simons asked him to sign it, which he did. (**See: Appendix 1:** Abbey Depo at pp. 13-14, 27.

    Sports Network's In-House Counsel, Stephen Heath, has testified that the June 22, 2004 letter on Brearly stationery was shown him by Edward Simons (**See: Heath Depo.** at pp. 35-38)

When asked <u>directly</u> about Heath's Affidavit the following was the sworn testimony of Abbey:

> Q:    Mr. Abbey, have you ever seen this affidof of Mr. Heath that we have marked as Exhibit 2 [in Warren's deposition] before?
> A:    No.
> Q:    Did you ever authorize Mr. Heath to do anything for Brearly?
> A:    **No. I had never met him, in fact, until late last year.**[4]

**See: Appendix 1, Abbey Depo. at p. 33. [Emphasis supplied].**

As was stated at p. 23 of the SJMemor, as this court examines the averments in Heath's affidavit submitted to the Kentucky federal court, its attention should be drawn to Plaintiff Neilson's fraud count against The Warren Conglomerate. Why? Because its collective fraud was so far reaching that it even touched the Kentucky federal court five months after the Tyson/Williams bout with the In-House Counsel of Warren's Sports Network providing a misleading (at best) and more likely a 'false' affidavit to the Kentucky federal court. <u>Heath never received instructions about the Distribution Agreement/s/ from Brearly or Abbey. Those instructions were received from Simons, who, along with Warren, manufactured the entire international fraudulent scheme for Warren's benefit</u>.

The next entry in the Kentucky federal court record reflects that Brearly's counsel filed a 32-page Motion to Dismiss on the ground that the Distribution Agreements each all call for Gibraltar as the selected forum selection (See: Doc. #5 in the Kentucky federal court litigation), which was met with a 20-page Response by Straight-Out's counsel containing numerous exhibits regarding the parties' negotiations that reflected multiple contacts between Brearly and Kentucky (See: Doc. 9 in the Kentucky federal court litigation). Brearly's 11-page Reply brief challenging jurisdiction <u>specifically</u> indicates that there were three drafts of the Distribution Agreement, each calling for the forum to be Gibraltar (See: Doc. 11 in the Kentucky federal court litigation).

---

[4]    The subject affidavit was signed on November 9, 2004 and submitted to the Kentucky federal court on November 15, 2004. Abbey's deposition was taken on February 8, 2007. Therefore, his answer "late last year" references late in the year **2006, thus meaning that Abbey didn't know who Heath was until 2 years after Heath's Affidavit, WHICH AVERS THAT HE WAS INSTRUCTED BY BREARLY was submitted to the Kentucky federal court.**

On April 1, 2005 the Kentucky federal court rendered its Memorandum and Order. (This Memorandum and Order is found at Appendix 7 of the SJMemor) In commenting upon this effort the Kentucky federal court wrote:

> The Kentucky long-arm statute is intended to reach to the limit of the Constitution. [case omitted]. Brearly made numerous contacts with the subject forum: directing economic activities at the forum, **buying rights to a broadcast originating in Louisville, and negotiating the contract at issue in the same city.**
> The Court finds that Brearly **has purposefully established minimum contacts in the forum** and is thus subject to this Court's jurisdiction.

See: Ex. 7 to SJMemor at p. 2. [Emphasis Supplied]

Then, following this holding as to jurisdiction, Judge Heyburn notes that the issue of venue requires additional examination. Judge Heyburn writes:

> To resolve this dispute, the Court must determine if the forum selection clause in question is part of the agreement between the parties. That is a difference between this case and others the Court has consulted and the parties have cited. In most instances, where the validity of a forum selection clause it at issue, there is no doubt the parties agreed to the provision in question. In this case, the terms of the agreement as well as the validity of the forum selection clause are in dispute. Thus, to construe the forum selection clause, **the Court must resolve major aspects of the central dispute itself**.

See: Ex. 7 to SJMemor at p. 2. [Emphasis Supplied]

Thus, when The Warren Conglomerate avers in its Response that the Kentucky federal court only dealt with venue and jurisdictional issues, which it does repeatedly, that is nothing more than a deliberate effort to obfuscate the facts surrounding Judge Heyburn's decision making in the Kentucky federal court proceeding.

Judge Heyburn concludes his April 1, 2005 Memorandum Order with five detailed and specific questions that he asks the parties to respond upon on or before May 2, 2005. Those questions were designed to assist him in understanding the major aspects of the central dispute between the parties – as he had stated in his Memorandum and Order.

To avoid repeating the contents of the SJMemor those questions are enumerated at pp. 10-11 of the SJMemor. A discussion of those Responses by both parties is found at pp. 10-12 of the SJMemor, and Brearly Responses are attached to the SJMemor as Appendix 8.

<u>On May 27, 2005, only several weeks later</u>, Judge Heyburn issued his Memorandum Opinion. It is appended to the SJMemor as Appendix 9 and commented upon in the SJMemor at pp. 12-14. For the Court's ease of reference the May 27, 2005 Memorandum Opinion is attached hereto **as Appendix 8**.

At this juncture it would be helpful for this Court to read Judge Heyburn's May 27, 2005 Memorandum Opinion, because The Warren Conglomerate has further endeavored to obfuscate the Kentucky federal court's action by baldly stating that " . . . the Kentucky district found that 'there was no meeting of the minds on any of the written distribution agreements . ." (See: Response at p.2)  That statement is a half-truth, because it doesn't describe <u>the basis of </u>the Kentucky federal district court Opinion, to wit:

> Where there is no written contract, courts may still determine the essential terms of a contract. In doing so, Kentucky courts recognize a contract implied in fact, "shown by evidence of facts and circumstances <u>from which a meeting of the minds concerning the mutual promises may be reasonably deduced</u> . . . . The dispute between the parties in this case <u>does not involve the interpretation of the written Distribution Agreement because Straight-Out claims damages based on Brearly's breach of a contract</u> **that does not include the written Distribution Agreements**.

(See; **Appendix 8**, Judge Heyburn's May 27, 2005 Memorandum Order at p. 7-8

As was noted in the SJMemor at pp. 12-13, the next half year of 2005 was taken up with Brearly obtaining several extensions of time to file an Answer, then several extensions of time to obtain new counsel all of which was followed by Straight-Out's eventual Motion for a Default Judgment. (Kentucky federal court Doc. #32.) That Memorandum is attached to the SJMemor as Appendix 10. Thereafter, on February 27, 2006, the Kentucky federal district court issued its Order entitling Straight-Out to a default judgment on Count I and II of its Complaint and awarded judgment as against Brearly in the amount of $2.7 million. A copy of that Order was attached to the SJMemor as Appendix 11 and is attached for the ease of this Court's reference as **Appendix 9, hereto**.

Following the issuance of Appendix 9, the Kentucky federal court retained jurisdiction of the case for the purposes of post-judgment discovery regarding the question of the amount (if

any) of world-wide television receipts by Brearly (!) that exceeded the Advanced Minimum Guarantee of $2.7 million that was supposed to be paid to Straight-Out by Brearly, but wasn't. The Kentucky federal court found that Straight-Out was to receive 45% of those proceeds.

Much of that post-judgment discovery effort has occurred as a result of this Adversary Proceeding. There has been a complete failure on the part of The Warren Conglomerate to produce any records regarding the worldwide television sales, <u>despite the fact that Abbey, Heath and Simons each testified that Simons kept the records</u>. As is noted in the SJMemor at page 22, footnote 19 there were license agreements sold in numerous nations across the globe, yet there isn't a single paper that has been produced that delineates a nation-by-nation financial analysis of the gross sales for each nation to whom the signal was beamed.

In a series of Status Conferences Judge Heyburn was kept apprised of the on-going developments regarding discovery and the actions/inactions of the Cross-Claim Defendants in this case. On December 15, 2008, following the conclusion of discovery in <u>this case</u> (which included the depositions of Abbey, Heath, Simons, Warren, Judge Heyburn conducted a final Status Conference. Counsel for Straight-Out produced a Status Report to the Court (See: Doc. 50 in the Kentucky federal court record) Following further discussion, Judge Heyburn issued the following:

1.     An Order dated December 15, 2008, setting forth the Court's findings regarding a variety of matters, including the pre and post-judgment interest calculations, and the amount of attorneys' fees for obtaining the original order and entertaining discovery and collecting the judgment amount. That Order is **attached hereto as Appendix 10.**

2.     An Order sustaining the pending motion for Judgment as a matter of law. That Order is **attached hereto as Appendix 11.**

3.     A Judgment in the amount of $4,554,191 as of February 28, 2008, to which shall be applied continuing post-judgment interest at the rate of 4.70% annually and compounded, annually, until paid. That Judgment is **attached hereto as Appendix 12.**

1.      **Summary of Kentucky federal court's action/s/**

It is impossible to conclude from an examination of the facts contained in this Article I that the Kentucky federal court did not purposefully make itself aware of all the salient and cogent facts that surrounded the question before it – the contractual relationship between Brearly and Straight-Out and whether there was a breach of that contractual commitment.

The determination, by the Kentucky federal court that there was a breach by Brearly of its implied contractual commitment to Straight-Out is *res judicata* upon <u>this Court</u> in that the points considered by Judge Heyburn cannot be reconsidered or reheard by <u>this Court in this proceeding</u> – despite the protestations to the contrary by The Warren Conglomerate.

Now, we turn to an examination of the Second Circuit law of the case on *res judicata* and offensive collateral estoppel as viewed by the SJMemor and the Response.

II.     **Examination of Second Circuit law as referenced in the SJMemor and the Response**

1.      *BBS Norwalk One v. Raccolta, Inc.*, 117 F.3d 674 (2nd Cir. 1997) is cited at pp. 14 of the SJMemor for the proposition that the preclusive effect of a prior decision, whether by *res judicata* or collateral estoppel " . . . provides an appropriate basis for determination of a motion for summary judgment." *Id* at p. 677-78.

The Response states the case holds that "To invoke collateral estoppel, a party must show that the identical issues were necessarily decided in the previous proceeding." (Response at p. 23). From that limited statement the Response extrapolates that Straight-Out " . . . fails to mention that the Kentucky District Court never made any findings as to alter ego liability – or fraud or illegal purpose – in issuing its default judgment against Brearlly." (Response at p. 24). This is a complete misrepresentation of Straight-Out's argument.

The Response fails to reference the <u>entire</u> opinon of the *BBS Norwalk* Court as to the doctrine of *res judicata*. Specifically, the Court in *BBS Norwalk* observed:

> Under New York law, in order to invoke the doctrine of collateral estoppel, a party must show that "the identical issue necessarily must have been decided in the prior action and be decisive of the present

action," *Khandhar v. Elfenbein, 943 F.2d 244, 247 (2d Cir. 1991)* (citation and internal quotation marks omitted). The party invoking collateral estoppel "bears the burden of proving the identity of the issues . . . ." *Id.* **The prior decision need not have been explicit on the point, since "if by necessary implication it is contained in that which has been explicitly decided, it will be the basis for collateral estoppel**." *Norris v. Grosvenor Mktg. Ltd., 803 F.2d 1281,* **[**8]** *1285 (2d Cir. 1986)* (construing New York law) (citations and internal quotation marks omitted). Nonetheless, the party asserting preclusion "bears the burden of showing with clarity and certainty what was determined by the prior judgment," *Clark v. Bear Stearns & Co., 966 F.2d 1318, 1321 (9th Cir. 1992)*, so that "issue preclusion will apply only if it is quite clear" that this requirement has been met, *Colon v. Coughlin, 58 F.3d 865, 869 (2d Cir. 1995)* (construing New York law).

*Id* at p. 677. [Emphasis Supplied]

Straight-Out <u>has not asserted</u> that the Kentucky federal court considered the alter ego issue, as the Response suggests. That is an issue to be determined <u>in this proceeding by this Court</u>.

What the Kentucky federal district court has determined is that there was <u>no written contract between Brearly and Straight-Out, **BUT**</u> (under Kentucky law) there was an implied contract between them, which required Brearly to place an Advanced Minimum Guarantee in the amount of $2.7 million in Straight-Out's bank account no less than seven days prior to the fight with the proceeds being distributed to Straight-Out on the day following the fight based upon a statement in the local Louisville newspaper that the fight occurred. The Kentucky federal court enforced <u>that</u> implied contract and issued an Order and an eventual Judgment based upon that finding.

It is <u>that</u> Order and Judgment, which is subject to the doctrine of *res judicata* and collateral estoppel <u>in this Court</u>. But despite that final judgment of the Kentucky federal court, The Warren Conglomerate NOW argues in it Response to <u>this Court</u> that there were three versions of the Distribution Agreement between Brearly and Straight-Out – as if that was something <u>this Court</u> should be concerned about. (See: Response at pp. 9-10) As Article II will point out, henceforth, that is far from the law of the Second Circuit.

2.    The next cases cited at page 15 in the SJMemor are *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979) and *Blounder-Tongue Laboratories, Inc. v. Univ. of Illinois*, 402 U.S. 313

(1971). These are important U.S. Supreme Court cases holding that "... collateral estoppel was no longer limited to the requirement of mutuality of the parties and is <u>applicable to privies of parties IF they had an opportunity to be heard at the prior proceeding</u>." (SJMemor at p. 15) The *Blonder* case is particularly significant, because of the historical analysis of the issue that is rendered by Mr. Justice White at pp. 324-329 of the case.

The Response doesn't reference these cases, at all.

3.    Next, the SJMemor cites to *Stichting Ter Behartiging, et.al. v. Phillippe S.E. Schreiber*, 327 F.3d 173 (2nd Cir. 2003) which reviewed the prior Second Circuit authority regarding the question of 'privity' in the application of offensive collateral estoppel.  The SJMemor notes that the *Stichting* Court found the Second Circuit has held that offensive collateral extoppel applies to those 'in privity' in cases where "the person asserted to be in privity had authorized the representation"[5] and when the person asserted to be in privity exercised some degree of actual control over the presentation of the parties' case at the previous proceeding."[6] (SJMemor at p. 16)

The Response cites *Stichting* at p. 18, by simply stating: "Res Judicata is inapplicable where the precluded party's interests have not been represented in the previous law suit by that party itself or by another party established to be in privity of the party." The Response doesn't note that <u>this is the issue the Cross-Claim Plaintiffs have presented to **this** Court</u>. Nor does the Response reference the multitude of facts presented in the SJMemor proving that the Warren Conglomerate totally controlled the Kentucky federal court litigation for Brearly – even to the point that Brearly's owner didn't authorize the hiring of the lawyer that

---

[5]    The SJMemor also cites in footnote 12, at p. 16 three more cases that utilize this reasoning, namely *Monahan v. New York City Dept. of Correction*, 214 F.3d 275, *United States v. Int'l Bhd of Teamsters*, 931 F.2d 177 (2nd Cir 1991) and *Amalgamated Sugar v. NL Indus. Inc.*, 825 F.2d 634 which held that "One whose interests were adequately represented by another vested with the authority of representation is bound that the judgment." The Response only cites to the *Amalgamated* case (at p. 16) and then only uses it in a string quote regarding the general rules for application of *res judicata*.

[6]    The SJMemor also cites in footnote 13, at p. 16 two cases supporting this proposition of the 'control over' the prior litigation. They are *Central Hudson Gas & Electric Corp v. Empresa Naviera Santa S.A.*, 56 F.3d 359 (2nd Cir 1995) and *National Fuel Distribution Corp. v. TGX Corp.* 950 F.2d 829 (2nd Cir 1991). Neither case is cited in the Response.

represented Brearly in the Kentucky federal court (Judd Burstein) and that he surmised Burstein was hired by the Cross-Claim Defendant Edward Simons (See: **Appendix 1, attached hereto,** Abbey Depo. at p. 22) Further, Abbey testified that he had <u>never</u> even spoken with Judd Burstein (See: **Appendix 1, attached hereto**, Abbey Depo. at p. 40) Lastly, Abbey testified:

> Q:    Let me then ask the question in a little broader way. . . Other than you and Mr. Simons is there anybody at Brearly who is authorized to retain attorneys of any type."
> A:    No.

(See: **Appendix 1, attached hereto**, Abbey Depo, at p. 41)

So the Kentucky federal court litigation was controlled by a lawyer, who the owner of Brearly didn't know and never instructed and that lawyer was hired by Warren Conglomerate member, Edward Simons, who is the CEO of another Warren Conglomerate member, S&L and which is also in partnership with Sports Network, which is solely owned (at the time of the fight) by Frank Warren, the center of The Warren Conglomerate web of deceit.

And the Response would have one believe that The Conglomerate wasn't in privity with Brearly in the Kentucky federal court proceeding!!!  No wonder Brearly didn't endeavor to implead The Warren Conglomerate into the Kentucky federal court, because Brearly's lawyer was hired, paid and controlled by The Conglomerate and the owner of Brearly had no idea what was happening, by his own deposition testimony!!!

4.    At page 16, the SJMemor cites to a very significant 1974 Harvard Law Review article, which is also referenced in the case of *Cowan v. Ernest Codelia, PC*, 149 F.Supp. 2d 67 (S.D.N.Y. 2001) and *mario Valente Collezioni, Ltd. v. AAK Limited, et.al* 2004 U.S. Dist. LEXIS 5049 (which is found at Appendix 12 of the SJMemor. Both cases reference the broadened concept of privity in New York and Second Circuit law, in favor of

> ". . . a more flexible consideration of whether all of the facts and circumstances of the party's and nonparty's actual relationship, their mutuality of interests and the manner in which the nonparty's interests were represented in the prior litigation establishes a functional representation such that the 'non party may be thought to have had a vicarious day in court."

Note: *Collateral Estoppel of Non-Parties*, 87 Harv.L.Rev. 1485, 1499-1500 (1974) quoted in SJMemor at page 16.

The SJMemor doesn't discuss the *Cowan* case; it merely notes it in Footnote 14 at page 16. Now, the Cross-Claim Plaintiffs will reference *Cowan* and attach it hereto as **Appendix 13.** U.S. District Judge Koeltl  sets forth the New York law:

> Under New York law, the transactional approach to res judicata prevents parties to the prior action <u>or those in privity with them</u> "from raising in a subsequent proceeding any claim they could have raised in the prior one, <u>where all of the claims arise from the same underlying transaction.</u> [citing nearly a dozen cases] New York courts have held that res judicata principles are <u>not to be applied</u> "mechanically," rather "<u>the analysis requires consideration of the 'realities of the litigation'</u>" *National Fuel Gas Distribution Corp v. TGX Corp,* 950 F.2d 829, 839 (2nd Cir. 1991) (quoting *Staatsburg Water Co. v. Staatsburg Fire Dist.* 527 N.E. 754 (N.Y. 1988)

*Id.* at 73.

Clearly the claims between Brearly, Straight-Out and The Warren Conglomerate ". . . arise from the same underlying transaction. . . . " as noted by the Court in *Cowan*. Also the Court in *Cowan* speaks of the analysis that "requires consideration of the realities of the litigation." That is the job, which is placed before <u>this Court</u>. It must determine from the 'realities of the litigation' whether The Warren Conglomerate is a privity of Brearly.

The Response doesn't mention the law review article or that the law review article's reasoning about a "community of interest" analysis is applied as the "realities of the litigation" in the *Cowan* case.

5.      Next, at page 17 the SJMemor cites the case of *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394 (1981), which is the bellweather case in the Second Circuit establishing a four-part test to determine if the doctrine of *res judicata* bars later litigation. At pages 17-19 the SJMemor concludes the first, second and fourth prong of the Federated test is met in the instant case. Namely, (Prong 1) the Kentucky federal court decision was a final decision that was known of and never appealed by Brearly or any artifice within The Warren Conglomerate for now, nearly four years, (Prong 2) that the Kentucky federal court was a court of competent jurisdiction to decide the existence of an implied contract between Brearly and Straight-Out and (Prong 4) there is no claim that The Warren Conglomerate can cite that Brearly didn't assert or couldn't have asserted in the Kentucky federal court case. As is noted in the SJMemor the only thing that

wasn't asserted by Brearly is that "The Warren Conglomerate [should have been] impled into the action." (See: SJMemor at p. 18) That wasn't done because, under the Third Prong of the Federated test, The Warren Conglomerate was the privy of Brearly and controlled Brearly's litigation in Kentucky through Warren's In-House Counsel, Heath and the machinations of Warren's partner, Simons – and in no event would Heath or Simons or the lawyer they hired to defend Brearly interplead The Warren Conglomerate into the Kentucky federal court case. That would defeat the purpose of the Conglomerate's fraudulent conspiracy.

It is also noteworthy that former U.S. District Court Judge (and FBI Director under President Clinton) has held in the case of *Somerville House Management, Ltd v. Arts & Entertainment Television Network*, 1993 U.S.Dist. LEXIS 5534 (attached hereto as **Appendix 14** that

> A number of courts have found that alleged co-conspirators can be considered 'in privity' with one another for *res judicata* purposes, despite the fact that those parties might even have some adverse interests.

*Id* at p. 2[7]

The Cross-Claim Plaintiffs, now, cite to an even newer case from the Southern District of New York, which has a holding that broadens, even further, New York's view of claim preclusion by res judicata. The case of *Estate of Essie May Keys, et.al. v. Union Planters, Bank, N.A.*, 578 F.Supp. 2d 629 (decided September 29, 2008), is **attached hereto as Appendix 15**. On the issue of preclusion by *res judicata*, the U.S. District Judge Holwell opined:

> New York takes the "transactional approach to res judicata, barring a later claim arising out of the same factual grouping as an earlier litigated claim <u>even if the later claim is based on different legal theories or seeks dissimilar or additional relief</u>."

*Id* at p. 635.

A re-analysis of the SJMemor discussion (found therein at pp. 14-19) of *res judicata* and the application of offensive collateral estoppel before <u>this Court</u> together with the reading of this Article II of the Reply should enable <u>this Court</u> to understand that <u>its job</u> is to decide

---

[7]  Those cases so cited in *Somerville* were: *In re Teletronics Service*, 762 F.2d 185, 192 (2nd Cir 1985), and *Gambocz v. Yelencsics*, 468 F.2d 837 (3rd Cir. 1972), *McLaughlin v. Bradlee*, 599 F.Supp. 839 (DDC 1984), *Hazzard v. Weinberger*, 382 F.Supp 225 (S.D.N.Y. 1974, and *Ruskay v. Jensen*, 342 F.Supp. 264 (S.D.N.Y. 1972

whether The Warren Conglomerate was in privity with Brearly, and if it was in privity, then the holdings of the Kentucky federal court must apply to The Warren Conglomerate.

Next, the final nail in the coffin is <u>this Court's</u> consideration of the law of the disregard of the corporate entity in the United Kingdom. That is the subject of Article III, hereafter.

**III.**    **United Kingdom's law concerning the disregard of the corporate entity**

For once the Cross-Claim Plaintiffs and The Warren Conglomerate agree on something – that the United Kingdom recognizes the concept of disregarding the corporate entity where it is being used or has been used as a sham or fraud by another. That is precisely what the case of *Trustor AB v. Smallbone* [2001] 3 All ER 987 holds and which is attached to the SJMemor as Appendix 21.

Since the preparation of the SJMemor and its inclusion of *Trustor AB v. Smallbone* another case has been brought to the attention of the undersigned, called *Kensington International Limited v. Republic of Congo* [2006] 2 BCLC 296. The case is quite lengthy and somewhat arcane, but does find that the veil should be pierced where it is clear that a chain of companies had been used with inter-company sales to disguise the fact that the real sale of oil was undertaken by the Congo and a debt owed could be subject to third party debt orders by the claimant who already had a judgment against the Congo.

Additionally, a helpful law review article has been found which cites to multiple cases of veil piercing in the United Kingdom. That article is 36 American Business Law Journal 73. At page 10 of the article in the section entitled "Piercing the Corporate Veil to do Justice among the Parties under U.K. law" the case of *Re A Company Ltd,* 205 BCLS 333 (C.A. 1985) is cited for the proposition that "[W]here evidence suggests that a network of companies has been used to conceal or dispose of money obtained  through fraud, the courts have pierced the corporate veil either to seize assets to satisfy a judgment or to enjoin the disposition of corporate stock." *Id* at p. 10. The Court in *A Company, Ltd.* was quoted as holding, ". . . the court will use its powers to pierce the corporate veil if it is necessary to achieve justice irrespective of the legal efficiency of the corporate structure under consideration."

23

The same law review also references the case of *Re: H, 2 All E.R.* 39 (C.A. 1996), where three shareholders were charged with evasion of customs and excise taxes, the corporate veils of their two family corporations were pierced for the purpose of seizing corporate assets to satisfy a judgment against the shareholders. The law review found, ". . . the court emphasized that the shareholders controlled the companies, the companies had been used for a large-scale fraud, the shareholders regarded the entities as their family business and the shareholders had benefited from the company cash in substantial amounts." *Id* at p. 11.

The law review article also references a series of cases where the corporate veil has been pierced because the court found intentional acts of deception or efforts to avoid a legal duty. *Id* at p. 12.

So, in order to pierce the veil of a United Kingdom corporation the English court must find that there has been a control by a person or a group of persons over a corporation, which has been used to foster or create a façade to hide a fraud or a deceit from another. One cannot read the depositions of Abbey, Heath, Simons and Warren and not reach the conclusion that they have participated in a fraudulent scheme to purloin the value of Straight-Out's rights to the worldwide television rights for the Tyson/Williams prize fight, by utilizing the façade of a shell corporation called, Brearly, to be the "beard" for The Warren Conglomerate's fraudulent scheme.

IV.    **Summary and Conclusion**

Much time as been spent in an effort to determine the 'killer' fact to deliver in this Summary and Conclusion to a travesty of international fraud. There are so many from which to choose.

However, for its sheer pomposity, few if any can top the fact discussed beginning at page 25 of the SJMemor, namely that Warren's lawyer, Heath, has testified that all the foreign distribution rights contracts were between Brearly and the Licensee, named therein – all except one. THAT ONE is a killer – it was the License Agreement between Warren (on behalf of Sports

Network) and Simons (on behalf of S&L), authorizing British Sky Broadcasting ("Sky-TV") to broadcast the bout to the United Kingdom, Ireland, the Channel Islands and the Isle of Man.

That Sport Network/S&L and Sky-TV Agreement was attached to the SJMemor as Appendix 16.

Nowhere in that document does Brearly's name appear. Further Heath admitted that there should have been an agreement between Brearly and The Warren Conglomerate in order for The Conglomerate to deliver those rights to Sky-TV – but there wasn't!!! (See: Heath depo at pp. 53-58).

This single document proves that Brearly never received any money for its licensing to Sports Network and S&L of the television rights it *ostensibly* owned, which allowed Sports Network and S&L to convey them to Sky-TV. In a situation like that there's only two alternatives – they are either purchased (which they weren't) or The Warren Conglomerate stole them from Brearly.

The Response papers endeavor to 'cover up' the obvious by referencing Sports Network's contractual understanding with Sky-TV; however, Sports Network <u>didn't own those rights because they didn't acquire them from Brearly. The reason they didn't acquire them from Brearly is that The Warren Conglomerate is Brearly  -- and, as such, is Brearly's privy for *res judicata* and collateral estoppel purposes.</u>  Why?  Because you can steal from yourself, so Sports Network's and S&L's possession of the United Kingdom, Ireland, Channel Islands and the Isle of Man television rights to the fight were obtained simply because Sports Network and S&L took them from themselves (albeit Brearly).

The time has come to 'pay the bag piper.' That price is determined by the existing Judgment from the Kentucky federal district court.

Dated: Louisville, Kentucky
      January 30, 2009

Respectfully submitted,

       J. Bruce Miller /s/

J. Bruce Miller
**J. BRUCE MILLER LAW GROUP**
605 W. Main St.
Louisville, Kentucky 40202
Ph. 502-587-0900
Counsel for the Cross-Claim Plaintiffs,
Straight-Out Promotions and Chris Webb.

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Reply Memorandum has been filed with the Bankrupcy Court's Electronic Filing system, and sent by email to the following listed counsel of record in this proceeding; and a true copy has been mailed, via Federal Express, to the Clerk's office and marked "Chambers Copy" for the Honorable Allan L. Gropper, United States Bankruptcy Judge, in accordance with Local Rule 9070-1(b), on this the 30th day of January 2009.

Robert N. Michaelson
**K&L GATES, LLP**
599 Lexington Ave.
New York, N.Y. 10022
robert.michaelson@klgates.com
*Counsel for the Cross-Claim Defendants*

Beth Levine
**PACHULSKI STANG ZIEHL & JONES, LLP**
780 Third Ave.
New York, N.Y. 10017
blevine@pszjlaw.com
*Counsel for the Plaintiff Trustee*

Alan Kornfeld
**PACHULSKI STANG ZIEHL & JONES, LLP**
Los Angeles, Calif.
akornfeld@pszjlaw.com

       J. Bruce Miller /s/