Robert J. Feinstein (RF 2836)
Alan J. Kornfeld (AK 5647)
Beth E. Levine (BL 6715)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017-2024
Telephone: 212/561-7700
Facsimile: 212/561-7777

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MICHAEL G. TYSON, et al., | Case No. 03-41900 (ALG) |
| Debtors. | (Jointly Administered) |
| R. TODD NEILSON, Plan Administrator of the MGT Chapter 11 Liquidating Trust, on behalf of the MGT Chapter 11 Liquidating Trust and on behalf of Michael G. Tyson, an individual, | Adv. No. 05-02210 (ALG) |
| Plaintiff, | |
| vs. | |
| STRAIGHT-OUT PROMOTIONS, LLC, a Kentucky Limited Liability Company, et al., | |
| Defendants. | |

## [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

On March 23 through March 27, 2009, the Honorable Allan L. Gropper, United States

Bankruptcy Judge, heard the trial of the above-captioned adversary proceeding (the "Action").

Plaintiff R. Todd Neilson ("Plaintiff"), the Plan Administrator of the MGT Chapter 11

Liquidating Trust (the "MGT Trust") was represented at trial by Alan J. Kornfeld and Beth E.

Levine of Pachulski Stang Ziehl & Jones LLP. Defendant and Cross-Claim Plaintiffs Straight-

Out Promotions LLC ("Straight-Out") and Chris Webb ("Webb" and, collectively with Straight-Out, the "Kentucky Defendants") were represented at trial by J. Bruce Miller and Michael J. Kitchen of the J. Bruce Miller Law Group. Defendants Frank Warren ("Warren"), Edward Simons ("Simons"), and Sports & Leisure Boxing Ltd. ("Sports & Leisure Boxing") (collectively the "UK Defendants") were represented by Lani A. Adler and Robert Michaelson of K&L Gates LLP.[1] Defendant Brearly (International) Limited ("Brearly") initially appeared in this action; however, it failed to answer or otherwise respond to the amended complaint filed in this Action (the "Amended Complaint") [Docket No. 57], and on January 23, 2008, the Clerk of the Court entered a default against Brearly. [Docket No. 95]. Brearly did not appear at trial of this Action.

Having considered the testimony of witnesses, documentary evidence, and legal arguments that counsel presented orally and in writing, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### A.    Plaintiff's Claim Against Straight-Out for Breach of the Event Agreement

1.      On July 16, 2004, Michael G. Tyson ("Tyson) and Straight-Out entered into an agreement (the "Event Agreement") pursuant to which Tyson was to participate in a boxing match (the "Fight") with Danny Williams ("Williams") in Louisville, Kentucky on July 30, 2004. Mar. 23 Trial Tr. at 34 and Exhibit P-33.[2]

---

[1] Defendant MarineTrack Holdings PLC ("MarineTrack") was also represented by K&L Gates LLP. At the beginning of the trial, counsel advised the Court that MarineTrack was being administered under the Companies Act in the United Kingdom and that, accordingly, all parties had stipulated to MarineTrack's dismissal from the case, with all parties to bear their own fees.

[2] References to "Exhibit P-__" are to Plaintiff's trial exhibits. References to "Exhibit SO-__" are to the Kentucky Defendants' trial exhibits. References to Exhibit UK-__" are to the UK Defendants' trial exhibits. References to trial transcripts are referred to by the trial date and transcript page; *e.g.*, Mar. 23 Trial Tr. at ___. References to
(continued)

2.    Pursuant to the Event Agreement, Tyson was to receive compensation in the total amount of $7.2 million. *Id.* That compensation was composed of an initial training advance in the amount of $225,000 and remaining payments in the amount of $6,975,000. Mar. 23 Trial Tr. at 35.

3.    The Event Agreement obligated Straight-Out to post two letters of credit for the remaining payments; one letter of credit in the amount of $5,000,000 was due within a few days of signature of the Event Agreement, and an additional letter of credit (the "Additional Letter of Credit") in the amount of $1,975,000 was to be posted a week before the Fight. *Id.*

4.    Although the $5,000,000 letter of credit was timely posted, the Additional Letter of Credit was not posted by Straight-Out. *Id.* at 36.

5.    In the week prior to the Fight, an agreement was reached whereby $75,000 of the outstanding $1,975,000 would be paid to Tyson in tickets. *Id.* at 37.

6.    Subsequent to the Fight, Tyson drew down on the $5,000,000 letter of credit that had been posted by Straight-Out. *Id.* at 36.

7.    Tyson is still owed $1,900,000 by Straight-Out, and has not collected it from Straight-Out or any assignee of Straight-Out. *Id.* at 37, 38.

8.    Straight-Out does not dispute that Straight-Out owes Plaintiff $1,900,000.00. In sum, the Court finds that Straight-Out owes Plaintiff (on behalf of the MGT Trust and Tyson) $1,900,000.00.

---

(continued)
"Heath Tr." are to the deposition of Stephen Heath dated February 7, 2007, references to the "Abbey Tr." are to the transcript of the deposition of Peter Abbey dated February 8, 2007, and references to the "Gavin Simons Tr." are to the transcript of the deposition of Gavin Ronald Maurice Simons dated October 23, 2008.

9.      In addition, Straight-Out is obligated to pay prejudgment interest as discussed in the Conclusions of Law, below.

## B.      Straight-Out's Counterclaim

10.      In its counterclaim, Straight-Out asserts that the Event Agreement provides that the only consideration that Tyson was to receive from the Fight was the purse (the "Purse") set forth in the Event Agreement, and that Tyson breached the Event Agreement by receiving consideration from third parties relating to the Fight.

11.      Straight-Out has not proffered any evidence that demonstrates that Tyson collected any consideration relating to the Fight other than the Purse.

12.      The Court finds that Tyson did not breach the Event Agreement and that, accordingly, (i) Straight-Out is not entitled to damages from Tyson and (ii) Straight-Out is not entitled to offset any amounts against its obligations to Tyson.

## C.      Plaintiff's Claim Against Brearly for Breach of Contract

13.      On or about July 26, 2004, Straight-Out and Brearly signed the Notice of Irrevocable Authority and Assignment (the "Assignment"). Exhibits P-13, P-14.[3]  The Assignment was an acknowledgment by Brearly that it had unconditionally guaranteed to Straight-Out at least $2.7 million for the international distribution rights to the Fight.  In the Assignment, which was signed by Straight-Out and Brearly, Brearly acknowledged that pursuant to the Distribution Agreement, Straight-Out was "entitled to receive minimum guaranteed compensation of $2,700,000 as an advance against 45% of the Net Receipts Pursuant to the Assignment." *Id.*

---

[3] Other than the fact that Exhibit P-13 was not executed by Straight-Out, the Assignments contained in Exhibits P-13 and P-14 are identical.  Mar. 23 Trial Tr. at 74.

14. Specifically, in the Assignment, Straight-Out notified Brearly that it had irrevocably assigned the first $3,200,000 of the Distribution Revenue (as that term was defined in the Distribution Agreement) to Showtime and Tyson such that (i) Showtime would be entitled to receive from Brearly the first $1,300,000 of Distribution Revenue without setoff or deduction on or before August 30, 2004, and (ii) Tyson would be entitled to receive the next $1,900,000 of the Distribution Revenue.

15. The Assignment constitutes an obligation that Brearly pay $1,900,000 to Tyson. Specifically, Paragraph 1(b) of the Assignment provides:

> Thereafter, Tyson shall be entitled to receive and Brearly is *hereby irrevocably authorized and directed to pay to Tyson the next $1,900,000 of the Distribution Revenue.* Such payment to Tyson shall be in lieu of payment of such amount to Straight-Out. Notwithstanding anything in this Notice, Brearly shall pay Tyson in connection with the Bout $1,400,000 (subject to the provisions of Paragraph 2 below) on or before August 30, 2004.

Exhibits P-13, P-14 (emphasis added).

16. Paragraph 2 of the Assignment provides:

> Notwithstanding the foregoing, the parties acknowledge that Brearly shall be entitled to recoup the following expenses (collectively, the "Recoupable Expenses"): (i) the sum of $110,000 for Brearly's production and satellite costs relating to the international television feed for the Bout, and (ii) sales commissions actually paid to Chester English in connection with international sales completed by English, not to exceed $80,000. The parties acknowledge that Brearly shall be entitled to recoup the Recoupable Expenses from the revenues received by Brearly in connection with the Bout prior to making any payments pursuant to Paragraphs 1(a) and 1(b) above, and the sums to be paid to the parties pursuant to Paragraphs 1(a) and 1(b) above shall be reduced in the aggregate by the amount of the previously unrecouped Recoupable Expenses in the event that the Distribution Revenues are less than $2,700,000 as of August 30, 2004.

*Id.*

17.    Thus, pursuant to the Assignment, the maximum recoupable expenses (the "Maximum Recoupable Expenses") that Brearly was entitled to offset from its payment to Tyson was $190,000, which represented $110,000.00 in production and satellite costs and up to $80,000 in commission fees payable to Chester English. *Id.*

18.    Under the Assignment, in no event was Tyson to receive less than $1,400,000. Further, pursuant to the agreement between Straight-Out and Brearly with respect to international distribution rights to the Fight, in the event that after paying Straight-Out the minimum guaranteed amount of $2,700,000, Brearly recouped amounts above that guaranteed amount, such overages would be split forty-five percent forty-five percent between Brearly and Straight-Out. In the Assignment, Straight-Out instructed Brearly that any such overages would be paid directly to Tyson until he was paid the full $1,900,000 he was owed by Straight-Out. *Id.* Mar. 23 Trial Tr. at 78-79.

19.    By the Assignment, Straight-Out assigned, among other things, its right to receive from Brearly certain payments due under the Distribution Agreements and all rights pertaining to those payments to Tyson.

20.    Although the Fight took place on July 30, 2004, Brearly has not paid anything to Tyson. Mar. 23 Trial Tr. at 79.

21.    Brearly failed to pay Tyson the amount to which he was entitled pursuant to the Assignment.

22.    Brearly failed to participate in this Action and proffered no evidence regarding the total amounts it received in connection with the distribution rights to the Fight or

the actual amount of the Maximum Recoupable Expenses. In light of this failure to present any

defense, this Court finds that Brearly owes Tyson $1,900,000.[4]

**D.     Plaintiff's Claim Against Brearly for Unjust Enrichment**

      23.    As described in detail in paragraphs ¶ 13-19, above on or about July 26,

2004, in the Assignment, Brearly acknowledged that it had entered into an agreement regarding

the international distribution rights for the Fight. In the Assignment, which Brearly signed,

Exhibits P-13, P-14, Brearly similarly acknowledged (i) that it had given Straight-Out a

guaranteed payment of at least $2,700,000 for those rights, and (ii) that it would remit to Tyson

directly the next $1,900,000 of Distribution Revenue as on that term is defined in the

Assignment. *Id.*

      24.    Brearly has unjustly retained those funds to the detriment of Tyson.

      25.    As set forth in paragraph 22, above, Brearly did not participate in trial of

this Action and did not proffer any evidence that it owes Tyson any amount less than

$1,900,000. Accordingly, this Court finds that Brearly owes Plaintiff $1,900,000 plus

prejudgment interest.[5]

**E.     Plaintiff's Claim for Fraud Against Warren and Simons**

      26.    As set forth in paragraphs 28-30 of the Conclusions of Law, under

Kentucky law, which applies here, one can commit fraud through affirmative misrepresentations

or failures to disclose. This Court finds that as set forth below, Warren and Simons and their

---

[4] Should the Court disagree with this analysis, it should find that Brearly owes Tyson between $1,210,000 ($1,400,000, the lowest guaranteed amount, less the Maximum Recoupable Expenses of $190,000) and $1,710,000 ($1,900,000, the highest assigned amount, less the Maximum Recoupable Expenses of $190,000).

[5] Should the Court disagree with this analysis, it should find that Brearly owes Tyson between $1,210,000 ($1,400,000, the lowest guaranteed amount, less the Maximum Recoupable Expenses of $190,000) and $1,710,000 ($1,900,000, the highest assigned amount, less the Maximum Recoupable Expenses of $190,000).

representatives committed fraud in both these ways and that Tyson completed the Fight in reliance upon such misrepresentations and failures to disclose.

27.    This Court finds that Warren and Simons defrauded Tyson. Warren and Simons wanted Tyson's Fight with Williams, Warren's boxer, to go forward because a potential Williams victory against Tyson would greatly advance Williams, and thus Warren, and because they wanted to afford Warren's company, Sports Network, the opportunity to sell the profitable United Kingdom distribution rights to British Sky Broadcasting ("Sky") with whom, as described in paragraphs 95-98 below, Warren had a longstanding business relationship.

28.    In order to effectuate these goals, Warren and Simons (1) made affirmative misrepresentations to the Tyson camp that Brearly was a Sports Network company and that all proceeds from international distribution rights to the Fight would pass through Brearly, (2) failed to make the disclosures necessary to keep numerous communications about Brearly's identity from being misleading, and (3) failed to disclose that Brearly was not a Sports Network entity when that information was critical to Tyson's agreement to complete the Fight and that information was solely within the knowledge of Warren and Simons. As set forth in paragraphs 28-30 of the Conclusions of Law, each of these categories of actions or inactions forms the basis of a claim for fraud. The Court finds factually that, as described below, each of these bases exists as follows:

### 1.    Factual Backdrop to the Fraud

29.    After it became clear, shortly before the Fight, that Straight-Out did not put up the Additional Letter of Credit, Tyson's counsel, Stephen Espinoza ("Espinoza") advised all relevant parties, including Sports Network's representatives, that Tyson would not agree to fight for less than the full amount that he had been promised in the Event Agreement and that

the parties therefore needed to immediately put in place a structure that would guarantee payment in full. Mar. 23 Trial Tr. at 40, 48-49. Negotiations then ensued as to an alternative arrangement that would permit the Fight to go forward. *Id.* at 43.

30. The initial suggestion was for Tyson and Straight-Out to get revenues directly from Sky, the United Kingdom broadcaster of the Fight. *Id.* Ultimately, after Sky refused to agree to an assignment of its revenues, the agreement turned into an assignment of revenues from the international distribution of the Fight pursuant to the Assignment. *Id.* at 43-44.

31. Both prior to and during the negotiations relating to the Assignment, Warren, Simons and their representatives made numerous misrepresentations and failed to disclose material facts on numerous occasions.

## 2. **Affirmative Misrepresentations**

32. As set forth in paragraph 28 of the Conclusions of Law, under Kentucky law, affirmative misrepresentations form the basis for a claim for fraud. This Court finds factually that Warren, Simons, and Stephen Heath ("Heath"), their representative, made material affirmative misrepresentations upon which Tyson and his representatives relied to their detriment.

33. At the time of the Fight and the negotiations that led up to it, Heath was in house counsel for Sports Network and performed the legal work relating to the provision of services agreement between Sports Network and Straight-Out pursuant to which Williams appeared at the Fight. Heath Tr. at 11, 39-40. From April 2002, through his departure from Sports Network, Heath reported to Warren and Simons. *Id.* 11-12. "99 percent of the time . . . in relation to Sports Network, [Heath] would be acting on the instructions of Ed Simons." *Id.* at

9

22. Simons, in turn, could not take action on behalf of Sports Network without Warren's approval. Mar. 25 Trial Tr. at 136-138. Thus, all communications made by Heath to Tyson's representatives were authorized by both Warren and Simons.

34.    In addition, at all relevant times, Espinoza understood Heath to be representing Brearly and all entities on the Sports Network side, including Warren and Simons. Mar. 23 Trial Tr. at 46. Indeed, Espinoza understood that nobody did anything on behalf of Sports Network without Warren authorizing it, Mar. 23 Trial Tr. at 93-94, and that nobody could have conducted the negotiations on behalf of Sports Network (and made the misrepresentations) that took place in the week before the Fight without Warren's approval. *Id.* at 94.

35.    During negotiations leading up to the execution of the Assignment and Tyson's determination to go forward with the Fight, Heath made multiple misrepresentations to Tysons's representatives on behalf of Warren and Simons.

36.    The misleading representations that he made included the following:

- that all international revenues relating to the Fight were being funneled through Brearly, *Id.* at 50-51;

- that Brearly would pay the $2.7 million dollars agreed to in the Distribution Agreement and acknowledged in the Assignment, *Id.* at 94;

- that Brearly was a Sports Network entity, *Id.* at 43, 94;

- that the only reason the foreign distribution rights relating to the Fight were being passed through Brearly was for tax purposes, *Id.* at 44-45, 94-95; and

- that Brearly had been used by Sports Network for these purposes before, Mar. 23 Trial Tr. at 94-95.

37.    Had Tyson known that all of these representations were untrue, he would not have fought. *Id.*

3.    **Failures to Disclose**

38.    As set forth in paragraphs 29-30 of the Conclusions of Law, fraud can be based upon a failure to disclose where (1) a party chooses to make a representation and then keeps secret information needed to make the representation accurate, or (2) where one party to a contract has superior knowledge and is relied upon to disclose that information.

39.    This Court finds factually that Warren and Simons, directly and through Heath, their representative, also defrauded Tyson by failing to disclose information sufficient to make its representations accurate in both of these ways.

40.    Heath, with the approval of Warren and Simons,[6] made it appear that Brearly was part of Sports Network without doing anything to clarify that, in fact, this was not the case. Thus, on multiple occasions, Heath made communications on behalf of Brearly that were made on Sports Network stationery or from his Frank Warren and Sports Network email addresses. *See, e.g.*, Exhibits P-3, P-9, UK-27, UK-33 UK-52, UK-57, UK-60. Indeed, Heath specifically instructed Espinoza to "please send future emails to stephenheath@frankwarran.tv, Exhibit P-11, and he faxed the signed Assignment to representatives of Tyson, Webb and Showtime from Sports Network on a Sports Network facsimile coversheet that bore the legend "A partnership between Frank Warren & Sports & Leisure Boxing Ltd." Exhibit P-13. This Court finds that these communications were fraudulent as Warren and Simons did nothing to correct the misimpression that Brearly and Straight-Out were one and the same that was occasioned by these communications.

---

[6] *See* ¶33, above (Heath acted on instructions of Simons; Simons could not take action without Warren's approval).

41.    In a similar vein, Heath made it explicit in an email that Brearly's consent

to the Assignment was inextricably linked to Straight-Out's compliance with its obligations to

Danny Williams:

> Furthermore in the conference call it was made quite clear that
> consent is conditioned on Straight Out making available the fee
> of $350,000 for Danny Williams participation in the bout.
> Straight Out are [sic] already in breach as the signing fee has not
> been paid. If it is not paid in clear funds prior to the Bout the
> assignment is to have no effect. Please insert words to this effect
> in the Notice.

Exhibit P-11.

42.    On the basis of this duel representation, Espinoza understood that

consistent with Heath's explicit representations to him, Brearly was a Sports Network entity and

that Brearly and Sports Network were "essentially the same party." Mar. 23 Trial Tr. at 48, 69.

Here, too, Defendants did nothing to correct this misimpression.

43.    Similarly, in a telephone conversation concerning the Assignment that

took place two days before the Fight in which Simons and Warren also participated, and in

which Heath made representations about Brearly's obligation to pay the $2.7 million guarantee,

Mar. 24 Trial Tr. at 175, Heath continued to act on behalf of both Sports Network and Brearly.

Mar. 23 Trial Tr. at 69-70. At no time on that call, did either Simons or Warren say that they

and Sports Network had nothing to do with Brearly or Brearly's guarantee obligations.

44.    In the week prior to the Fight, Espinoza, on behalf of Tyson, had twenty to

thirty conversations with Heath. *Id.* at 48. At no time during the course of those conversations

did Heath ever tell Espinoza that Brearly had nothing to do with Frank Warren and Sports

Network. *Id.* at 49. As set forth in paragraph 30 of the Conclusions of Law, in light of their

superior knowledge, Warren and Simons had a duty to disclose that Brearly was not part of

Sports Network, was nothing more than a shell, and, except for potential proceeds from the

12

Fight, did not have the wherewithal to pay Tyson the amounts it had guaranteed in the Assignment.

### 4. **Tyson Relied to His Detriment**

45.     This Court finds that Tyson relied to his detriment on defendants' misrepresentations and failures to disclose.

46.     First, Tyson would not have fought if he had known that Brearly had no ability to honor its obligations. Mar. 23 Trial Tr. at 92-93. This was communicated by Espinoza to Heath, Warren and Simons. *Id.* at 93.

47.     The fact that Brearly was a Warren entity was critical to Tyson and his representatives. Tyson would otherwise not have accepted the assignment of proceeds owed by Brearly and agreed to fight. *Id.* at 73-74. In addition, had Tyson and his representatives known that Brearly was separate from Sports Network, they would have conducted due diligence regarding the company, would have found out that Brearly was a shell company, would have immediately rejected Brearly's guarantee, and Tyson would not have fought in the Fight. *Id.* at 86. Had Espinoza had known in the week prior to Fight that Brearly was, in fact, a shell corporation with no assets, little if any activity and no officers, than he would not have accepted the Assignment as security for Straight-out's obligations to Tyson. *Id.* at 73.

48.     Warren, Simons, and Heath knew that Tyson would not participate in the Fight without a guarantee that he would be paid the full amount of the Purse. *Id.* at 40, 48-49. In order to induce Tyson to Fight, they did nothing to correct the misapprehensions about the ownership and solvency of Brearly and the misapprehension that Sports Network and Warren stood behind Brearly occasioned by the letterhead and email addresses on which Heath, their

representative communicated. Had they done so, Tyson would not have participated in the Fight.

### 5.    **Defendants' Post-Fight Actions Are Further Evidence of Their Fraud**

49.    As set forth in paragraph 31 of the Conclusions of Law, cover-up efforts as well as a general indifference to truth can constitute evidence of fraud. This Court finds further evidence of the fraud perpetrated by Warren, Simons, and their representatives in their actions after the Fight as they attempted to cover up their involvement in the Brearly debacle and to further shelter Warren from the obligations they had foisted upon Brearly to the detriment of Tyson.

50.    In August 2004, Straight-Out commenced a lawsuit against Sports Network and a lawsuit against Brearly, each in Federal District Court for the Western District of Kentucky. Mar. 25 Trial Tr. at 118-122 and Exhibits UK-77 and UK-78. Warren and Simons attempted to cover up the fraud they perpetrated against Tyson by causing Judd Burstein ("Burstein"), the same counsel who defended Sports Network in the proceeding against it, to also defend Brearly in the action that was brought against it. Mar. 25 Trial Tr. at 123-124, 128-129. Warren was never asked by Burstein or any of his representatives to sign a conflict waiver so that Burstein could also represent Brearly, Mar. 25 Trial Tr. at 129, and the UK Defendants have not proffered any other evidence that a waiver was signed.

51.    This Court finds that Warren's and Simon's cover-up efforts continued in this Action. An answer (the "Brearly Answer"), dated October 7, 2005, was filed in this Action on behalf of Brearly, [Docket No. 14], just one day after the initial answer (the "Initial Warren Answer") filed by Warren in this Action. [Docket No. 10]. The Brearly Answer generally tracks the language of the Initial Warren Answer. There is no evidence of the identity of the

person who prepared the Brearly answer or who caused it to be filed with this Court. This Court finds on basis of the similarity between the Initial Warren Answer and the Brearly Answer that there is sufficient evidence from which to draw the inference that the UK Defendants caused or assisted in the preparation and filing of the Brearly Answer in a further effort to perpetuate their fraud and shield Warren from liability.

52.    Finally, evidence of the fraud perpetuated by Warrens and Simons and their attempts to cover up that fraud can be found in the fact that Warrens and Simons both lied in their sworn testimony before this Court.

53.    Warren lied when he testified that he learned from Simons that Brearly had acquired from Straight-Out the international broadcast rights to the Fight and that he knew nothing else about how Brearly got those rights. Mar. 25 Trial Tr. at 147-148.

54.    Warren's claim that he knew nothing about how Brearly obtained the foreign distribution right to the fight is not supported by the evidence before this Court. Warren testified that because of his relationship with Sky, Sky would necessarily have to have been the UK broadcaster for any fight involving Williams (or any of the boxers for whom Warren was the promoter). *Id.* at 69. Thus, it is not credible that Warren would have given no thought to the international distribution of the Fight until such time as Simons approached him about selling the UK rights to Sky.

55.    Moreover, Simons admitted Warren "is Sports Network," Mar. 26 Trial Tr. at 17, 127, and that he could take no action on behalf of Sports Network without Warren's approval, Mar. 25 Trial Tr. at 136-138. It is therefore also not credible that Simons could have used Sports Network's personnel and resources for Brearly's benefit, as described in paragraphs 75-81 below, without Warren's knowledge.

56.     Warren also lied when he testified before this Court that in 2004, he wanted nothing to do with Tyson, Mar. 25 Trial Tr. at 163. The evidence put forth before this Court is to the contrary and demonstrates that Warren was quite involved with Tyson. Specifically:

- Warren provided a fighter to fight against Tyson in the Fight;

- Sports Network, Warren's company, obtained the UK broadcast rights to the Fight from Brearly;

- Sports Network licensed those rights to Sky;

- Heath, Sports Network's counsel did legal work for Brearly in connection with the Fight;

- Simons, Warren's partner, acted on behalf of Brearly in connection with the Fight.

*Id.* at 163-164.

57.     This Court finds that Simons also lied in his testimony. In an apparent effort to imply that his actions on behalf of Sports Network were not authorized by that entity, he denied both that he was Warren's partner, Mar. 26 Trial Tr. at 6, and that he had acted as Chief Executive Officer of Sports Network since 2002. *Id.* at 89. In light of the evidence put forth before this Court which is described below, this, too, is simply not credible.

58.     In a letter that Warren wrote to his staff in March 2002 to advise them of the partnership between himself and Sports & Leisure Boxing, Warren stated:

> I have for some time been looking for a suitable partner who can take the business forward and who could take some of the burden of running the business away from me, leaving me free to promote the business and our boxers in the best way possible. I believe I have found that *suitable partner in Ed Simons* and his company . . . I shall retain the major stake in the business and will continue to have overall control over its affairs."

Exhibit P-32; Mar. 25 Trial Tr. at 132-33 (emphasis added).

59.    Similarly, Warren's own testimony and the exhibits before this Court make clear that Simons was Sports Network's CEO. *Id.* at 133-34; Exhibit P-29 at 8.

60.    In sum, this Court finds further evidence of fraud in the false testimony before this Court by Warren and Simons as they continued to attempt to shield Warren and Sports Network from liability.

61.    This Court finds that Tyson was damaged in the amount of $1.9 million, plus prejudgment interest, as a result of the fraud perpetrated on him by Warren and Simons.

62.    In addition, because of the fraud perpetrated upon Tyson by Warren and Simons, Plaintiff is entitled to punitive damages.

## F.    **Warren and Simons are Brearly's Alter Egos**

63.    This Court finds factually that, as described below, Warren and Simons used Brearly to their own advantage and the advantage of Warren's company, Sports Network, in disregard of the corporate form and to the detriment of Plaintiff and that Brearly is the alter ego of Warren and Simons.

64.    Brearly was formed as a shell to be used to invest in other companies. Abbey Tr. at 9. It was an off-the-shelf Gibralter corporation. Abbey is Brearly's sole shareholder. Mar. 26 Trial Tr. at 99-100; Abbey Tr. at 9. Brearly has minimal capitalization; its only officers are Abbey and a corporate officer at the Gibraltar law firm of Marrache & Co., and it has no bank account. Abbey Tr. at 11-12. Brearly has no offices, employees, accountants, or staff, and has filed no tax returns. Mar. 26 Trial Tr. at 99, Heath Tr. at 23-24, Abbey Tr. at 21.

65.    In effect, Warren was Sports Network. As to Simons, Warren's partner put it: "It's really one and the same. Frank Warren is Sports Network." Mar. 26 Trial Tr. at 17. *See also Id.* at 127 (same).

66.     Gavin Simons, Sport Network's Chief Financial Officer, confirmed that at all relevant times, Warren controlled Sports Network:

> Q:     So during the whole time you were associated with the Sports Network entities, Frank Warren had overall control of those entities – is that correct?
> A:     That's correct.

Gavin Simons Tr. at 24.

67.     As of April 2002, Simons was the chief executive officer of Sports Network and he reported to Warren as the managing partner. Exhibit P-29 at 8, Mar. 25 Trial Tr. at 133-34.

68.     At trial, Warren and Simons both attempted to downplay Simon's managerial role in Sports Network, *see, e.g.*, Mar. 25 Trial Tr. at 71; however in light of the evidence discussed in the previous paragraph, this is simply not credible.

69.     Further, although Simons had a managerial role is Sports Network, he did not act on its behalf without Warren's approval. While Sports Network was a partnership between Warren and Sports & Leisure Boxing, Simons

- was not allowed to make decisions for that partnership without consulting Sports Network's management board;

- was not allowed to make decisions for Sports Network without consulting Warren;

- took action on behalf of Sports Network only after receiving authority from Warren;

- could not bind Sports Network without Warren (only Warren could bind the partnership).

*Id.* at 136-138.

70.     Thus, this Court finds that at all relevant times, Simons was a manager of Sports Network and authorized to act on its (and thus, Warren's) behalf.

71.     Evidence that Brearly is the alter ego of Warren and Simons can be found in the actions taken by Simons, Sports Network's Chief Executive Officer on Brearly's behalf.[7]

72.     Simons was not a shareholder, officer, employee or paid consultant of Brearly, and he never received any compensation for his services to Brearly. Mar. 26 Trial Tr. at 129-130. Notwithstanding this, Simons, Sports Network's Chief Executive Officer, *see* Exhibit P-29 at 8, directed all actions on behalf of Brearly and freely helped himself to Sports Network's resources in doing so. Among other things he:

- Kept the account records on behalf of Brearly. Abbey Tr. at 24.

- Was responsible for collecting revenues and paying out expenses. *Id.*

- Negotiated the Distribution Agreement on Brearly's behalf. Mar. 26 Trial Tr. at 102.

- Kept all accounting records for Brearly with respect to the Fight. Abbey Tr. at 17:16-17:15.

- Simons approved the licensing deals put into place on behalf of Brearly. *Id.* at 107.

- Requested, on behalf of Brearly, that Warren handle the sale of the UK distribution rights for the Fight to Sky. Mar. 26 Trial Tr. at 128.

73.     Similarly, Simons, himself, sold distribution rights for the Fight in Scandinavia and the Ukraine on behalf of Brearly. Mar. 24 Trial Tr. at 56-59. 61; Mar. 26 Trial Tr. at 51 and UK Defendants Exhs. 65, 129.

74.     In negotiating the Scandinavian license, Simons attempted to capitalize on Sports Networks relationships with the licensors. Mar. 26 Trial Tr. at 51, 57. Simons does not recall telling the Scandinavian licensee that Brearly had nothing to do with Sports Network or, indeed, anything that would make the Scandinavian licenses understand that Brearly and Sports

---

[7] As discussed above at paragraph 69, Simons could take no actions without Warren's approval.

Network were not related. *Id.* at 86. Simons also negotiated with the licensee for the former

USSR territories because in his capacity of trying to expand Sports Network's role in those

territories, he already had a relationship with that licensee. *Id.* at 87-88.

75.     Simons also freely used SNL's personnel and consultants for Brearly,

including David McConachie ("McConachie") and Stephen Heath.

76.     McConachie was involved in selling television rights for Sports Network's

boxing matches from 1994 to 2005. Mar. 24 Trial Tr. at 13-14. The actions of and relating to

McConachie in connection with Brearly is further evidence that Brearly is the UK Defendants,

alter ego.

77.     Simons intended that McConachie would get involved in licensing the

foreign sales for the Fight. Mar. 26 Trial Tr. at 21-22. He asked McConachie if he would be

interested in selling Brearly's international television rights to the Fight. Mar. 24 Trial Tr. at 15,

67. At the time that Simons made that inquiry, McConachie had his own company but still

represented Sports Network with respect to the television rights for its events. *Id.* at 22.

78.     McConachie understood Simons to be Warren's partner in Sports

Network, *Id.* at 65-66, and he "took it on faith" that Simons could act for Brearly. *Id.* at 25.

79.     McConachie prepared the invoices rendered on behalf of Brearly with

respect to international distribution of the Fight. *Id.* at 39 and Exhibit UK-132. Simons

authorized McConachie to prepare those invoices on letterhead with Brearly at the top. Mar. 24

Trial Tr. at 40 and Exhibit UK-132. McConachie made reports to Simons of his sales regarding

the international distribution rights to the Fight. Mar. 24 Trial Tr. at 54, 59, 71. The only

person purporting to act on behalf of Brearly with whom McConachie had discussions was

Simons. *Id.* at 59, 69.

80.    McConachie agreed that in consideration for his efforts, he would receive from Brearly fifteen percent of the gross revenues of his sales. *Id.* at 69. Simons negotiated the terms of this agreement on Brearly's behalf. *Id.* McConachie trusted Simons because he had worked with him in the past, was still working with him at Sports Network and because Sports Network always paid McConachie the monies that it owed to him. *Id.* at 69-70. McConachie received part of the fifteen percent commissions on sales to which he was entitled from Brearly. *Id.* at 27-28.

81.    Similarly, on behalf of Brearly, Simons made generous use of the services of Heath, Sports Network's in-house attorney, in connection with the Fight although Heath was not employed by Brearly. Heath Tr. at 17.

82.    As noted above in paragraphs 65 and 69, Warren controlled Sports Network, and Simons did not take action on behalf of Sports Network without Warren's approval. On that basis, this Court infers that Warren approved of the use of his company's resources for the benefit of Brearly and as part of his efforts to shield himself and Sports Network from any obligation to Tyson in connection with the Fight.

83.    Heath received all instructions with respect to that work from Simons. Heath Tr. at 17, 25. Simons authorized and instructed Heath to perform work on behalf of Brearly with respect to the negotiation of the distribution of foreign licensing rights to the Fight, Mar. 26 Trial Tr. at 88, 129, and Abbey, Brearly's incorporator, never authorized Heath to do so; he confirmed that Simons provided all instructions to Heath with respect to Brearly. Abbey Tr. at 28. Simons held himself out to Heath as the party authorized to be the voice of Brearly with respect to documentation of Brearly's purchase of the international distribution rights for the Fight, Heath Tr. at 22, and Heath understood that Simons was negotiating directly with

Webb on behalf of Brearly. *Id.* at 44 -45. Heath did not receive instruction from any party other than Simons in connection with documentation of Brearly's distribution agreement with Straight-Out. *Id.* at 75-76.

84.     According to Heath, he was directed by Simons to perform work for Brearly in his capacity as in house counsel for Sports Network. *Id.* at 19. Heath believed that he was being instructed by Simons regarding Brearly "in [his] capacity as in-house counsel for Sports Network." *Id.* at 7. Simons never explained to Heath what his role was with respect to Brearly; he never explained to Heath what Brearly was, and he never explained to Heath who owned Brearly. *Id.* at 19.

85.     Further, in instructing Heath with respect to the transactions related to the Fight, Simons made no distinction between Brearly and Sports & Leisure Boxing. Thus, Simons initially instructed Heath that Sports & Leisure Boxing would be acquiring the worldwide broadcasting rights for the fight, *Id.* at 30 -31, and subsequently instructed Heath that the acquiring entity would, instead, be Brearly. *Id.* at 31-32.

86.     Heath's own actions in connection with the Fight further demonstrate that he saw no distinction between Brearly and Warren, Simons, and Warren's company, Sports Network, and that in his dealings with Tyson and the Kentucky Defendants, he held them out as one and the same.

87.     During the time that Heath represented Brearly, he was paid by Sports Network. Mar. 26 Trial Tr. at 91. Brearly  did not pay Heath for the work he did on its behalf nor did it reimburse Sports Network for that work. *Id.* at 97-98.

88.     Notwithstanding this, Heath took countless actions on Brearly's behalf in connection with the Fight. For example, on behalf of Brearly, Heath sent copies of agreements regarding distribution of the Fight in various countries to Webb. Exhibit P-9.

89.     As described in detail in paragraph 40-41, above, whenever Heath communicated on behalf of Brearly, he did so using Sports Network or Frank Warren letterhead and email addresses.

90.     Indeed, everything that Tyson's representatives saw pertaining to Brearly came from Sports Network including facsimile coversheets and return phone numbers with Sports Network's contact information. Mar. 23 Trial Tr. at 72. Espinoza never received any facsimile or correspondence from Brearly on Brearly fax cover sheets or stationery. *Id.* at 75-76. The fact that Heath used those addresses confirmed to Espinoza that Brearly was a Sports Network entity and that "all those entities were all sort of interchangeable, whether it's Sports Network or Frank Warren TV or Brearly. He was, you know, acting on sort of on behalf of them, altogether." Mar. 23 Trial Tr. at 60.

91.     Further evidence that Brearly was the alter ego of the UK Defendants and Sports Network can be found in the fact that Heath often represented Brearly and Sports Network at the same time.

92.     Thus, the initial written proposal sent by Stephen Heath to Webb linked distribution of foreign rights by Sports & Leisure with the entry into an agreement with Danny Williams. It provided:

> Upon Mike Tyson executing a binding contract to fight Danny Williams on 30th July in Louisville, Kentucky on a promotion of Louisville Production Inc (Metro) Sport and Leisure Boxing Limited (S&L) shall acquire the worldwide boxing rights for that contest and the undercard excluding the USA.

Exhibit P-3.

93.    Heath's emails make clear that from the perspective of the UK

Defendants, the interests of Brearly and Sports Network were one and the same:

> Brearly [sic] have made it clear to Straight Out that the guarantee
> of 2,700,000 is subject to the recoupment of the direct production
> costs that were to be met by Straight Out and which have been
> incurred by Brearly . . . Furthermore, the payment is subject to
> Straight Out rectifying its present breach in failing to make the
> payment of the signing fee in respect of the participation of
> Danny Williams in the Bout and Straight Out paying the full fee
> for the services of Danny Williams in the time frame set out in
> the documentation failing which those sums will have to be
> recouped from the Guarantee.

Mar. 23 Trial Tr. at 61-63, Exhibit P-11. *See also* paragraphs 40-41, above.

94.    On the basis of this duel representation, Espinoza understood that

consistent with Heath's explicit representations to him, Brearly was a Sports Network entity and

that Brearly and Sports Network were "essentially the same party." Mar. 23 Trial Tr. at 69.

95.    This Court finds that the circumstances surrounding the transfer of the

United Kingdom distribution rights for the Fight to Sky is also evidence that Brearly is the alter

ego of Warren and Simons.

96.    The agreement with respect to the British distribution of the Fight was

between Frank Warren, Sports & Leisure Boxing and Sky.  Exhibit P-7.

97.    In 2004, there was a contractual relationship between Warren and Sky

pursuant to which Warren was obligated to promote twenty-eight fights per year for the years

2003 through 2005, which Sky had the right to broadcast in the United Kingdom in return for

fixed monthly payments totaling over a million pounds sterling per year. Mar. 25 Trial Tr. at

68, 154 and Exh. P-29 at 21. In addition, Sky has the obligation to work through Sports Network

for the broadcast rights for any fighter under contract with Sports Network (like Williams was at

the time of the Fight). Mar. 25 Trial Tr. at 69.  Because of that relationship, in order for the

Fight to have been broadcast on the Sky network, Warren and Sports Network would necessarily have had to be involved in the transaction." *Id.*, Mar. 26 Trial Tr. at 7-8.

98.    As Warren put it, "[w]ithout me involved, those rights could not be sold to Sky because of the exclusivity agreement with Danny Williams." Mar. 25 Trial. Tr. at 194.

99.    According to Warren, in June or July 2004, he learned from Simons that Brearly had obtained the international distribution rights to the Fight, when Simons asked Warren if he could sell the British rights because of his relationship with Sky. *Id.* at 96-97. Had Brearly sold the rights to Sky directly, Warren would have informed Brearly that Sky could only have sold the rights through Sports Network because of his exclusive promotional agreement with Danny Williams. *Id.* at 100.

100.    The transfer of the UK rights from Brearly to Sports Network is further evidence of common control and of lack and of formality between Brearly and the UK Defendants.

101.    Warren negotiated on behalf of Sports Network for these rights, and Simons, Sports Network's chief executive officer, negotiated on behalf of Brearly. *Id.* at 149. There is no written agreement between Brearly and Sports Network for the UK distribution rights to the Fight. *Id.* In the course of those negotiations Warren never asked Simons what authority he had to negotiate on behalf of Brearly or what position he held with Brearly and he never worried that Simons' negotiation on behalf of Brearly against Sports Network was a conflict of interest. *Id.* at 151-152. Warren did not know why Simons was negotiating on behalf of Brearly. *Id.* at 152.

102.    In 2004, Warren received personally 1 million pounds sterling in consultancy fees from Sky. *Id.* at 154-55. Simons did not ask Warren to pay any of those funds to Brearly. *Id.* at 155.

103.    The total license revenue for the UK distribution rights to the Fight were 406,468.00 pounds sterling. Mar. 26 Trial Tr. at 71 and Exhibit UK-122. Sports Network collected the pay-per-view payments for the Fight but did not pay any of those funds to Brearly. Mar. 25 Trial Tr. at 159-160.

104.    Warren had personally guaranteed the outstanding amounts owed to Showtime in connection with the Fight. Mar. 25 Trial Tr. at 29; 103-106. Rather than paying Showtime out of his own funds -- or those of his company -- he, instead, took control of the proceeds to which Brearly was entitled for distribution of the Fight in the United Kingdom and caused Sports Network to pay all of the income it received from Sky to Showtime without any affirmative agreement from Brearly that this should be done. Mar. 25 Trial Tr. at 160-161.

105.    The conduct of defendants' representatives subsequent to the Fight is further evidence that Brearly is the alter ego of Simons and Warren.

106.    As discussed in detail above, the same counsel defended Warren's company, Sports Network, and Brearly in the respective suits brought against them by Straight-Out in Kentucky. *See* ¶50, above.

107.    Heath's performance of duties on behalf of Brearly continued after the Fight. Heath submitted a sworn statement to the Court in the lawsuit against Brearly in support of Brearly's motion to dismiss in the Kentucky litigation. Specifically, he swore in an affidavit that was filed with that Court that he was "an English solicitor who was instructed by Defendant Brearly (International) Limited to represent it in contract negotiations with Plaintiff, Straight-

Out Promotions, LLC, concerning the Distribution Agreement between Brearly and Straight-Out." Heath Tr. at 18:13-18:20 and Exhibit P-2. Again, Simons, who took no actions without Warren's approval, was the only person whoever instructed Heath in connection with these matters. *See* ¶33, above.

108.    Further as discussed above at paragraph 51, this Court finds that there is sufficient evidence from which to draw the inference that the UK Defendants caused or assisted in the preparation and filing of the Brearly Answer.

109.    That Warren engaged in a pattern of disregarding corporate formalities is clear. At the time that Sports Network was a partnership, Warren had a capital account at Sports Network. That account was overdrawn on occasion, and, as of June 30, 2004, the account was overdrawn by 416,721 pounds sterling. March 25 Trial Tr. at 138.

110.    Sports Network did not operate as an entity independent of Warren. Rather, Warren used Sports Network as his personal piggy bank. For example, as Gavin Simons Chief Financial Officer testified in June 2004, Warren's partnership account in Sports Network was overdrawn in the amount of 416,721 sterling because Warren had withdrawn more than his share of profit:

> Q:    Who authorized him to do that?
> A:    He was the majority shareholder, he didn't require any authorization. . . .
> Q:    So he simply could make withdrawals from the capital accounts whenever he wanted to?
> A:    At that time.
> Q:    He could make withdrawals from the capital account whenever he wanted to, even though those withdrawals would lead to his capital account being overdrawn – is that correct?
> A:    He could. The board of the plc, if my memory serves me correctly, wrote to him to say that this shouldn't continue and it must be corrected, but there was nothing to stop him doing it. There was nothing we could do to stop him doing it.

Gavin Simons Tr. at 19.

111.    Warren's disregard of the corporate form was his modus operandi.

Following proceedings (which concluded in 1996) brought by the Official Receiver in relation

to certain companies for which Warren was a director, he was disqualified from holding

company directorships for a period of seven years.  The Prospectus describes the allegations as

follows:

- he [Warren] failed to ensure that the companies of which he was a director filed accounts;

- he failed to ensure that the annual returns were filed;

- he failed to ensure that proper records were maintained and preserved.  A large volume of cash transactions were not adequately explained and petty cash slips and computer records were lost.  In some instances there were no cheque book stubs, cash books or records of expenditure and no bank statements could be provided;

- he failed to ensure that the VAT returns were filed, which subsequently led to the winding up of certain companies due to inability to meet the demands;

- one company, Redevelopment, was trading whilst insolvent;

- there was a preferred creditor payment made from one company to another; and

- there was a payment of nearly £200,000 made to Mr. Warren between the presentation of a winding upon petition and the appointment of administrative receivers, without any validation order."

Exhibit P-29 at 60.

112.    The Judge presiding over the receivership proceedings concluded that

those complaints *"demonstrated a serious disregard by Mr. Warren of his duties as a director*

*and therefore a disqualification period of seven years was appropriate in the case."  Id.*

(emphasis added).

113.    Prior to the Fight, Warren believed that a bout with Tyson could significantly advance Williams's interests and, consequently, those of Warren and the UK Defendants.  Mar. 25 Trial Tr. at 87.

114.    It is clear that a guarantee was necessary to induce Tyson to complete the Fight.  It is equally clear that it was important to Warren that the Fight go forward.  This Court infers from the evidence set forth above that Warren and Simons used Brearly to insulate Warren and Sports Network from any liability to Straight-Out or Tyson.

115.    As of July 2004, Sports Network was a profitable company.  In the Prospectus promulgated by Sports & Leisure Boxing on or about July 30, 2004, the chairman of that company stated that Sports & Leisure Boxing believed that the acquisition of Sports Network was

> an excellent opportunity for Sports & Leisure [because] Sports Network is a leading business in its market, *is cash positive, and is profitable*.  It made an operating profit of 1.6 million on turnover of £9.8 million in the year ended 31 December 2003.

Exhibit P-29 at 8 (emphasis added).  Thus, if Sports Network had incurred obligations in connection with the Fight, it would have had the wherewithal to satisfy them even if the proceeds from the Fight were insufficient.  This Court finds that Warren and Simons determined to shelter Sports Network and Warren from this potential outcome through the vehicle of Brearly.

116.    In sum, this Court finds that Brearly is a corporate shell that was used only as an instrumentality to further Warren's and Simons's goals of promoting Williams, gaining the British distribution rights, and shielding Warren and Sports Network from obligations to Tyson and Straight-Out.  Accordingly, this Court finds that Warren and Simons are jointly and severally liable to Plaintiff for Brearly's breach of the Distribution Agreement and Brearly's unjust enrichment.

117.  Any Finding of Fact that may qualify as a Conclusion of Law shall be equally considered as such.

## CONCLUSIONS OF LAW

### A.   Kentucky Law Applies to the Breach of Contract Claim Against the Kentucky Defendants

1.  Section 9.10 of the Event Agreement provides that the Agreement "shall be construed and interpreted in accordance with the laws of the Commonwealth of Kentucky without any regard to conflict of laws provisions." Exhibit P-33. A bankruptcy court hearing state-law claims that do not implicate significant federal policy must apply the choice-of-law rules of the forum state. *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 602 (2d Cir. 2001); *MCI Worldcom Comm. V. HSG/ATN (In re WorldCom, Inc.)*, 361 B.R. 697, 709 (S.D.N.Y. 2007). Choice-of-law provisions are valid and enforceable in New York. *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000); *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996). *See also Rahl v. Bande*, 328 B.R. 387, 401 (S.D.N.Y. 2005) ("[i]t is well-settled that where a choice of law provision is expressly set forth in an agreement, it is presumed to be the parties' intent and New York courts will enforce it."). Therefore, this Court will apply Kentucky law to the breach -of- contract claim relating to the Event Agreement.

### B.   Straight-Out Breached the Event Agreement

2.  To succeed on a claim for breach of contract under Kentucky law, a plaintiff must establish the following: (1) the existence of a valid contract; (2) breach of the contract; and (3) resulting damages or loss to the plaintiff. *Holley Performance Pro., Inc. v. Smith-CNC China Network Co.*, 2009 WL 1067307 (W.D. Ky. April 21, 2009); *Sudamax Industria e Comercio de Cigarros, Ltda v. Buttes & Ashes, Inc.*, 516 F. Supp. 2d 841, 845 (W.D.

Ky. 2007); *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007).

3.      To be valid, a "contract must contain definite and certain terms setting forth promises of performance to be rendered by each party." *Barnett*, 233 S.W.3d at 727. The terms of the contract must be clear and definite "so that the court can measure the damages in the event of its breach." *Quadrille Bus. Systems v. Kentucky Cattlemen's Assn*, 242 S.W.3d 359, 364 (Ky. App. 2007).

4.      In an action for breach of contract under Kentucky law, the measure of damages "is that sum which will put the injured party into the same position he would have been in had the contract been performed." *Barnett*, 233 S.W.3d at 727.

5.      Under the Event Agreement, Straight-Out was required to pay to Tyson the entire Purse of $7,200,000. Exhibit P-33. The evidence introduced at trial demonstrates that in breach of the Event Agreement, Straight-Out has failed to pay Tyson $1,900,000.00 and has no valid counterclaim pursuant to which it can offset its obligation. Accordingly, it must do so.

6.      As discussed below in paragraphs 40-45, Tyson is also entitled to prejudgment interest.

## C.      The Assignment of Straight-Out's Rights Under the Distribution Agreement Was Valid

7.      Under New York choice-of-law rules, the question of whether a contract is assignable typically is controlled by the law of the place where the contract is made and is to be performed. *Mogul v. Jenkins Bros.*, 120 N.Y.S.2d 585, 586 (N.Y. 1953); *Conopco, Inc. v. McCreadie*, 826 F. Supp. 855, 865 (D.N.J. 1993) ("the assignability of a right arising out of a contract is to be governed by the law which would govern the contract generally"); Restatement (Second) Conflict of Laws § 208 (1971) ("[w]hether, and under what conditions, a contractual

right, which is not embodied in a document, can be effectively assigned is determined by the local law of the state which has the most significant relationship to the contract and the parties with respect to the issue of assignability").

8.    New York law gives full effect to parties' choice-of-law provisions. *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996). "Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000); *MSF Holding Ltd. v. Fiduciary Trust Co. Int'l*, 435 F. Supp. 2d 285, 295 (S.D.N.Y. 2006) (enforcing choice-of-law provision and holding that selected state had sufficient contacts with the transaction where defendant was located in selected state and letter of credit in dispute was issued from selected state).

9.    If there is a choice-of-law clause in an assigned contract, the validity of the assignment will be determined under the law of the specified forum.  6A C.J.S. *Assignments* § 14. *See LaSala v. Needham & Co*, 399 F. Supp. 2d 421, 423 n.7 (S.D.N.Y. 2005) ("New York law applies to the Assigned Claims by virtue of a choice-of-law provision in the Underwriting Agreement that is at the heart of the claims."); *Farrell Lines Inc. v. Columbus Cello-Poly Corp.* 32 F. Supp. 2d 118, 126 (S.D.N.Y. 1997) (holding that, because subrogee stands in the shoes of the subrogor, subrogee was bound by forum selection clause in bill of lading to which subrogor was a party).

10.    This Court finds that under this analysis, to the extent that any of the unsigned distribution agreements, *see* Exhibits UK-13, UK-13, and UK-15, entered into evidence in this Action are held to govern the parties' obligations with respect to the foreign distribution rights for the Fight, such agreements all contain a Gibraltar choice-of-law provision,

and Gibraltar law would apply to the Assignment. To the extent those distribution agreements

are not held to govern the parties' obligations with respect to the foreign distribution rights for

the Fight, Kentucky law would apply as Kentucky had the most significant relationship to the

agreement to distribute the foreign rights as such agreement was largely negotiated in Kentucky

and the Fight that was the subject matter of the agreement took place in Kentucky.

        11.     Under New York's conflict-of-law approach, the "first step in any case is

to determine whether there is any actual conflict between the law of the jurisdictions involved."

*Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006) quoting *In re Allstate Ins. Co.*, 597

N.Y.S. 2d 904, 905 (N.Y. 1993); *Comprehensive Habilitation Services, Inc. v. Commerce

Funding Corp.*, 2009 *WL 935665 at * 10* (S.D.N.Y. Apr. 7, 2009) (same). As set forth below,

there is no significant conflict between Gibraltar and Kentucky law because under the law of

either jurisdiction, assignments of contract rights are generally valid.

        12.     The Gibraltar legal system is based upon the common law and statute law

of England. Section 2 of the English Law (Application) Act 1962-17 declares the extent to

which English law is in force in Gibraltar:

> (1) The common law and the rules of equity from time to time in
> force in England shall be in force in Gibraltar, so far as they may
> be applicable to the circumstances of Gibraltar and subject to
> such modifications thereto as such circumstances may require,
> save to the extent to which the common law or any rule of equity
> may from time to time be modified or excluded by–
>
> > (a) any Order of Her Majesty in Council which applies to
> > Gibraltar; or
> >
> > (b) any Act of the Parliament at Westminster which
> > applies to Gibraltar, whether by express provision or by
> > necessary implication; or
> >
> > (c) any Act.

> (2) In all causes or matters in which there is any conflict or
> variance between the common law and the rules of equity with
> reference to the same subject, the rules of equity shall prevail.

English Law (Application) Act 1962-17, § 2.

13.    The validity of an assignment of a legal right is governed by the statutory

law of Gibraltar.  Section 40 of the Contract and Tort Act 1960-04 provides that:

> Any absolute assignment by writing under the hand of the
> assignor (not purporting to be by way of charge only) of any debt
> or other legal thing in action, of which express notice in writing
> has been given to the debtor, trustee or other person from whom
> the assignor would have been entitled to claim such debt or thing
> in action, is effectual in law (subject to equities having priority
> over the right of the assignee) to pass and transfer from the date
> of such notice–
>
> > (a) the legal right to such debt or thing in action;
> >
> > (b) all legal and other remedies for the same; and
> >
> > (c) the power to give a good discharge for the same
> > without the concurrence of the assignor:
>
> Provided that, if debtor, trustee or other person liable in respect of
> such debt or thing in action has notice–
>
> > (a) that the assignment is disputed by the assignor or any
> > person claiming under him; or
> >
> > (b) of any other opposing or conflicting claims to such
> > debt or thing in action,
>
> he may, if he thinks fit, either call upon the persons making claim
> thereto to interplead concerning the same, or pay the debt or other
> thing in action into court under the provisions of the Trustee Act.

Contract and Tort Act 1960-04, § 40.

14.    Similarly, under Kentucky law, "a contract is generally assignable, unless

forbidden by public policy or the contract itself, or its provisions are such as to show that one of

the parties reposes a personal confidence in the other, which he would have been unwilling to

repose in any other person." *Managed Health Care Assoc.s, Inc. v. Kethan*, 209 F.3d 923, 928

(6th Cir. 2000) (quoting *Pulaski Stave Co. v. Miller's Creek Lumber Co.*, 128 S.W. 96, 101 (Ky. App. 1910)). A chose in action for failure to fulfill a contractual obligation is assignable under Kentucky law. *Terrell v. Western Casualty & Surety Co.*, 427 S.W.2d 825, 827 (Ky. App. 1968). A contractual right to receive a future stream of payments also is assignable. *Wentworth v. Jones*, 28 S.W.3d 309, 313 (Ky. App. 2000).

15.     No particular form is necessary to constitute an assignment. *Gibbons v. Tenneco, Inc.*, 710 F. Supp. 643, 648 (E.D. Ky. 1988); *Napier v. Duff*, 136 S.W.2d 1083, 1085 (Ky. App. 1939). "[A]ny language, however informal, if it shows the intention of the owner of a chose in action to transfer, so that it will become the property of the transferee, will amount to an equitable assignment." *Young v. Auxier*, 195 S.W.2d 295, 298 (Ky. App. 1946); *see also Roberts v. Powers*, 198 S.W.2d 58, 60 (Ky. App. 1946) ("valid assignment is made when the context of the assigning instrument shows the intention of the owner of a chose in action to transfer it to the transferee"). Under Kentucky law, an assignment need not be in writing; a parol assignment also is valid. *Napier*, 136 S.W.2d at 1085.

16.     This Court finds that under either Gibraltar or Kentucky law, the Assignment, which was executed by both Brearly and Straight-Out, is valid.

**D.     Plaintiff Is Entitled to a Default Judgment Against Brearly**

17.     On January 23, 2008, the Clerk of the Court entered a default against Brearly based upon its failure to answer the Amended Complaint. [Docket No. 95]. "A default constitutes admission as to liability; therefore, the effect of a [defendant's] default is that it is deemed to have admitted all of the well-pleaded allegations raised in the complaint pertaining to liability." *Montcalm Publishing Corp. v. Ryan*, 807 F. Supp. 975, 977 (S.D.N.Y. 1992). Upon a defendant's default, the court must accept all well-pleaded factual allegations of the complaint

as true, except those relating to damages. *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *Deshmukh v. Cook*, 630 F. Supp. 956, 959 (S.D.N.Y. 1986). The factual allegations in the complaint should be rejected as not well-pleaded only "in very narrow, exceptional circumstances." *Farberware, Inc. v. Groben*, 1991 WL 123964, *8 (S.D.N.Y. Jul 3, 1991) (quoting *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973)). Allegations that are contrary to facts of which the court will take judicial notice, or that are not susceptible of proof by legitimate evidence, or that are contrary to uncontroverted material in the file of the case are not well-pleaded allegations. *Id.*

18.    Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, made applicable here by Rule 7055 of the Federal Rules of Bankruptcy Procedure, where entry of default judgment by a court, rather than a clerk, is requested, the Court may determine the amount of damages for which the defaulting party is liable at the time of trial. *See, e.g., Cho v. Koam Medical Services P.C.*, 524 F. Supp. 2d 202, 205 (E.D.N.Y. 2007) (damages inquest against defaulting defendants taken against defaulting defendants at the same time as the bench trial against the defendant who had appeared).

E.    **Brearly Breached Its Obligations Under the Assignment**

19.    Both the well-pleaded allegations contained in the Amended Complaint, *see, e.g.*, Amended Complaint ¶¶ 35-38, 45-48, and the evidence at trial make clear that Brearly breached its obligations under the Assignment by, *inter alia*, failing to remit to Tyson funds that it had unconditionally guaranteed to pay under the Assignment. Accordingly, this Court finds that Brearly is liable to Tyson in the amount of $1,900,000 for its breach of its obligations to pay the amounts it had guaranteed to pay in the Assignment.

**F.     Kentucky Law Applies to the Unjust Enrichment Claim**

20.     To determine which state's substantive law applies to unjust enrichment claims, New York courts apply a "center of gravity" or "grouping of contacts" analysis. *Khreativity Unlimited v. Mattel, Inc.*, 101 F. Supp. 2d 177, 183 (S.D.N.Y. 2000). "New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *In re WorldCom*, 361 B.R. at 710; *see also In re Rezulin Products Liability Litigation*, 392 F. Supp. 2d 597, 618-619 (S.D.N.Y. 2005). Under this approach, courts may consider a number of factors, including: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter; and (5) the domicile or place of business of the contracting parties. *In re Grand Theft Auto Video Game Consumer Litigation*, 251 F.R.D. 139, 149 (S.D.N.Y. 2008). Because, as discussed in section C, above, Kentucky had the most significant relationship to the parties' agreement with respect to the foreign distribution rights to the Fight, Kentucky law applies to the claim for unjust enrichment.

**G.     Brearly Has Been Unjustly Enriched**

21.     Under Kentucky law, unjust enrichment is an equitable doctrine that is "applicable as a basis of restitution to prevent one person from keeping money or benefits belonging to another." *Haeberle v. St. Paul Fire & Marine Ins. Co.*, 769 S.W.2d 64, 67 (Ky. App. 1989). To succeed on a claim of unjust enrichment under Kentucky law, a plaintiff must establish the following: (1) a benefit conferred on the defendant at the plaintiff's expense; (2) a resulting appreciation of the benefit by the defendant; and (3) an inequitable retention of the benefit by the defendant without payment for its value. *Marcus & Millichap Real Estate*

*Investment Brokerage Co. v. Skeeters*, 395 F. Supp .2d 541, 557 (W.D. Ky. 2005); *Guarantee Electric Co. v. Big Rivers Electric Corp.*, 669 F. Supp. 1371, 1380-81 (W.D. Ky. 1987).

22.     The most significant element of proof is that the enrichment to the defendant is unjust. *Guarantee Electric Co.*, 669 F. Supp. at 1381; *Dirt & Rock Rentals, Inc. v. Irwin & Powell Constr., Inc.*, 838 S.W.2d 412, 414 (Ky. App. 1992).

23.     As was the case with respect to Plaintiff's claim against Brearly for breach of the Distribution Agreement, here too, both the well-pleaded allegations of the Amended Complaint, *see, e.g.*, Amended Complaint ¶¶ 35-38 and 49-52, and the evidence introduced by Plaintiff at trial establish as a matter of law that Brearly was unjustly enriched at Tyson's expense as result of it failing to remit to Tyson the monies it obtained in connection with the Fight. Accordingly, this Court finds that Brearly is liable to Tyson in the amount of $1,900,000 for its breach of its obligations to pay for the international distribution rights to the Fight.

**H.     Kentucky Law Applies to Plaintiff's Fraud Claim**

24.     To determine which state's substantive law applies to tort claims, New York courts apply an "interest analysis" that requires application of the law of the jurisdiction having the greatest interest in the litigation. *Krock v. Lipsay*, 97 F.3d at 640; *Globe Comm. Corp. v. R.C.S. Rizzoli Periodici, S.p.A.*, 729 F. Supp. 973, 975-976 (S.D.N.Y. 1990); *Shultz v. Boy Scouts of America, Inc.*, 491 N.Y.S.2d 90, 95 (N.Y. App. 1985). Under this approach, the court considers: (1) what the significant contacts are and in which jurisdiction they are located and (2) whether the purpose of the law is to regulate conduct or allocate loss. *Devore v. Pfizer Inc.*, 867 N.Y.S.2d 425, 427 (N.Y. 2008). The significant contacts are almost exclusively the parties' domiciles and the locus of the tort. *Id.* (citing *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992)); 19A N.Y. Jur. 2d *Conflict of Laws* § 53.

25.    "In tort cases where conduct-regulating standards are at issue, courts generally apply the law of the state where the tort occurred, as that state usually has the greatest interest at stake in the litigation." *In re Grand Theft Auto Video Game Consumer Litigation*, 251 F.R.D. at 149; *see also HSA Residential Mortgage Services v. Casuccio*, 350 F. Supp. 2d. 352, 364 (E.D.N.Y. 2003) ("[t]he jurisdiction where the tort occurred has the greatest interest in regulating behavior within its borders"). A tort occurs in the place where the injury was inflicted. *Pension Comm. v. Banc of America Securities, LLC*, 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006); *Shultz*, 491 N.Y.S.2d at 94 ("[w]hen the defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred").

26.    Consistent with this doctrine, in fraud cases, a plaintiff typically is found to suffer injury in the place where it is located when the injury occurs. *Kingdom 5-KR-4, Ltd. v. Star Cruises, PLC,* 2002 WL 432390 at *12 (S.D.N.Y. Mar. 20, 2002) (although certain of the allegedly fraudulent communications were sent from Norway, New York law held to apply as injury was inflicted in New York, regardless of where it originated); *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (locus of the fraud is "the place where the injury was inflicted, as opposed to the place where the fraudulent act originated"); *J.A.O. Acq. Corp. v. Stavitsky*, 745 N.Y.S.2d 634, 639 (N.Y. Sup. 2001) ("fraud claims are governed by the law of the place of injury ... where plaintiffs are located"). Thus, in *Rosenberg v. Pillsbury Co.*, 718 F. Supp. 1146, 1150 (S.D.N.Y. 1989), the court applied Massachusetts law to fraud claims filed by Massachusetts franchisees against a New Jersey franchisor. The plaintiffs in that case alleged that the defendants fraudulently induced them to enter into a franchise agreement for a Massachusetts ice cream shop. 718 F.Supp. at 1149. The court held that the locus of the fraud

was Massachusetts because the "alleged injury suffered by plaintiffs occurred at their [ice cream shop] in Massachusetts." *Id.* at 1150. Therefore, the court applied Massachusetts law, holding as immaterial the fact that the alleged misrepresentations occurred in New Jersey and were transmitted from New Jersey to New York. *Id.*[8]

27.    The misrepresentations at issue were made from the United Kingdom in the weeks leading up to the Fight and in Kentucky in the few days before the Fight. The injury suffered was Tyson's participation in the Fight, in Kentucky, in reliance on those misrepresentations. Accordingly, this Court finds that New York courts would apply Kentucky law to the fraud claim.

## I.    <u>Warren and Simon Defrauded Tyson</u>

28.    Under Kentucky law, a claim for actual fraud requires proof that: (1) defendant made a material representation; (2) it was false; (3) when defendant made it the defendant knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) defendant made it with the intention that it should be acted upon by plaintiff; (5) plaintiff acted in reliance upon it; and (6) plaintiff thereby suffered injury. *Sallee v. Fort Knox Nat'l Bank (In re Sallee)*, 286 F.3d 878, 895-96 (6th Cir. 2002), *cert(* quoting *McGuffin v. Smith*, 215 Ky. 606, 286 S.W. 884, 886 (1926)).

---

[8] In addition, courts will consider other contacts, such as the location of the defendant's tortious conduct, to determine which jurisdiction has the greatest interest in the litigation. *Crossland Sav. FSB v. Rockwood Ins. Co.*, 692 F. Supp. 1510, 1512-13 (S.D.N.Y. 1988) ("New York courts do not apply the law of the plaintiff's state of residence when most of the relevant events occur elsewhere. "[W]here the tort is one of misrepresentation, the substantive law of the state in which the misrepresentation is made and the parties have taken action in reliance thereon is applicable." *Id.* at 1512 (citing Restatement (Second) of Conflict of Laws § 148 (1981)); *see also In re Grand Theft Auto Video Game Consumer Litigation*, 251 F.R.D. at 149 n12 (holding that alleged consumer fraud occurred in each state where allegedly fraudulent items were purchased, regardless of plaintiff's residence).

29.    Fraud can also be based on a failure to disclose material facts, even in the

absence of a fiduciary or confidential relationship.  Section 551 of the Restatement (Second) of

Torts provides:

> (1)  One who fails to disclose to another a fact that he knows may
> justifiably induce the other to act or refrain from acting in a
> business transaction is subject to the same liability to the other as
> though he had represented the nonexistence of the matter that he
> has failed to disclose, if, but only if, he is under a duty to the
> other to exercise reasonable care to disclose the matter in
> question.
>
> (2)  One party to a business transaction is under a duty to exercise
> reasonable care to disclose to the other before the transaction is
> consummated,
>
> * * *
>
> (b) matters known to him that he knows to be necessary to
> prevent his partial or ambiguous statement of the facts from being
> misleading; and
>
> * * *
>
> e) facts basic to the transaction, if he knows that the other is about
> to enter into it under a mistake as to them, and that the other,
> because of the relationship between them, the customs of the
> trade or other objective circumstances, would reasonably expect a
> disclosure of those facts.

Restatement (Second) of Torts § 551 (1977).

30.    Kentucky law is consistent with the Restatement.  "Under Kentucky law,

once a party chooses to make a representation, the party cannot keep secret information needed

to make the representation accurate.  Although mere silence is not fraudulent absent a duty to

disclose, a duty to reveal may arise from a partial disclosure of information, or from particular

circumstances such as where one party to a contract has superior knowledge and is relied upon

to disclose that information." *Sallee v. Fort Knox Nat'l Bank*, 286 F.3d at 896. *See also* 26

*Williston on Contracts* § 69:17 (4th ed.) ("Transactional circumstances other than a confidential

or fiduciary relationship can give rise to a duty to disclose, and one such circumstance is the disclosure of certain facts which, absent other disclosures, will mislead."); *Plastic Packaging Corp. v. Sun Chemical Corp.*, 136 F. Supp. 2d 1201, 1205 (D. Kan. 2001) ("a contracting party who has superior knowledge, or knowledge that is not within the reasonable reach of the other party, has a legal duty to disclose information material to the bargain."); *Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 295 (2004) (same; "The mere fact that information exists somewhere in the public domain is by no means conclusive.").

31.    Cover-up efforts, as well as a general indifference to truth, may constitute evidence of fraud. "[B]ecause it is difficult to prove intent to defraud from direct evidence, a jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom.' Intent can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States. v. Davis*, 490 F.3d 541, 549 (6th Cir. [Ky.] 2007) (citation omitted). "[T]he record contains testimony on the part of a number of witnesses that implicates Mr. Davis in cover-up operations to destroy evidence, from which the jury could infer that he sought to conceal his own wrongful acts." *Id.* at 550.

> Because it is difficult to prove intent to defraud from direct evidence, a jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom. Thus, "[i]ntent may be inferred from evidence that the defendant attempted to conceal activity. Intent to defraud may be inferred from the defendant's misrepresentations, knowledge of a false statement as well as whether the defendant profited or converted money to his own use." Further, *"[e]vidence of the schemer's indifference to the truth of statements can amount to evidence of fraudulent intent."*

*United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003) (emphasis added).

32.     The evidence presented at trial supports a finding of fraud, under any of three independent bases: (1) affirmative misrepresentations that Brearly was a Sports Network entity; (2) failure to disclose that Brearly was not a Sports Network entity, where such disclosure was necessary to keep numerous ambiguous communications from being misleading with respect to Brearly's relationship to Sports Network; and (3) failure to disclose that Brearly was not a Sports Network entity, where one party had superior knowledge and the true facts concerning the Gibraltor entity's (lack of) corporate affiliation with Sports Network were not readily accessible.

33.     As discussed in paragraphs 47, below, Plaintiff is also entitled to punitive damages and prejudgment interest.

## J.     Brearly Is the Alter Ego of Warren and Simons and As Such Warren and Simons Are Also Liable for the Claims Against Brearly

34.     The parties have agreed that English law applies to the alter ego/corporate veil claims in this Action. *See* Stipulation and Order Regarding Choice of Law With Respect to Issues of Alter Ego and Corporate Veil entered December 8, 2009. [Docket No. 133].

35.     Warren and Simons used Brearly to advance their own interests -- the advancement of Warren's fighter, Williams, and the procurement of the distribution rights for the Fight. To that end, they used Brearly as a judgment-proof mechanism to shield the assets of Warren and Sports Network from obligations to Plaintiff and Straight-Out, while at the same time holding themselves out to them as the real parties in interest and the guarantors of Brearly's obligations.

36.     Under English law, one clearly established circumstance where the courts will pierce the corporate veil is to prevent the corporate form from being used for the purposes of fraud, or as a device to evade a contractual or other legal obligation. For example, in *Jones v.*

*Lipman,* 1 WLR 832 (1962), the defendant had entered into a contract to sell his house, and then sought to escape his obligation to close by conveying the property to a company in which he and a nominee of his controlled all the shares and were the directors. Russell J, in granting a decree of specific performance, described the company as "the creature of the first defendant, a device and a sham, a mask which he holds before his face in any attempt to avoid recognition by the eye of equity." *See also Gilford Motor Co. Ltd. v. Home*, Ch. 934, 956, 965, 969 (1933). (Individual held liable for breach of non-solicitation covenant notwithstanding interposition of a company because the company was formed as device to the "effective carrying on of a business of the individual.").

37.    Similarly, in *Trustor AB v. Smallbone* 2 BCLC 436 (2001), the veil was lifted where a controlling shareholder used a company to receive monies improperly transferred from another company. Specifically, in *Smallbone*, the court found that the company was a "creature of [the shareholder]. He owned and controlled Introcom." In addition, like Brearly, the company was incorporated in Gibraltar, only had nominee directors and acted on the instructions of the controlling shareholder. The court found it is was appropriate to "'pierce the corporate veil' and recognize the receipt of the company as that of the individuals in control of it if the company was used as a device or façade to conceal the true facts thereby avoiding or concealing any liability of those individuals." *Id.*

38.    As was the case in *Gilford Motor Co., Ltd.*, Brearly was created as a device "to the effective carrying on of business" by Warren. Like Introcom, the company in *Smallbone*, Brearly was a creature of individuals, Warren and Simons, and was used as a façade to conceal the true facts -- that Brearly did not have $2,700,000 to back up the guarantee

contained in the Assignment and that neither Warren, nor Sports Network stood behind that guarantee. Had those facts been revealed, Tyson would never have completed the Fight.

39.     The evidence presented at trial supports a finding that Warren and Simons are Brearly's alter egos and that Brearly's corporate veil should be pierced to hold Warren and Simons liable for Brearly's breach of the Assignment and its unjust enrichment at the expense of Plaintiff.

## K.     Prejudgment Interest

40.     State law applies to questions of prejudgment interest on the state law claims before this Court in this Action. *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1997) (citing *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 692 n. 13 (2d Cir. 1983)). As discussed above, Kentucky law applies to the claim against Straight-Out for breach of contract, the claim for unjust enrichment, and the claim for fraud.

41.     Under Kentucky law,  prejudgment interest may be awarded on a claim for breach of contract. *Nucor Corp. v. General Electric Co.*, 812 S.W.2d 136, 144 (Ky. 1991) Prejudgment interest may also be awarded on unjust enrichment claims. *Prima International Trading v. Wyant*, 2009 WL 722609, *3 (E.D. Ky. Mar. 17, 2009). Finally, courts in Kentucky award prejudgment interest for fraud. *Faulkner Drilling Co., v. Gross*, 943 S.W.2d 634, 638 (Ky. App. 1997); *Edward E. Gillen Co. v. East Kentucky Power Coop.* 718 F.2d 816, 818 (6th Cir. 1983). This Court finds, as a matter of law, that Plaintiff is entitled to prejudgment interest on its breach of contract claim against Straight-Out and on its unjust enrichment claim and fraud claim.

42.     Interest on a claim for breach of contract typically runs from the date payment was due under the contract. *See Cooper v. Hubberd*, 703 S.W.2d 494, 497 (Ky. App.

1986) (interest on real estate commission awarded from date commission became due);

*American Bank & Trust Co. v. Shouse & Burns* 648 S.W.2d 540, 542 (Ky. App. 1983) (interest

on wrongfully withheld proceeds of stock sale awarded from date of sale); *Friction Materials*

*Co., v. Stinson.*, 833 S.W.2d 388, 392 (Ky. App. 1992) (interest on sales commissions from date

commissions were due); *Dalton v. Mullins*, 293 S.W.2d 470 474 (Ky. App. 1956) (interest on

payments awarded from time payments were due).  Similarly, interest on a claim for unjust

enrichment may be awarded from the date the claim arose.  *Prima Int'l Trading*, 2009 WL

722609 at *3 (prejudgment interest awarded on unjust enrichment, fraud and other claims as of

date of fraudulent purchase.  Finally interest on a claim for fraud also may be awarded from the

date the claim arose.  *Id. See also* Restatement (Second) of Torts § 913 (interest for harms to

pecuniary interests appropriate from the time of the accrual of the cause of action to the time of

judgment).

  43. Accordingly, this Court finds that interest on the breach of contract claim

against Straight-Out, the unjust enrichment claim, and the fraud claim accrues from July 30,

2004, the day of the Fight.

  44. Under Kentucky law, prejudgment interest typically is simple interest.

*Reliable Mechanical, Inc. v. Naylor Industrial Services, Inc.*, 125 S.W.3d 856, 858 (Ky. App.

2003).  In Kentucky, the "legal rate of interest is eight percent (8%) per annum." KRS §

360.010.

  45. This Court finds as a matter of law that prejudgment interest should be

calculated as simple interest in the amount of eight percent per annum from July 30, 2004,

through the date of entry of judgment.

  46. Post-judgment interest is awarded, as well.

**L.**    **Punitive Damages**

47.    As discussed above, Kentucky law applies to Plaintiff's fraud claims.

Pursuant to Kansas Revised Statute Section 411.184, "[a] Plaintiff shall recover punitive

damages only upon proving by clear and convincing evidence, that the defendant from whom

such damages are sought acted toward the plaintiff with oppression, fraud or malice." KRS §

411.184. This Court has found that Warren and Simons defrauded Tyson. Accordingly,

Plaintiff is entitled to punitive damages in the amount of _____.

48.    Any Conclusion of Law that may qualify as a Finding of Fact shall be

equally considered as such.

Dated:    May 28, 2009                    PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Beth E. Levine*
Robert J. Feinstein (RF 2836)
Alan J. Kornfeld (AK 5647)
Beth E. Levine (BL 6715)
780 Third Avenue, 36th Floor
New York, NY  10017-2024
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777