Robert J. Feinstein (RF 2836)
Alan J. Kornfeld (AK 5647)
Beth E. Levine (BL 6715)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017-2024
Telephone: 212/561-7700
Facsimile:  212/561-7777

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>MICHAEL G. TYSON, et al.,<br>　　　　　　　　　Debtors. | Chapter 11<br>Case No. 03-41900 (ALG)<br>(Jointly Administered) |
| R. TODD NEILSON, Plan Administrator of the MGT Chapter 11 Liquidating Trust, on behalf of the MGT Chapter 11 Liquidating Trust and on behalf of Michael G. Tyson, an individual,<br>　　　　　　　　　Plaintiff,<br>vs.<br>STRAIGHT-OUT PROMOTIONS, LLC, a Kentucky Limited Liability Company, et al.,<br>　　　　　　　　　Defendants. | Adv. No. 05-02210 (ALG) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' POST-TRIAL MEMORANDA**

Plaintiff R. Todd Neilson ("Plaintiff"), the Plan Administrator of the MGT Chapter 11

Liquidating Trust, submits the following opposition to the Post-Trial Memorandum of UK

Defendants (the "UK Defendants' Mem."), filed on May 28, 2009 [Docket No. 164], and the

Post-Trial Brief of Defendants and Cross-Claim Plaintiffs, Straight-Out Promotions, LLC and

Chris Webb (the "Kentucky Defendants' Mem."), filed on May 28, 2009 [Docket No. 162].

## PRELIMINARY STATEMENT

Plaintiff's [Proposed] Findings of Fact and Conclusions of Law [Docket No. 161] demonstrates that the evidence introduced at trial established that (1) Plaintiff is entitled to recover from Warren and Simons for the fraud they perpetrated upon Tyson; (2) Plaintiff is also entitled to recover from Warren and Simons, as Brearly's alter egos, for Brearly's breach of the Assignment and its unjust enrichment; and (3) Plaintiff is entitled to recover $1,900,000 from Straight-Out for its breach of the Event Agreement with Tyson.

As shown below and in the accompanying Plaintiff's Objections to UK Defendants' Proposed Findings of Facts and Conclusions of Law ("Plaintiff's Objections"),[1] the UK Defendants'[2] assertions to the contrary are based upon distortions of the evidence that is before this Court and misstatements of the factual and legal bases for Plaintiff's claims. The claim by the Kentucky Defendants (who do not dispute Straight-Out's liability) that Straight-Out is entitled to a setoff that would decrease the amount of the judgment against Straight-Out is similarly unfounded. Accordingly, this Court should enter judgment for Plaintiff as set forth in Plaintiff's Proposed Findings of Fact and Conclusions of Law.

---

[1] Plaintiff's objections to the UK Defendants' factual assertions are contained in Plaintiff's Objections and will not be reiterated at length in this Memorandum.

[2] Capitalized terms and abbreviations not otherwise defined herein shall have the meanings ascribed to them in Plaintiff's [Proposed] Findings of Facts and Conclusions of Law, filed on May 28, 2009.

## ARGUMENT

### A. WARREN AND SIMONS DEFRAUDED TYSON

In an attempt to support their contention that Tyson was not defrauded by Warren and Simons, the UK Defendants make four arguments. None of these arguments carries the day.

First, the UK Defendants attempt to rely on a supposed conversation on July 21, 2004 in which Warren purportedly stated that he would not guarantee Brearly's obligations to Tyson. UK Defendants' Mem. at 2-3, 64-65. However, the import of this conversation, if any, is negated by Espinoza's testimony regarding another conversation that took place a week later, on July 28, 2004. Among others, Warren, Simons, Heath, and Espinoza participated in that July 28, 2004 conversation. During that conversation, Heath, with the acquiescence of Warren and Simons, led Espinoza to understand that the payment called for in the Assignment would be coming from Brearly and that Brearly was a Sports Network entity. Mar. 23 Trial Tr. at 69-72. Thus, even assuming, *arguendo*, that Warren stated on July 21, 2004, that he would not guarantee Brearly's obligations to Tyson, the conversation on July 28th negated that declaration, and Tyson relied on the July 28th discussion in determining to go forward with the Fight.

Second, the UK Defendants distort Espinoza's testimony on cross-examination. They claim that Espinoza testified that he had no knowledge of "any misrepresentations by any of the UK Defendants which induced Tyson to enter into the Event Agreement for the Fight" and no knowledge of "any misrepresentations by any of the UK Defendants which induced Tyson not to withdraw from the fight when Tyson knew that he would not receive his full purse payment on the day of or before the fight took place." UK Defendants' Mem. at 65. However, Espinoza did *not* testify that he did not have personal knowledge of *any* misrepresentations made by any of the

UK Defendants on which Tyson relied in deciding to participate in the Fight. Rather, in the cross-examination cited by the UK Defendants, Espinoza testified that he did not have personal knowledge of specific representations by *Warren or Simons* that Warren, Simons and/or their entities could and would pay to Tyson certain amounts and that he did not have personal knowledge of specific representations by *Warren or Simons* that induced Tyson not to withdraw from the Fight. Mar. 24 Tr. at 229-232.

In fact, Espinoza testified to multiple affirmative misrepresentations made by Heath, who represented and acted on behalf of Warren and Simons, upon which Tyson relied to his detriment. These include the following misrepresentations:

- that all international revenues relating to the Fight were being funneled through Brearly, Mar. 23 Trial Tr. at 50-51;

- that Brearly was a Sports Network entity, *id.* at 43, 94;

- that the only reason the foreign distribution rights relating to the Fight were being passed through Brearly was for tax purposes, *id.* at 44-45, 94-95;[3] and

- that Brearly had been used by Sports Network for these purposes before. *Id.*

Espinoza had extensive personal knowledge of misrepresentations made on behalf of Warren and Simons, and he testified to them at length.

Third, the UK Defendants disregard the fact that under Kentucky law, which is

---

[3] Tellingly, the UK Defendants do not dispute that Heath told Tyson's representatives that foreign distributions were being passed through Brearly for tax purposes; rather, they claim that the tax structure never existed. UK Defendants' Mem. at 4. This, of course, is the point. The tax structure never did exist; the UK Defendants just said that it existed in order to induce Tyson to complete the fight on the basis of the assignment of Straight-Out's obligations to Brearly. This statement was a misrepresentation made to further the misimpression that Brearly was part of Sports Network.

57000-001\DOCS_NY:18227.4                                    4

applicable here, a claim for fraud can also be based on failures to disclose where (1) a party chooses to make a representation and then keeps secret information necessary to make the representation accurate, or (2) one party to a contract has superior knowledge and is relied upon to disclose that information. *See* Plaintiff's Proposed Conclusions of Law ¶¶ 29-32. At trial, Plaintiff met this standard as well by demonstrating that Warren and Simons, directly and through Heath, defrauded Tyson by failing to disclose information sufficient to make their representations true. For example, Heath, with the approval of Warren and Simons, made it appear that Brearly was part of Sports Network without doing anything to clarify that in fact this was not the case. Thus, on multiple occasions, Heath made communications on behalf of Brearly that were made on Sports Network stationery or from his Frank Warren and Sports Network email addresses. *See, e.g.*, Exhibits P-3, P-9, UK-27, UK-33 UK-52, UK-57, UK-60. Indeed, Heath specifically instructed Espinoza to "please send future emails to stephenheath@frankwarren.tv, Exhibit P-11, and he faxed the signed Assignment to representatives of Tyson, Webb and Showtime from Sports Network on a Sports Network facsimile coversheet that bore the legend "A partnership between Frank Warren & Sports & Leisure Boxing Ltd." Exhibit P-13.

In a similar vein, Heath made it explicit in an email that Brearly's consent to the Assignment was inextricably linked to Straight-Out's compliance with its obligations to Danny Williams:

> Furthermore in the conference call it was made quite clear that consent is conditioned on Straight Out making available the fee of $350,000 for Danny Williams participation in the bout. Straight Out are [sic] already in breach as the signing fee has not been paid. If it is not paid in clear funds prior to the Bout the

assignment is to have no effect. Please insert words to this effect in the Notice.

Exhibit P-11.

On the basis of this dual representation, Espinoza understood that consistent with Heath's explicit representations to him, Brearly was a Sports Network entity and that Brearly and Sports Network were "essentially the same party." Mar. 23 Trial Tr. at 48, 69. Here, too, Warren and Simons did nothing to correct this misimpression.

Similarly, in the July 28th telephone conversation concerning the Assignment that took place two days before the Fight in which Simons and Warren also participated, and in which Heath made representations about Brearly's obligation to pay the $2.7 million guarantee, Mar. 24 Trial Tr. at 175, Heath continued to act on behalf of both Sports Network and Brearly. Mar. 23 Trial Tr. at 69-70. At no time on that call did either Simons or Warren say that they and Sports Network had nothing to do with Brearly or Brearly's guarantee obligations.

In the week prior to the Fight, Espinoza, on behalf of Tyson, had twenty to thirty conversations with Heath. *Id.* at 48. At no time during the course of those conversations did Heath ever tell Espinoza that Brearly had nothing to do with Frank Warren and Sports Network. *Id.* at 49. As set forth in paragraph 30 of the Conclusions of Law, in light of their superior knowledge, Warren and Simons had a duty to disclose that Brearly was not part of Sports Network, was nothing more than a shell, and, except for potential proceeds from the Fight, did not have the wherewithal to pay Tyson the amounts it had guaranteed in the Assignment. Because Warren and Simons did not make these disclosures, they defrauded Tyson.

Finally, the UK Defendants argue that Plaintiff has not proven that Tyson was defrauded

because "there is not a single document which indicates that Brearly are 'one and the same' . . . or that Frank Warren or Sports Network or Ed Simons agreed to be responsible for any obligation owed by Brearly to Tyson or to Straight-Out." UK Defendants' Mem. at 3. *See also* UK Defendants' Mem. at 64-65. That there is little *direct* evidence of the UK Defendants' fraud is both unsurprising and irrelevant. "Evidence of fraud is rarely susceptible of direct proof and must ordinarily be established by circumstantial evidence and the legitimate inferences arising therefrom." *Goshen Litho, Inc. v. Kohls*, 582 F. Supp. 1561, 1564 (S.D.N.Y. 1983).

For this reason, courts routinely hold that fraud can be proven by circumstantial evidence. "Proof may be developed by the character of the testimony, the coherency of the entire case as well as the documents, circumstance and facts presented." *United Parcel Service Company v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). Thus, "[f]raud may be established by evidence which is wholly circumstantial." *Id.* (citing *Grant v. Wrona*, 662 S.W.2d 227, 229 (Ky. App. 1983)). *See also Century Pacific, Inc .v Hilton Hotels Corp.*, 528 F. Supp 2d. 206, 219 (S.D.N.Y 2007) (evidence of fraud may be circumstantial); *Van Iderstine Co. v. Barnet Leather Co.*, 242 N.Y. 425, 435 (N.Y. 1926) (same). As discussed at length in paragraphs 26-62 of Plaintiff's Proposed Findings of Fact and paragraphs 28-32 of Plaintiff's Proposed Conclusions of Law, the circumstantial evidence introduced at trial supports a finding of fraud against Warren and Simons.[4]

---

[4] The UK Defendants also argue that Plaintiff's fraud claim should be denied because the gist of that claim is that Brearly said it would pay Tyson when it did not intend to do so. UK Defendants' Mem. at 66. But this is not the gist of Plaintiff's claim. Rather, Plaintiff's fraud claim is based upon the multiple affirmative misrepresentations and failures to disclose discussed above.

### B. BREARLY IS THE ALTER EGO OF WARREN AND SIMONS

There is no real dispute among the parties that under UK law, a corporate veil may be pierced only under limited circumstances. The UK Defendants assert that those circumstances are not present in this case and that Plaintiff has not shown that the corporate structure was devised as a mere façade concealing true facts or that there was any improper motive by the UK Defendants. UK Defendants' Mem. at 13-14. The facts proven at trial, however, are to the contrary and fully support a finding that Warren and Simons are Brearly's alter egos.

As set forth in detail at paragraphs 63-116 of Plaintiff's Proposed Findings of Fact, at trial, Plaintiff demonstrated that Warren and Simons used Brearly to advance their own interests -- the advancement of Warren's fighter, Williams, and the procurement of the UK distribution rights for the Fight.[5] To that end, they used Brearly as a judgment-proof mechanism to shield the assets of Warren and Sports Network from obligations to Plaintiff and Straight-Out, while at the same time holding themselves out to them as the real parties in interest and the guarantors of Brearly's obligations.

Brearly was formed as a shell to be used to invest in other companies. Abbey Tr. at 9. It was an off-the-shelf Gibralter corporation. Abbey is Brearly's sole shareholder. Mar. 26 Trial Tr. at 99-100; Abbey Tr. at 9. Brearly has minimal capitalization; its only officers are Abbey and a corporate officer at the Gibraltar law firm of Marrache & Co., and it has no bank account. Abbey Tr. at 11-12. Brearly has no offices, employees, accountants, or staff, and has filed no tax returns. Mar. 26 Trial Tr. at 99, Heath Tr. at 23-24, Abbey Tr. at 21.

---

[5] Prior to the Fight, Warren believed that a bout with Tyson could significantly advance the interests of his fighter, Williams, and, consequently, those of Warren and the UK Defendants. Mar. 25 Trial Tr. at 87.

Among other things, evidence that Brearly is the alter ego of Warren and Simons can be found in the actions taken by Simons, Sports Network's chief executive officer, on Brearly's behalf with Warren's approval. Simons was not a shareholder, officer, employee, or paid consultant of Brearly, and he never received any compensation for his services to Brearly. Mar. 26 Trial Tr. at 129-130. Notwithstanding this, Simons, Sports Network's chief executive officer, *see* Exhibit P-29 at 8, directed all actions on behalf of Brearly and freely helped himself to Sports Network's resources in doing so. Virtually no actions were taken on behalf of Brearly that were not taken by or at the direction of Simons, Warren's partner.

Among other things, Simons:

- Kept the account records on behalf of Brearly. Abbey Tr. at 24.

- Was responsible for collecting revenues and paying out expenses. *Id.*

- Negotiated the Distribution Agreement on Brearly's behalf. Mar. 26 Trial Tr. at 102.

- Kept all accounting records for Brearly with respect to the Fight. Abbey Tr. at 17:16-17:15.

- Approved the licensing deals put into place on behalf of Brearly. *Id.* at 107.

- Requested, on behalf of Brearly, that Warren handle the sale of the UK distribution rights for the Fight to Sky. Mar. 26 Trial Tr. at 128.

Similarly, although he was not an officer of employee of Brearly, Simons, himself, sold distribution rights for the Fight in Scandinavia and the Ukraine on behalf of Brearly. Mar. 24 Trial Tr. at 56-59. 61; Mar. 26 Trial Tr. at 51 and Exhibits UK-65 and UK-129. Simons also freely used SNL's personnel and consultants for Brearly, including David McConachie ("McConachie") and Stephen Heath. Thus, Simons intended that McConachie would get

involved in licensing the foreign sales for the Fight, Mar. 26 Trial Tr. at 21-22, and he asked McConachie if he would be interested in selling Brearly's international television rights to the Fight. Mar. 24 Trial Tr. at 15, 67. At the time that Simons made that inquiry, McConachie had his own company but still represented Sports Network with respect to the television rights for its events. *Id.* at 22.

As described in greater detail in paragraphs 81-85 of Plaintiff's Proposed Findings of Fact, additional evidence that Brearly is Warren's and Simons's alter ego can be found in the fact that on behalf of Brearly, Simons also made generous use of the services of Heath, Sports Network's in-house attorney, in connection with the Fight although Heath was not employed by Brearly. *See* Plaintiff's Proposed Findings of Fact ¶¶ 83-85.

The transfer of the UK rights from Brearly to Sports Network and Sports Network's sale of those rights to Sky is further evidence of common control and of lack formality between Brearly and the UK Defendants. Warren claims that he negotiated on behalf of Sports Network for these rights, and that his partner Simons, Sports Network's chief executive officer, negotiated on behalf of Brearly. Mar. 25 Trial Tr. at 149. That assertion is incredible. No such "negotiation" ever took place. Rather, two business partners, Warren and Simons, engineered the transfer from Sports Network to Sky of lucrative distribution rights that belonged to Brearly without any written agreement and apparently without having paid any consideration for those rights to Brearly.

The total license revenues for the UK distribution rights to the Fight were 406,468.00 pounds sterling. Mar. 26 Trial Tr. at 71 and Exhibit UK-122. Sports Network collected the pay-per-view payments for the Fight but did not pay any of those funds to Brearly. Mar. 25 Trial Tr.

at 159-160. As further evidence of the common control between Brearly and the UK Defendants, Warren and Simons appropriated the revenues collected by Sky for the UK distribution of the Fight for their own purposes. Warren had personally guaranteed the outstanding amounts owed to Showtime in connection with the Fight. Mar. 25 Trial Tr. at 29; 103-106. Rather than paying Showtime out of his own funds -- or those of his company -- Warren, instead, took control of the proceeds to which Brearly was entitled for distribution of the Fight in the United Kingdom and caused Sports Network to pay all of the income it received from Sky to Showtime without any affirmative agreement from Brearly that this should be done. Mar. 25 Trial Tr. at 160-161.

In sum, Plaintiff put forth sufficient evidence for this Court to find that Brearly is a corporate shell that was used only as an instrumentality to further Warren's and Simons's goals of promoting Williams and ensuring that the Fight go forward, gaining the British distribution rights to the Fight, and shielding Warren and Sports Network from obligations to Tyson and Straight-Out. Had Warren and Simons not used Brearly as a façade to conceal the true facts -- that Brearly did not have $2,700,000 to back up the guarantee contained in the Assignment and that neither Warren, nor Sports Network stood behind that guarantee --Tyson would never have completed the Fight.

### C. PLAINTIFF IS ENTITLED TO PREVAIL AGAINST WARREN AND SIMONS FOR BREARLY'S BREACH OF THE ASSIGNMENT

The UK Defendants do not dispute that Brearly breached the Assignment. Rather, they argue that Plaintiff cannot recover from Warren and Simons for that breach because the "Trustee's claim against the UK Defendants is that they agreed to be responsible for Brearly's

obligations under the Assignment," that such agreement is effectively a guarantee, and that in order to be effective, it must be in writing. UK Defendants' Mem. at 67-68. This argument is based upon a deliberate misunderstanding of Plaintiff's claim against Warren and Simons for breach of the Assignment. Plaintiff's claim is not based upon a guarantee, written or otherwise, by the UK Defendants with respect to the Assignment. Rather, it is based upon the fact that, as demonstrated above and in Plaintiff's Proposed Findings of Fact and Conclusions of Law, Warren and Simons are Brearly's alter egos. Brearly breached the Assignment. As its alter egos, Warren and Simons are also liable for that breach.

In a similar vein, the UK Defendants attempt to escape liability for Brearly's breach of the Assignment on the basis of paragraph 4 of that document which provides that the Assignment does not relieve Straight-Out of its obligations under the Event Agreement. UK Defendants' Mem. at 31-32. While it is correct that under the Assignment, Straight-Out's liability remains until Tyson is paid in full, nothing in the Assignment relieves Brearly from liability until such time as Tyson is, in fact, paid in full. As Espinoza testified, "there were obviously alternative remedies." Mar. 24 Trial Tr. at 208.[6]

### D. STRAIGHT-OUT IS NOT ENTITLED TO A SETOFF

Espinoza's testimony at trial demonstrated that prior to the Fight, Straight-Out breached the Event Agreement by failing to post the required Additional Letter of Credit in the amount of

---

[6] The UK Defendants also attempt to evade liability on the basis of the integration clause in the Event Agreement. UK Defendants' Mem. at 32-33. This attempted evasion is nonsensical in the face of paragraph 9.8 of the Event Agreement which provides: Straight-Out may assign any or all of Straight-Out's rights, duties and/or obligations under this Agreement . . . to any person as reasonably necessary for the distribution and exploitation of the rights in and to the 2004 Match *without Tyson's consent* . . . ." Exhibit P-33 (emphasis added). The Assignment was explicitly permitted under the terms of the Event Agreement, and the integration clause is therefore irrelevant.

$1,975,000 and that in the week prior to the Fight, an agreement was reached pursuant to which $75,000 of that outstanding amount would be paid to Tyson in tickets. Mar. 23 Trial Tr. at 36, 37. Thus, as Espinoza testified, Tyson is still owed $1,900,000 by Straight-Out. Straight-Out concedes that "it owed Tyson money in accordance with the terms of the Event Agreement," Kentucky Defendants' Mem. at 44, however, it argues that it is entitled to reduce its liability as a result of several setoffs arising out of Tyson's alleged breach of the Event Agreement. *Id.* Each of Straight-Out's arguments for setoff is without merit.

Straight-Out argues first that a payment in the amount of $242,000 that Tyson received from Showtime pursuant to an amendment (the "Amendment") to a multi-fight agreement between Showtime and Tyson is a breach of the Event Agreement because section 9.2 of that agreement provides that "all gross revenues derived from or connected in any way to the 2004 Match and any activities or events related thereto or arising in connection therewith shall be sole property of Straight-Out," Exhibit P-33, and the $242,00 payment consisted of gross revenues connected to the Fight. Kentucky Defendants' Mem. at 45-46. However, as described in the Debtor's Amended Motion for Approval of (1) Amendment to Multi-Fight Agreement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure; and (2) Assumption and Assignment of Multi-Fight Agreement, as Amended, to Michael G. Tyson, in His Individual Capacity, or to His Designee, Pursuant to 11 U.S.C. Section 365, the $242,000 payment at issue was made to Tyson in consideration for the assumption by Tyson personally of certain obligations and as part of a global settlement between Tyson and Showtime. Exhibit SO-3 at MT007292.[7] Thus, this

---

[7] This Court entered an order approving the Amendment on July 29, 2004 [Main Bankruptcy Case Docket No. 213].

payment was not a gross revenue derived from or connected to the Fight, and Straight-Out is not entitled to a setoff in connection with it.

Straight-Out also claims that it is entitled to a setoff for $300,000 paid to Tyson in 2004 as a purse advance. Kentucky Defendants' Mem. at 47.[8] However, Straight-Out has come not come forward with any evidence indicating either that the $300,000 was advanced by Straight-Out or that it was connected in any way with the Fight. Straight-Out has not established that it is entitled to any setoff. As set forth in Plaintiff's Proposed Findings of Fact and Conclusions of Law, it is obligated to pay Plaintiff $1,900,000, plus interest.

## CONCLUSION

For all the reasons set forth herein, in the accompanying Objection, and in Plaintiff's [Proposed] Findings of Fact and Conclusions of Law, judgment should be entered for Plaintiff as set forth in Plaintiff's [Proposed] Findings of Fact and Conclusions of Law.

Dated:   June 11, 2009                        PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Beth E. Levine*
Robert J. Feinstein (RF 2836)
Alan J. Kornfeld (AK 5647)
Beth E. Levine (BL 6715)
780 Third Avenue, 36th Floor
New York, NY  10017-2024
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777

---

[8] The relevant extract from Tyson's tax returns shows that in 2004, Tyson received $525,00 in purse advances. $225,000 were from Straight-Out. Mar. 23 Trial Tr. at 35. Exhibit P-33 at ¶3.1(a). Espinoza testified that he did not recall the source of the other $300,000 but that it could have been for a fight that took place in 2005. Mar. 23 Trial Tr. at 105-06.