UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MICHAEL G. TYSON, et al. | : | Case No. 03-41900 (ALG) |
| | : | |
| | : | |
| Debtors. | : | |

-----------------------------------------------------------------x

| | | |
|---|---|---|
| R. TODD NEILSON, Plan Administrator of the | : | Adv. No. 05-02210 (ALG) |
| MGT Chapter 11 Liquidating Trust, | : | |
| on behalf of the MGT Chapter 11 Liquidating | : | |
| Trust and on behalf of Michael G. Tyson, | : | |
| an individual, | : | |
| | : | |
| Plaintiff, | : | |
| vs. | : | |
| | : | |
| STRAIGHT-OUT PROMOTIONS, LLC, | : | |
| a Kentucky Limited Liability Company; | : | |
| CHRIS WEBB, an individual; BREARLY | : | |
| (INTERNATIONAL) LIMITED, a Gibraltar | : | |
| Corporation; FRANK WARREN, an individual; | : | |
| SPORTS NETWORK, PLC, a United Kingdom | : | |
| Corporation; MARINETRACK HOLDINGS, | : | |
| PLC, a United Kingdom Corporation; SPORTS | : | |
| & LEISURE, BOXING, LTD., a United Kingdom | : | |
| Corporation; and EDWARD SIMONS, | : | |
| an individual, | : | |
| | : | |
| Defendants. | : | |

-----------------------------------------------------------------x

## <u>**MEMORANDUM OF OPINION**</u>

A P P E A R A N C E S:

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
Attorneys for the MGT Chapter 11 Liquidating Trust and the Debtor
  By:  Robert J. Feinstein, Esq.
       Alan J. Kornfeld, Esq.
       Beth E. Levine, Esq.
780 Third Ave., 36th Floor
New York, NY 10017

1

J. BRUCE MILLER LAW GROUP
Attorneys for Straight-Out Promotions and Chris Webb
  By:  J. Bruce Miller, Esq.
       Michael J. Kitchen, Esq.
605 W. Main St.
Louisville, Kentucky 40202

K&L GATES LLP
Attorneys for Sports Network PLC, Sports & Leisure Boxing, Ltd.,
Marinetrack Holdings, PLC, Frank Warren and Edward Simons
  By:  Lani A. Adler
      Robert N. Michaelson
599 Lexington Avenue
New York, NY 10022

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

     This is an action for damages in connection with a professional heavyweight

boxing match (the "Fight") held on July 30, 2004, in Louisville, Kentucky between Mike

Tyson ("Tyson"), the former world heavyweight champion, and Danny Williams

("Williams").

***A. The Parties***

    ***(i)    Todd Neilson (the "Plaintiff")***

     The year before the Fight, Tyson and his wholly-owned corporation filed Chapter

11 bankruptcy petitions in this Court.  The Fight was the first of a series of bouts that

Tyson had agreed to hold as set forth in his Chapter 11 reorganization plan (the "Plan")

filed on June 24, 2004.[1]  Under the Plan, the Plaintiff was appointed as Plan

Administrator and given authority to collect proceeds from the Fight as well as to

prosecute causes of action on behalf of Tyson's estate.

---

[1] On September 27, 2004, the Court confirmed an amended version of the Plan, which provided for fifty
percent of the earnings from certain boxing matches to be distributed to Tyson's creditors.

    *(ii)    Straight Out Promotion, LLC ("Straight Out") and its principal Chris Webb ("Webb") (together, the "Kentucky Defendants")*

Straight Out is a Kentucky limited liability company owned and managed by Webb.  Prior to the time of the Fight, Webb was a relatively inexperienced boxing promoter.  He had, however, obtained rights to promote a fight in Louisville between Tyson and Kevin McBride, Tyson's original opponent in the Fight.

    *(iii)    Sports Network, PLC ("Sports Network") and its principals Frank Warren ("Warren") and Sports & Leisure, Boxing, LTD ("Sports and Leisure")*

Sports Network was at the time of the Fight a United Kingdom partnership between Warren and Sports and Leisure.[2]  Warren is a well-known English boxing promoter with over 35 years of experience, who has promoted multimillion-dollar boxing matches around the world.  As Sports Network's majority stakeholder and managing director, Warren held a tight grip over every aspect of the partnership's operations, and people in the boxing industry perceive him and Sports Network as one and the same. (*See* Trial Tr. 39:8-17, March 23, 2009; Trial Tr. 17:7-12, March 25, 2009; Trial Tr. 17:19-21, March 26, 2009.)

Sports and Leisure is a United Kingdom limited liability company that had a minority stake in Sports Network; it handled Sports Network's internet and television business.

    *(iv)    Edward Simons ("Simons")*

Simons is also a veteran of the boxing business with decades of experience.  At the time of the Fight, Simons was Sports Network's chief executive officer and Warren's

---

2 Today Sports Network is a privately-held corporation; Warren holds approximately 98% of its outstanding stock.

right-hand man.[3]  Simons also held a minority interest in Sports and Leisure and was one

of its directors.  Simons, Warren, Sports Network and Sports and Leisure are hereafter

called the "UK Defendants."[4]

   *(v)      **Brearly International Limited ("Brearly")***

       Brearly is a shell corporation that had been formed under the laws of Gibraltar by

Peter Abbey ("Abbey"), an English investor who was a friend and business acquaintance

of Simons.  Abbey is Brearly's sole shareholder.  At the time of the Fight, Brearly had

minimal capitalization (if any), no assets, no offices and no employees, and it had never

engaged in any business.

**B. The Allegations**

   *(i)      **Plaintiff's Claims***

       Plaintiff commenced this action to collect a portion of the Fight purse still owed

to Tyson.  Specifically, Plaintiff asserts (i) that the Kentucky Defendants and Brearly

breached their contractual obligations to Tyson by failing to pay the final $1.9 million of

his purse; (ii) that Brearly and Sports Network were unjustly enriched by retaining funds

from the Fight; and (iii) that the Kentucky and UK Defendants fraudulently induced

Tyson to go forward with the Fight.  Regarding the UK Defendants, Plaintiff argues that

Brearly's corporate veil should be pierced and that the UK Defendants should be held

liable to Tyson directly.  Plaintiff argues in effect that Brearly was a shell without

---

3 At trial, Simons denied being Sports Network's chief executive officer ("CEO").  (*See* Tr. 88:18-22,
March 26.)  However, Warren testified that this was Simons' position.  A Sports & Leisure's prospectus
issued in 2004 identified Simons as the partnership's CEO. (*See* Tr. 133:7-22, March 25; Plaintiff's Trial
Exh. 29, p. 8; *see also* Plaintiff's Trial Exh. 32.)

4 At the beginning of the trial, the parties advised the Court that MarineTrack Holdings, PLC, one of the
above-captioned defendants, was being administered under the Companies Act in the United Kingdom and
that all parties had stipulated as to its dismissal from the case.

business, employees or capitalization, and that the UK Defendants abused the corporate form by using it as a mere façade, concealing the true facts.

### (ii)    The Kentucky Defendants' Response, Counterclaim and Cross-claims

The Kentucky Defendants do not dispute that Tyson is still owed $1.9 million for the Fight, but contend that he received $542,000 in breach of their agreement and that his claims should be offset in this amount.  They deny Plaintiff's fraud and alter ego claims and assert cross-claims against Brearly and the UK Defendants that seek to pierce the corporate veil and impose Brearly's liability on the UK Defendants for the same reasons advanced by the Plaintiff.

### (iii)    Brearly's Default

On October 11, 2005, Brearly filed an answer to Plaintiff's complaint, allegedly *pro se*.  It failed to appear thereafter, and the Clerk of the Court entered a default against Brearly on January 23, 2008.  Plaintiff filed a motion for default judgment on February 28, 2008, but withdrew the motion a month later after all the other defendants objected to it.

### (iv)    The UK Defendants' Response

The UK Defendants deny all the allegations against them.  Their main arguments are that (i) they fully disclosed that Brearly was a separate entity and are not otherwise guilty of any fraud; (ii) the Fight generated no economic benefit to Sports Network and there were no damages for which they are responsible, and (iii) the legal bases for piercing Brearly's corporate veil are absent.

### C. The Trial

The Court held a five-day trial on the issues. Plaintiff and the Kentucky Defendants called three witnesses: Stephen Espinoza ("Espinoza"), Tyson's attorney in connection with the Fight; Sampson Lewkowicz ("Lewkowicz"), who became the matchmaker for the Fight that actually took place;[5] and Webb. The UK Defendants called four witnesses: David McConachie ("McConachie"), a former employee of Sports Network, who coordinated the sale of the international broadcasting rights to the Fight; Ken Hirschman ("Hirschman"), an executive from Showtime Networks Inc. ("Showtime") involved in the contractual negotiations; Warren; and Simons. The parties also introduced into evidence deposition testimony from Abbey; Stephen Heath ("Heath"), Sports Network's former in-house counsel; and Gavin Simons, Sports Network's chief financial officer and Edward Simons' brother.

Upon the findings of fact and conclusion of law set forth below, the Court grants Plaintiff's and Straight Out's breach of contract and veil piercing claims against Brearly and the U.K. Defendants. It also grants Plaintiff's breach of contract claim against Straight Out. All other claims for relief are denied or dismissed.

## FACTS

Pursuant to a document called the Event Agreement, Tyson granted Straight Out worldwide rights to promote, broadcast and distribute the Fight, in exchange for $7.2 million, payable in stages. Although Tyson and Straight Out had been negotiating since early 2003, it was not until May 2004 that they agreed to the basic terms for the Fight, including a list of possible opponents. Negotiations with Showtime were also underway

---

5 A matchmaker assists boxing promoters in creating the best possible matches for a boxing event.

for the United States broadcast right to the Fight, and Straight Out had received an offer of $2 million for the international rights to the Fight.

As noted above, Kevin McBride was initially proposed as Tyson's opponent. On June 10, 2004, Straight Out received an alternative proposal.

### A. The Appearance of the UK Defendants

While attending promotional activities for a Sports Network event in Manchester, England, Lewkowicz, a fight matchmaker with ties to Webb, ran into Heath, who at the time was in-house counsel for Warren's company, Sports Network, and asked whether Warren would be interested in distributing the Fight internationally. Heath immediately got Warren on the phone, but Warren told Heath and Lewkowicz that the Fight was not financially viable and that he did not want anything to do with Tyson.[6] Once the phone conversation ended, however, Warren instructed Simons, who had been at his side during the telephonic exchange, to meet with Lewkowicz to see whether he could "slip" Danny Williams as Tyson's opponent. Williams was an English fighter promoted by Warren, and for Warren and Sports Network, a Tyson fight represented a golden opportunity to advance Williams' career and their interests, especially if Williams defeated Tyson. (*See* Tr. 87:12-24, March 25.)

As Warren had directed, Simons, Heath and Lewkowicz met a few hours later, and from the meeting Simons called Webb to relate a business proposal. According to Webb,

> [w]hen Mr. Simons initially got on the telephone, he introduced himself to me as Frank Warren's business partner, and . . . shared with me about Sports Network. . . . [He] shared with me that [Sports Network] had their own division within their company . . . [that]

---

6 Warren did not want to deal with Tyson or his manager due to a physical altercation he once had with Tyson.

> could do the international distribution. . . . he said [Sports Network]
> would be very interested in placing Mr. Williams [as Tyson's
> opponent]. Mr. Simons told me that he would have to get in touch
> with Frank, but. . .assured me that they were very interested in
> distributing this fight.

(Tr. 159:4-24, 161:3-5, March 26.)

Simons' account of the telephone conversation is markedly different. Although

he concedes proposing Williams as Tyson's opponent, he asserts that "I absolutely told

[Webb], categorically, that Frank Warren was not interested [in the international rights to

the Fight], but [that] I thought I might be able to find some investors who would be able

to meet the number he was looking for." (Tr. 17:3-9, March 26.) The following emails

sent by Heath (Sports Network's in-house lawyer) to Webb on June 14, 2004, support

Webb's version of the facts. They outline the business proposal that Simons conveyed to

Webb as follows:

> SUBJECT TO CONTRACT
> * * *
> I refer to my email of yesterday to which I note I have not received
> a reply[;] therefore I shall repeat below the outline of our proposed
> agreement.
>
> Upon Mike Tyson executing a binding contract to fight Danny
> Williams. . . Sports and Leisure Boxing Limited (S and L) shall
> acquire the worldwide broadcasting rights for that contest and the
> undercard excluding the USA.
> * * *
> Proceeds shall be distributed in the following bases:
>
> a.  In light of the fact that Pay Per view revenue can take up to a
>     month to be collected. . .revenues shall be distributed on or
>     before 30th of August 2004.
>
> b.  S and L shall deduct its distribution fee of 15% and its agreed
>     costs incurred in procuring the sales. The net balance shall be
>     distributed 45% to [Straight Out], 45% to S and L and 10% to
>     Sampsom Lewkowicz.

8

c.  S and L shall enter into a guarantee to state that provided the
Contest takes place the revenue share of [Straight Out] from the
sales proceeds shall not be less than $2,000,000.
* * *
Sports Network shall provide the services of Danny Williams as
the boxer opponent for a fee to be agreed between the parties.
* * *

(Plaintiff's Trial Exh. 3.)  A few hours later, Heath followed up with another

message to clarify certain of points made in his previous email:

Firstly I wish to make it absolutely clear to you that upon you
granting the broadcasting rights that we seek arrangements will
immediately be made to ensure that the guarantee sum of
$2,000,000 will be available to be drawn by yourself from the
escrow account immediately upon the bout taking place.  I am sorry
if I did not make this clear in my earlier email as this is obviously a
key point.

Secondly I made a reference to Ress/Anchondo on the undercard[;]
however that is not intended to be a requirement of Sports Network.
We accept that the undercard is under the exclusive control of
[Lewkowicz] and we understand that fight may be on the card[;]
however it makes no difference to our agreement if it is not.

(Plaintiff's Trial Exh. 4.)

When presented with the emails at trial, Simons said he did not know why Heath

had sent the messages and had "absolutely no idea" why Heath had referred to Sports and

Leisure (Simons' company and one of the partners of Sports Network). (Tr. 37:11-13,

March 26.)   Attempting to make sense of his response, Simons explained that he could

"only assume that [Heath] was . . . distancing Sports Network from what he was agreeing

to do . . . . [and] used Sports & Leisure, Boxing as a name." (*Id.* at 36:5-11, 37:16-20.)

Heath's deposition testimony belies Simons' explanation.[7]  According to Heath, the

---

7 The Court credits Heath's deposition testimony over Simons' trial testimony.   Heath was not a party to
this proceeding, and he was a partner at a law firm that represented Sports Network, Warren and Simons on
many other matters.  (Heath's Dep. Test. 10:10-21, Feb. 2007.)

emails had been sent on Simons' direct instructions to provide "the basis on which Danny

Williams would participate in the contest and the basis on which the overseas

broadcasting rights would be acquired," because  "Frank Warren was never interested in

the overseas TV rights as an individual [and]. . . it was understood that Sports & Leisure

would be acquiring the overseas TV rights."  (Heath's Dep. Test. 29:18-23, 31:22-32:1.)

## B.  Negotiations

After receiving Heath's emails, Webb continued negotiations with Simons, and by

approximately the third week of June, there was an agreement to increase the minimum

guarantee for the international distribution rights from $2 million to $2.7 million.  This

was in exchange for an increase of 10% in the participation of the UK companies in the

proceeds of the international sales.  At this time, the name Brearly was also introduced, as

Simons had convinced Abbey to allow him to use Brearly (one of Abbey's shell

corporations located in Gibraltar) as the vehicle to carry out the transactions relating to

the international rights to the Fight.  Abbey's only condition had been that Simons

perform all the work, and Simons had agreed to do so without compensation.  Simons'

commitment included, among other things, directing all efforts to sell the Fight in

international markets; approving all international licensing deals put in place, allegedly

on behalf of Brearly; and collecting revenues, paying expenses, and keeping Brearly's

books of account (such as they were).

On or about June 22, 2004, Webb received a letter, ostensibly from Brearly,

confirming certain terms of the proposed deal and stating that "all other terms [remain] as

set out in Stephen Heath's email to you on the 13th of June 2004." (UK Defendants' Trial

Exh. 4.)[8]  The fact that Brearly and not Sports and Leisure was the contracting party did

not concern Webb, as he had been told by Simons that Brearly was an offshore Sports

Network entity being used to distribute the Fight. (Tr. 168:11-15, March 26.)

On or about June 30, 2004, Heath flew from England to Louisville, Kentucky to

finalize the documentation in connection with the Fight.  Even though Straight Out and

Sports Network executed the contract for Williams' services in that meeting, Heath and

Straight Out reached an impasse on certain provisions of the proposed international

distribution agreement (the so-called "Distribution Agreement"), and Heath returned to

England without a signed agreement for that part of the deal.[9]  The parties disagreed on

two issues.  First, whether the $2.7 million guarantee for the international rights was to be

deposited in an escrow account or be secured by a letter of credit.  Second, a forum

selection clause: Heath (acting on Simons' instructions) had insisted that Gibraltar be the

forum for any litigation arising from the agreement, and Straight Out insisted on

Kentucky.  (*See* Heath's Dep. Test. 43:6-15.)  A week earlier, however, Simons had

already begun selling the international rights to the Fight.  As Simons explained,

"everybody [had] agreed it was in everybody's interest to get moving on this. . . . five

weeks before the intended fight [is] a very short window to be selling international

rights." (Tr. 28:23-29:4, March 26, 2006.)

---

8 The June 13th email is not in the record.  The two June 14th emails described above, confirm and clarify
the June 13th message.  Although Simons did not deny having agreed to increase the guarantee payment to
$2.7 million at trial, he alleged first seeing the letter from Brearly to Webb in the course of this litigation.
(*See* Tr. 30:8-9, March 26.)  Heath's and Abbey's deposition testimony do not support this account.  Heath
asserted that Simons had given him a copy of the letter before it was sent to Straight Out.  (*See* Heath's
Dep. Test. 37:21-38:13.)   Abbey believed Simons had prepared the letter.  (*See* Abbey's Dep. Test. 27:7-
24, Feb. 8, 2007.)

9 During the course of negotiations three drafts of an international distribution agreement were prepared,
but the parties never executed any of them.

Assisted primarily by McConachie, Simons' selling went forward; Russia and Japan were among the countries that bought rights to broadcast the Fight.[10]  The Fight was also sold in the United Kingdom.  There, however, Warren and Simons had determined that Sports Network would license the Fight, and Brearly's name would not be used.  The reasons were that the only company capable of broadcasting the Fight in the U.K. had an exclusive contractual relationship with Sports Network and had refused to transact business with Brearly. (*See* Tr. 69:6-18, March 25.)  Moreover, since the Fight was to be transmitted in England at 3:00 a.m. (due to the time difference between England and Kentucky), Sports Network was promoting another boxing event in England at a somewhat earlier time (a so-called Event I) and had sold the rights to the event and the Tyson-Williams fight as a package deal.  (*See* Plaintiff's Trial Exh. 7; Heaths' Dep. Test. 57:9-18.)  Warren and Simons say they intended to have Sports Network sell the Fight in England, deduct a commission for its services and then remit remaining proceeds to Brearly. (*See* Tr. 111:22-112-1, March 26.)

On July 16, 2004, Straight Out and Tyson formalized the Event Agreement, which, among other things, required Straight Out (i) to provide Tyson with an immediate payment of a $225,000 training advance; and (ii) to secure the remaining $6.975 million of the purse with letters of credit on or before July 21, 2004.  The Event Agreement also named Williams as a pre-approved opponent for Tyson and authorized Straight Out to contract for his services.  Also on July 16, 2004, Straight Out and Showtime executed an exclusive Pay-Per-View Agreement, which required Straight Out to post a letter of credit

---

10 Some of the other countries sold by McConachie and Simons were Ireland, Channel Islands, Isle of Man, Denmark, Norway, Finland, Ukraine, Belarus, Armenia, Georgia, Moldova, Kyrgyzstan, Estonia, Kazakhstan, Azerbaijan, Uzbekistan, Turkmenistan and Tajikistan. Certain other countries had been reserved for another distributor, Chester English.

of $1.3 million to secure Showtime's projected marketing expenses for the Fight.

Although Straight Out paid the training advance and delivered a $5 million letter of credit

to Tyson, it was unable to post letters of credit for the $1.975 million balance of Tyson's

purse or for Showtime's $1.3 million in projected marketing expenses.

Tyson and Showtime began demanding compliance with Straight Out's

commitments, and Webb responded that Straight Out could only post the letters of credit

when it was paid the promised $2.7 million guarantee on the international rights.  Webb,

in turn, pressed Simons for payment, but Simons put off his demands, stating that

"Sports Network wasn't able to draw on their letter of credit from the bank because Mr.

Tyson was attached to the event and the bank felt like Mr. Tyson was a risk," but that

"[h]im and Frank were going to get together and get it worked out." (Tr. 183:10-20,

March 26.)

On or about July 22, 2004, Warren, Simons, Hirschman of Showtime and Tyson's

fight manager held a conference call to discuss possible solutions to the issues at hand.

As for Showtime, Warren stated that the $1.3 million dollar advance would be covered

with the United Kingdom proceeds and "that he would make sure that Showtime [got

paid]."  (Tr. 29:1-2, March 25; *see also* Tr. 68:15-69:4, March 26.)  This proposition

satisfied Showtime's concerns.  Regarding Tyson's purse, however, Warren took a

different position, stating emphatically that neither Sports Network nor he would pay a

penny to the fighter.

### C.  The Assignment Agreement

Negotiations continued among the parties, and on or about July 26, 2004, a

consensual resolution was reached.  This was documented in the form of an Assignment

13

Agreement, in which Straight Out irrevocably assigned to Tyson and Showtime certain

proceeds from the international rights to the Fight.  Specifically, in respect to Tyson, it

was agreed that after payment of $1.3 million to Showtime,

> Tyson shall be entitled to receive, and Brearly is hereby irrevocably
> authorized and directed to pay Tyson, the next $1,900,000 of the
> Distribution Revenue.  Such payment to Tyson shall be in lieu of
> payment of such amount to Straight Out.  Notwithstanding anything
> in this Notice, Brearly shall pay Tyson in connection with the Bout
> $1,400,000. . .on or before August 30, 2004.

(Plaintiff's Trial Exh. 13.)  Thus, the Assignment Agreement limited Brearly's liability to

Tyson to $1.4 million if the Distribution Revenue were not sufficient to cover the

Showtime payment of $1.3 million and the full $1.9 million that Straight Out still owed

Tyson.[11]   The Assignment Agreement also entitled Brearly to "deduct" from its

obligations to Tyson and Showtime up to $190,000 for certain expenses, including up to

$80,000 of possible sales commissions payable to another distribution agent, Chester

English.  Tyson also agreed to reduce his purse by $75,000 worth of tickets to the Fight.

Espinoza, Tyson's lawyer, testified credibly that Heath had told him, in several

conversations in the days leading up to the Assignment Agreement, that Brearly was a

Sports Network company being used for tax purposes and that it had been used in this

manner previously.  (Tr. 43, 69:21-72:7, 85-86, 94-95, 120-123, March 23.)  He believed

Heath because this use of an offshore company was credible and, "Essentially, everything

that I saw in connection with Brearly came from Sports Network."  (Tr. 72:23-24, March

23.)  The signed version of the Assignment Agreement bears a fax transmittal line

showing a fax transmission from Marrache & Co., Brearly's law firm in Gibraltar, to

---

11 Distribution Revenue was defined by reference to "that certain Distribution Agreement" between
Straight Out and Brearly.  However, as discussed below, such an agreement was never actually executed.

Sports Network, and a further fax from Sports Network to Louisville, all on the day of the

Fight.

At trial Simons tried to downplay the UK Defendants' involvement in the

Assignment Agreement.  However, Heath's deposition testimony and his emails reveal

what really happened.  When asked to describe the purpose of the Assignment

Agreement, Heath stated:

> I think you would have to ask Ed Simons and Frank Warren, but as a
> lawyer, my understanding was that the event was not going to
> happen because Showtime and Tyson's parties were unhappy with
> Chris Webb and they didn't think he would follow through with his
> promises to them. . . . My role was simply corresponding, based on
> instructions received from Ed Simons.

(Heath's Dep. Test., 66:12-17; 67:1-2.)  Heath also made it explicit in an email that

Brearly's consent to the Assignment Agreement was inextricably linked to Straight Out's

compliance with its obligations to Sports Network regarding Williams.  (*See* Plaintiff's

Trial Exh. 12.)

### D. The Fight

On July 30, 2004, approximately half an hour after Tyson and Williams stepped

into the ring the Fight was over—Williams defeated Tyson in a knockout in the fourth

round.

### E. The Aftermath of the Fight

Early in the morning of August 2, 2004, the Monday after the Fight, Straight Out

and Espinoza received an email from Marrache & Co, the Gibraltar law firm representing

Brearly.  Despite the fact that Abbey testified that it was likely the Assignment

Agreement had been executed by somebody from Marrache & Co (See Abbey's Dep.

Test. 31:9-32:22.), Marrache now repudiated it, stating that "Brearly ha[d] neither been

consulted nor been made a party to any. . . agreement" and that Brearly would not make distributions "to any party until it ha[d] satisfied itself as to the full extent of the commitments made by Straight Out."  (Plaintiff's Trial Exh. 15 and 25.)  The email also said that Brearly would reserve "all its rights with respect to Straight Out's conduct in seeking to bind Brearly to agreements with third parties without obtaining Brearly's express agreement thereto."  *Id.*  All emails, phone calls and letters to the UK Defendants went unanswered.

On August 12, 2004, Straight Out sued Brearly in the United States District Court for the Western District of Kentucky, asserting causes of action for breach of contract and unjust enrichment.  *See Straight-Out Promotions, LLC v. Brearly (International) Limited*, Civil Action No. 3:04CV-473-H.  The same day and in the same Court, Straight Out also sued Sports Network and Warren for breach of contract in connection with Williams' Service Agreement.  *See Straight-Out v. Frank Warren, et al.*, Civil Action No. 3:04-CV-475-S.  The same attorney appeared, representing Brearly, Warren and Sports Network in the two Kentucky suits.[12]  However, after the action against Warren and Sports Network had been dismissed, the Court allowed the attorney to withdraw in the lawsuit against Brearly.  Brearly defaulted thereafter, and the Kentucky District Court granted Straight Out a default judgment in the amount requested ($2.7 million plus interest and attorneys fees), which Straight Out has not been able to collect.

---

12 Warren and Simons testified that they had learned about the suit against Brearly during the discovery process in this proceeding and that they had nothing to do with Brearly's retention of an attorney.  (*See* Tr. 124:2-125:3, March 25; Tr. 82:9-22, March 26.)  However, Heath and Abbey testified at their depositions that Simons had not only hired the attorney, but that he was also involved in the coordination of Brearly's defense in that suit.  (*See* Heath's Dep. Test. 18:6-19:10; Abbey's Dep. Test. 40:10-41:17.)  Moreover, the income statement described below, prepared at Sports Network on Simons' instructions to account for Brearly's expenses in connection with the Fight, reflects as a paid expense legal fees of $110,050 to the attorney retained in connection with the Kentucky suit.  (*See* UK Defendants' Trial Exh. 121.)

*F. Revenue from the International Sales*

An income statement prepared at Sports Network shows that Warren's earlier projections were correct: the Fight was not financially successful.[13]  Revenue from international distribution rights totaling approximately $1.9 million was not sufficient to cover all the financial obligations the Fight had generated.  (*See* UK Defendants' Trial Exh. 121.)  Warren, nonetheless, kept his promise to Showtime and paid its $1.3 million bill out of Brearly's proceeds.  Warren also made sure that Sports Network's commission of $109,746 in connection with the United Kingdom sales was paid.  After paying some of Brearly's direct and indirect expenses arising from the Fight, such as sales commissions and attorneys fees, the remaining proceeds from the Fight appear to have been $135,795, which the income statement shows as Brearly's net proceeds.  The UK Defendants have never explained where this money is or offered an explanation as to why they are withholding it.

## DISCUSSION

As stated above, the Complaint and Cross-Claims assert four claims for relief. The parties have stipulated that the law of Gibraltar governs the alter ego/veil piercing claims and that Gibraltar law on this issue is the same as English law.  (*See* Choice of

---

13 At trial, Simons first denied that Sports Network had prepared the income statement.  When confronted with his deposition testimony to the contrary, Simons admitted having ordered a Sports Network accountant to prepare it.  (*See* Tr. 113:15-119:21, March 26.)  Plaintiff and the Kentucky Defendants contested the accuracy of the figures presented in the income statement.  The Kentucky Defendants alleged that it fails to account for a lucrative sponsorship deal the UK Defendants had entered into with a Russian company. (*See* Tr. 184:9-186:9, March 26.)   The Court, however, received no evidence supporting these allegations, and it is undisputed that the Fight did not sell well at the pay-per-view level.

Law Stip. and Order, ECF Doc. No. 133.)  As to the other causes of action, there is no

dispute that Kentucky law applies.[14]

## A. Breach of Contract

Under Kentucky law, a breach of contract claim requires the following elements

to be established by clear and convincing evidence: (1) the existence of a valid contract;

(2) breach of the contract; and (3) resulting damages or loss to the plaintiff.  *See Sudamax*

*Industria e Comercio de Cigarros, Ltda v. Buttes & Ashes, Inc.*, 516 F. Supp. 2d 841, 845

(W.D.Ky. 2007).  A valid and enforceable contract exists when legally competent parties

agree to be bound to each other in exchange for sufficient and legal consideration.  *See*

*Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997).  In a breach of contract action,

damages are generally the sum required to put the non-breaching party "into the same

position he would have been in had the contract been performed."  *Barnett v. Mercy*

*Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007).  Prejudgment and

postjudgment interest are recoverable; prejudgment interest typically running from the

date payment was due under the contract.  *See University of Louisville v. RAM*

*Engineering & Const., Inc.*, 199 S.W.3d 746; 748 (Ky. App. 2005); *Cooper v. Hubberd*,

---

14  The negotiations and some of the alleged misrepresentations giving rise to this action originated in the
United Kingdom and some in Kentucky.  All alleged injuries, however, arose in connection with the Fight,
which took place in Kentucky.  Under these circumstances and premised on New York's choice-of-law
rules, the laws of Kentucky apply to the non-veil piercing issues in this case.  *See Official Comm. of*
*Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.),* 264 B.R. 69,
90 (Bankr.S.D.N.Y. 2001), *citing Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496 (1941); *see*
*also In re WorldCom*, 361 B.R. 697, 717 (Bankr.S.D.N.Y. 2007) (in breach of contract suit the "law of the
jurisdiction with the most significant interest in, or relationship to, the dispute" applies); *In re Grand Theft*
*Auto Video Game Consumer Litigation*, 251 F.R.D. 139, 149 (S.D.N.Y. 2008). ("In tort cases where
conduct-regulating standards are at issue, courts generally apply the law of the state where the tort
occurred, as that state usually has the greatest interest at stake in the litigation."); *Kingdom 5-KR-4, Ltd v.*
*Star Cruises, PLC*, 2002 WL 432390 at *12 (S.D.N.Y. Mar. 20, 2002) (although the alleged fraudulent
communications originated in Norway, New York law applied as injury was inflicted there).

703 S.W.2d 494, 497 (Ky.App. 1986); *Dalton v. Mullins*, 293 S.W.2d 470, 474 (Ky.App. 1956).

### (i) Plaintiff's Contract Claim Against Straight Out

As stated above, Straight Out has never denied being in breach of the Event Agreement, in that the final $1.9 million of Tyson's purse was never paid. Straight Out, nonetheless, argues that its obligations to Tyson must be reduced by $542,000 on account of money Tyson received for the Fight in alleged breach of the Event Agreement. There are two separate elements to this counterclaim or offset. First, Straight Out contends that $242,000 Tyson received in 2004 from Showtime in connection with a multi-fight settlement agreement constituted gross revenues connected to the Fight. Straight Out next argues that Tyson's 2004 income tax return shows $300,000 in unidentified purse advances, and that these should be considered as gross revenues from the Fight because that was the only bout Tyson had that year.

Straight Out did not present any evidence to support either allegation. Showtime's payment to Tyson was by its express terms part of a global settlement unrelated to the Fight. (*See* Kentucky Defendants' Trial Exh. 3.) As for Tyson's tax returns, Straight Out's claim that one item on a tax return entitled "purse advance" should be related to the Fight is mere speculations and guesswork. Tyson had more than one source of income during that tax year. Straight Out did not sustain its counterclaims, and they are dismissed. Straight Out's contractual liability to Tyson is set at $1.9 million, plus applicable prejudgment and postjudgment interest, less any recovery that Plaintiff is able to obtain in respect of the Assignment Agreement (as discussed below).

*(ii) Plaintiff's Contract Claim against Brearly*

Brearly's default makes the Court's inquiry here a limited one.  "A default constitutes admission as to liability; therefore, the effect of a [defendant's] default is that it is deemed to have admitted all of the well-pleaded allegations raised in the complaint pertaining to liability." *Montcalm Publishing Corp. v. Ryan*, 807 F. Supp. 975, 977 (S.D.N.Y. 1992); *see also Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *Deshmukh v. Cook*, 630 F. Supp. 956, 959 (S.D.N.Y. 1986).  When a defendant defaults, courts reject the well-pleaded factual allegations of a complaint only "in very narrow, exceptional circumstances." *Farberware, Inc. v. Groben*, 1991 WL 123964, *8 (S.D.N.Y. Jul 3, 1991).  "[A]llegations [that] are contrary to facts of which the court will take judicial notice, or which are not susceptible of proof by legitimate evidence, or which are contrary to uncontroverted material in the file of the case are not well-pleaded allegations." *Id.*  However, the question of damages must be sustained by evidence even when a defendant defaults.  *See Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).  In a suit with multiple defendants, a damages inquest against a defaulting defendant can be conducted at the same time as the trial against the non-defaulting defendants. *See Cho v. Koam Medical Services P.C.*, 524 F. Supp. 2d 202, 205 (E.D.N.Y. 2007).

The evidence at trial provides no reason to question Plaintiff's well-pleaded allegations in its amended complaint against Brearly.  Straight Out assigned to Tyson $1.9 million from the sums that Brearly would pay in respect of the international rights to the Fight.  Of this, the evidence at trial shows that Brearly, through its authorized representative, agreed to be unconditionally liable to Tyson for $1.4 million, less certain

expenses that Brearly would incur in connection to the Fight. The evidence at trial is that these expenses totaled $162,150.[15] Therefore, as per the Assignment Agreement, Brearly's liability to Plaintiff is limited to $1,237,850 ($1,400,000 - $162,150), plus applicable prejudgment and post-judgment interest.

Brearly's lawyers in Gibraltar, in an email communication immediately after the Fight, disputed the validity of the Assignment Agreement, claiming that the parties had never executed it. This repudiation, however, is evidence only of the U.K. Defendants' bad faith, as further discussed below. Heath confirmed in his deposition that Brearly had in fact executed the agreement. (*See* Plaintiff's Trial Exh. 14; *see also* Heath's Dep. Test. 79:8-80:9.) Hirschman, Espinoza and Webb also testified as to the negotiation and terms of the Assignment Agreement, and email communications introduced in evidence support their testimony. Admittedly, the Assignment Agreement referenced a "Distribution Agreement," which was never executed. However, as will be discussed below, there was an enforceable distribution agreement, and the absence of a final executed version does not make the Assignment Agreement uncertain or unenforceable. There was a meeting of the minds. *See Dohrman v. Sullivan*, 220 S.W.2d 973, 975 (Ky. 1949).

On the other hand, Plaintiff's claim against Brearly for breach of contract is sustained only for the amount guaranteed in the Assignment Agreement. Plaintiff did not adduce any evidence to prove that proceeds from international sales of the Fight exceeded $2.7 million, which was the revenue required for Brearly to have contractual

---

15 The sales commissions paid to Chester English of $52,150, as well as "Brearly's" expenses of $110,000. (See U.K. Defendants' Trial Exh. 121.)

liability to Tyson for more than $1.4 million. (*See* Plaintiff's Trial Exh. 13.)[16]   The only

evidence of record on the international sales revenues was contained in the income

statement described above, which showed net revenues of only about $1.9 million.  These

numbers were generally corroborated by McConachie's trial testimony, which confirmed

that the international sales generated by the Fight were low.  (*See* Tr. 15:50-16:8, March

24.)  Since the best evidence is that total revenues were only approximately $1.9 million,

subtracting $1.3 million for Showtime and additional sums for expenses, there were no

revenues to be assigned to Tyson above the $1.4 million fixed amount.

### (iii) Straight Out's Cross-Claim Against Brearly

Straight Out has also sustained its breach of contract claim against Brearly.

Although Straight Out and Brearly never executed a written contract to evidence their

agreement, the record establishes that the parties agreed that certain international

distribution rights to the Fight would be assigned to Brearly, in exchange for a minimum

guaranteed payment of $2.7 million. Email communications and faxes sent among the

parties clearly reflect the terms of their agreement.  *See Dohrman*, 220 S.W.2d at 975

(agreement valid and enforceable when "court can see from the writings or

correspondence that the minds of the parties have met").  The contract is not

unenforceable because the initial written proposal Straight Out received stated that their

agreement was "subject to contract" or because the parties never agreed on a forum

selection clause or on the security for payment of the $2.7 million fixed amount.  As the

Kentucky Court held in *Dohrman*, 220 S.W.2d at  975-76: "Nor does a contemporaneous

---

16 The amount assigned from the international sales in the Assignment Agreement was $1.9 million, the
shortfall in Straight Out's obligation to Tyson.  The guaranteed amount was $1.4 million.  However, before
Tyson could get more than $1.4 million, $1.3 million had to be paid to Showtime, and some of Brearly's
expenses (a maximum of $190,000) had to be satisfied.

agreement to reduce a contract to writing make its validity depend upon it being actually

reduced to writing and signed." *See also Quadrille Bus. Sys. v. Ky. Cattlemen's Assn.*,

242 S.W.3d 359, 364 (Ky.App. 2007) (once essential terms are established, a contractual

agreement need not cover every conceivable term of the underlying deal). Equally

significant is Simons' trial testimony:

> Once Mr. Abbey had told me that he was interested in the
> transaction, then I informed Mr. Webb that was the
> situation. . . . And everybody agreed it was in everybody's interest to
> get moving on this . . . . five weeks before the intended fight [is] a
> very short window to be selling international
> rights. . . . I spoke to Peter Abbey and I think I'm right with what
> was agreed; an increase in Brearly's profit participation in return for
> an increase from $2 to $2.7 million.

(Tr. 28:23-29:4, 31:12-14, March 26.)

A decision of the Kentucky District Court also concluded that the lack of a signed

written contract between Brearly and Straight Out would not preclude them from having

an enforceable agreement. As discussed above, Straight Out sued Brearly on a contract

claim in the Kentucky Federal District Court in 2004, shortly after the Fight. Brearly

initially appeared and moved to dismiss (before it defaulted). In a thorough opinion the

Kentucky District Court denied the motion to dismiss, recognizing that the distribution

agreement had never been executed but stating, among other things, that Kentucky law

applied and that "Kentucky courts recognize a contract implied in fact, 'shown by

evidence of facts and circumstances from which a meeting of the minds concerning the

mutual promises may be reasonably adduced.'" Op. of District Judge Heyburn, dated

May 27, 2005, *quoting Perkins v. Daugherty*, 722 S.W.2d 907, 909 (1987).

On the other hand, the Kentucky Defendants overreach when they argue that the

default judgment entered in the Kentucky litigation regarding Straight Out's breach of

contract claim against Brearly should be determinative and conclusive on the amount of

damages.  In a default judgment, entered after the above decision and after Brearly had

defaulted, the Kentucky District Court also found that "the implied contract between

Straight Out and Brearly" had been breached as of July 23, 2004, and ultimately entered a

judgment in the principal amount of $2.7 million. However, with the addition of pre-

judgment interest of 8% per annum ($356,580), attorney's fees to obtain the judgment

($71,875), a 30% contingent fee to collect ($938,537), expenses incurred to collect

($87,500), and post-judgment interest, the default judgment against Brearly as of

December 16, 2008 totaled $4,154,492.

This Court cannot enter the same judgment.  The UK Defendants appeared in this

case and had an opportunity to present their case on damages as well as liability.  There is

no dispute that Straight Out had assigned the entire amount of its $2.7 million guaranteed

recovery—$1.3 million to Showtime and $1.4 million to Tyson. Since the proceeds from

the international sales of the Fight did not exceed $2.7 million, Straight Out did not

establish that it has a right to a net contractual recovery based on the record in this case.[17]

### B. Unjust Enrichment

Plaintiff asserts unjust enrichment claims against Brearly and Sports Network.

Under Kentucky law, unjust enrichment is an equitable doctrine by which a contract is

implied by law based upon "a legal fiction invented to permit recovery where the law of

natural justice says there should be a recovery as if promises were made.  The courts

supply the fiction of the promise to permit the recovery." *Perkins v. Daugherty,* 722

---

17 It is a separate question whether Straight Out can obtain its costs, including attorneys fees, as an element
of the judgment to be entered in this case.  This is a matter for further briefing.

S.W.2d 907, 909 (Ky.App. 1987).[18]  The doctrine of unjust enrichment does not apply

when a contract governs the relationship between the parties, as "there can be no implied

contract or presumed agreement where there is an express one . . . in reference to the

same subject matter." *Fruit Growers Express Co. v. Citizens Ice & Fuel Co.*, 112 S.W.2d

54, 56 (Ky.1937).

The unjust enrichment claims of Plaintiff against Brearly fail because, as found

above, a valid and enforceable contractual agreement governed the relationship between

the parties.  Moreover, there was no evidence to prove that Brearly ever received any

funds at all from the Fight—a point that Plaintiff and Straight Out stress in asking that

Brearly's corporate veil be pierced.

There was no enforceable contract between Plaintiff and Sports Network relating

to the international revenues from the Fight.  However, Plaintiff asserts that Brearly's

contractual liability should be imposed on Sports Network and the other UK Defendants

by piercing Brearly's corporate veil.  Since this relief is granted, as set forth below, there

is no cause to resort to the equitable doctrine of unjust enrichment to fashion a remedy in

this case against Sports Network.  In effect, it is being held liable on the contract itself.

Based on the forgoing, Plaintiff's claims for unjust enrichment are denied or

dismissed.

---

18 A successful unjust enrichment claim requires evidence of three factors: (i) that a benefit was conferred
upon the defendant at the plaintiff's expense; (ii) that the benefit resulted in an appreciation by the
defendant; and (ii) that the defendant accepted the benefit under circumstances which render its retention
without payment inequitable. *See Guarantee Electric Co. v. Big Rivers Electric Corp.,* 669 F.Supp. 1371,
1380-81 (W.D.Ky.1987).

### C. Piercing of the Corporate Veil

#### (i) Brearly

As previously stated, the parties have agreed that English law applies to the alter

ego/veil piercing claims against Brearly.  The UK Defendants provide the following

general description of English law on the subject of veil piercing in their Post-Trial

Memorandum:

> [A] corporate veil may be pierced only in extremely limited
> circumstances, and may not be pierced merely because a court
> considers that it might be just to do so.

(UK Defendants' Post-Trial Memo. of Law, p. 9-10, 13, ECF Doc. No. 164)

(internal citations omitted).  They then contend that under English law:

> Generally, the distinction between two separate entities, each with
> separate legal rights and liabilities, and between a company, on the
> one hand, and its owners or shareholders, on the other, is to be
> scrupulously observed.  There is no presumption that the subsidiary
> is the parent company's alter ego.  Even if separate companies,
> within a group of companies, effectively function as a single
> economic unit, their separation is to be respected.

(*Id.* at 10) (internal quotations and citations omitted).  Nevertheless, the UK

Defendants concede that the veil can be pierced under the following

circumstances:

> In order for the veil to be pierced, the corporate structure must have
> been devised as a mere facade concealing true facts.

(*Id.* at 13) (internal citation omitted).

In this case the facts of record easily satisfy this last test.  Granted that a corporate

veil can be pierced only in extremely limited circumstances, there could be no more apt

description of the actions of the UK Defendants than that they devised "the corporate

structure. . . as a mere facade concealing true facts."

26

Brearly was not what the UK Defendants said it was, an offshore subsidiary or affiliate of Sports Network used for the purpose of saving taxes.  It was someone else's shelf entity, a corporate shell, with no employees, capital or business, used as a "facade concealing true facts."  Brearly never had any employees: Simons and Heath, Sports Network's chief operating officer and in-house counsel, respectively, were the only parties who negotiated with Straight Out in connection with the acquisition of the international rights to the Fight.  The UK Defendants never asserted that Brearly ever had any capital, except perhaps for the minimum equity required to set up a company in Gibraltar.  Even though some of the contracts that the UK Defendants entered into in Brearly's name required Fight proceeds to be deposited into a "Brearly" bank account, there is no evidence that this ever happened or that Brearly even had a bank account.  Brearly engaged in no business; Simons and Heath used Sports Network's stationery and business facilities in England to carry on all its business.  The name Brearly was introduced to the transaction, and Brearly's lawyer in Gibraltar signed the Assignment Agreement, but that is all.

Brearly never had a real interest in the transaction or a true economic stake, and the UK Defendants ignored its position when it suited their interests.  Warren and Sports Network conducted the sale of the Fight in the United Kingdom directly, without using Brearly's name, and they profited directly (Sports Network's $109,746 sales commission) and indirectly (the sale of Event I).  They also paid Showtime out of the proceeds of the Fight without using Brearly's name.   It appears that they are continuing to withhold the net proceeds of the international sales of the Fight.  As indicated above, the net proceeds, after subtracting costs and expenses and $1.3 million paid to Showtime, total at least

$135,795.  The UK Defendants have never explained why they are withholding these proceeds of the international sales.

The UK Defendants' misuse of Brearly continued in connection with the lawsuits brought against Brearly in the Kentucky Court and in this Court.  When Brearly was first sued in Kentucky, only a few weeks after the Fight, it initially appeared by the same counsel who represented Warren and Sports Network in a contemporaneous suit brought in Kentucky.  After the suit against Warren and Sports Network had been dismissed, counsel withdrew from the Brearly suit, and Brearly defaulted.  Similarly, in this Court, Brearly initially filed an answer, purportedly "pro se," its answer being virtually identical to the answer filed by Sports Network.  Shortly thereafter, it appears that the UK Defendants decided to have Brearly default, and it did so.  At trial they denied having had anything to do with Brearly's default, but there is no credibility to their denial, as Brearly never acted through anyone other than Simons and Heath.  The UK Defendants' abuse of the process of two courts, by causing Brearly to appear and then to default, constitutes a further misuse of the corporate form that supports veil piercing.[19]

The credible testimony of Espinoza (Tyson's attorney) is that he was told that Brearly was a Sports Network affiliate that was being used for tax purposes.  That was a good reason for the UK Defendants to use an offshore entity, and Espinoza reasonably concluded that Brearly was being used for a legitimate purpose.  However, at trial, the UK Defendants denied that they had actually used Brearly for tax purposes, and they

---

19 In Cardozo: A Study in Reputation 119 (1990), Judge Richard Posner critiques one of Cardozo's famous veil-piercing decisions, *Berkey v. Third Avenue RR Co.*, 244 N.Y. 84 (1924).  Posner contends that the conduct of the lawyer for the parent company, in litigation after the events that gave rise to liability, would have justified piercing the corporate veil, an argument that no one made at the time.  *See also* Andrew Kaufman, Cardozo 424-25 (1998).

never provided a credible explanation as to why Brearly was introduced into the matter. Warren testified that he did not know why Simons and Heath had done work for Brearly and claimed that he had learned the extent of their involvement only during the proceedings in this Court.  (Tr. 102:8-20, March 25.)  Heath said he did not know whether Brearly was or was not affiliated with Sports Network and when asked whether he thought he was working for "some stranger," responded, "To be honest, it is not my position to think. My position is to act on instructions from Ed Simons and Frank Warren and I carried out those instructions." (Heath's Dep. Test. 69:3-7.)

Simons would have the Court believe Brearly was used because this was a good "business opportunity" for Brearly, and he would do all the work in connection with the Fight "as a courtesy to Peter Abbey."  (Tr. 100:3-10, March 26, 2009.)  Abbey's deposition testimony as to why Brearly was used is closer to the mark: "I can only presume because it helped [the] deal with Frank Warren and Sports Network." (Abbey's Dep. Test. 18:9-12.)  There is no credibility to Simons' testimony that he used Brearly as a favor to Abbey, as the only thing Abbey got out of Brearly was a subpoena to testify at a deposition in this action.

Based on the credible testimony at trial, the Court has no doubt that the UK Defendants used Brearly in the transaction to mislead and injure.  In words appropriate in the boxing world, it was a perfect set-up.  Warren testified that he did not think the Fight would be financially viable, and he did not want to deal with Tyson.  However, Warren admitted that the Fight was an excellent opportunity to advance Sports Network's interest in Danny Williams, and he instructed Simons to commence negotiations with Straight Out for that reason.  Under these circumstances, Brearly came in handy.  It was a

corporate entity unrelated to the UK Defendants, with no assets or business that creditors could attach if Warren's financial projections in connection with the Fight materialized (as they did). It allowed the UK Defendants to lure Straight Out and Tyson into naming Williams as Tyson's opponent, by purporting to offer them an attractive guaranteed return on the international rights to the Fight. Brearly allowed the UK Defendants to make two agreements—a distribution agreement with Straight Out, which guaranteed international proceeds at a minimum level of $2.7 million, and the Assignment Agreement, which guaranteed Tyson at least $1.4 million—without any intention of honoring them, once the Fight was over. The Distribution Agreement was never formally executed, so the UK Defendants never had to repudiate it. "Brearly" repudiated the Assignment Agreement on the next business day after the Fight, for wholly spurious reasons. The evidence is clear and convincing that the corporate form was used as a facade, concealing the true facts, and to injure and defraud.

Abuse of the corporate form is the key to veil piercing under English law. *Trustor AB v. Smallbone* [2001] 1 WLR 1177, illustrates this point. There, the Court pierced the corporate veil of a Gibraltar corporation used by its controlling shareholder as a judgment-proof vehicle to receive monies improperly transferred from another company. In its conclusion, the Court emphasized that the shareholder was the "directing mind and will [of the company, which] had no independent business, third-party directors, creditors or shareholders" and had been used improperly as a device or facade for the shareholder's benefit. *Id.*

Similar results were reached in *Gilford Motor Co., Ltd. v. Home*, Ch. 934, 956, 969 (1933), and in *Kensington International Ltd. v. Republic of the Congo* [2005] EWHC

2684 (Comm).  In *Gilford*, the defendant had agreed with a former employer not to solicit

its customers, but he did so through a competing corporation he had formed for such

purposes.  In granting injunctive relief to the plaintiff, the Court found that defendant's

corporation was "effectively carrying [the] business of the individual" owner and that

"the company was a mere cloak or sham device to enable the defendant to commit a

breach of his covenant against solicitation." *Id.*  In *Kensington*, the plaintiff sought to

enforce a money judgment obtained against the Republic of Congo, attaching monies to

be paid by third parties to corporations owned by the Congolese State.  The Court granted

the order, finding that the companies had no separate existence from the Congolese State,

that the transactions between the corporations and the Congolese State were not at arms

length, and that the corporations were used to avoid the attachment of sale proceeds by

creditors of the Congolese State.  *See also Ord & Anor v. Belhaven Pubs Ltd.*, [1998]

B.C.C. 607 (proper to pierce corporate veil of an entity with no assets or operations

whose purpose was to conceal true facts and defraud).

        The UK Defendants allege that unlike the cases cited above, "the UK Defendants

had nothing to do with the incorporation of Brearly." (UK Def. Post-Trial Brief, p. 16,

ECF Doc. No. 164.)  No case has been cited where someone else's corporate shell was

used in a scheme like the one at bar.  However, the use of an unrelated shell corporation

appears more abusive than the use of an entity that is owned by those in control.  A

corporation can establish or purchase a subsidiary corporation for the purpose of saving

taxes, limiting liability or for many other purposes.  Nevertheless, parties dealing with

such a company are entitled to rely on the subsidiary's position in the group as some

protection against fraud and abuse.  Third parties are entitled to assume that the

subsidiary is adequately capitalized and has a real business, so that it is not likely to repudiate its obligations at the earliest opportunity. Third parties are entitled to assume that there may be some hesitance on the part of a group to engineer the appearance of an affiliate in litigation and, then, after a subsequent default, claim to have no knowledge or responsibility for the corporate "stranger." Use of someone else's shell entity would appear to permit those in control to disclaim responsibility and repudiate agreements more easily. In any event, the relevant inquiry is whether the corporate form was abused and used to conceal true facts, not by whom the entity was incorporated.

The UK Defendants also argue that Tyson and Webb were aware that Brearly was a separate corporate entity and that Simons and Heath "were wearing two hats— negotiating for Brearly with respect to the international broadcast rights; and for Sports Network with respect to promoting Danny Williams." (UK Def. Post-trial Brief, p. 14-15.) It is also argued that Tyson and Webb knew that Warren had refused to guaranty Brearly's obligations. The evidence of record confirms that Warren had refused to guaranty Brearly's obligations to Tyson. Nonetheless, Tyson and Webb were lulled into accepting Brearly on false representations, and they were not told that it was sham, without capital, management or a business, being used so that those in control could repudiate and attempt to avoid all obligations immediately after the Fight took place.

American courts follow the same principles as the English courts with respect to veil piercing. There is no prohibition against using the corporate form for a myriad of purposes, including for the purpose of limiting liability. *See U.S. v. Bestfoods*, 524 U.S. 51 (1998). However, courts disregard the corporate form when presented with evidence of its abuse, which may include concealment of true facts, improper motives, lack of

adequate capitalization, improper record keeping, or evidence that the corporate form has

been used as a facade by a third party, such as a dominant shareholder.  *See NetJets*

*Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 176-77 (2d.Cir. 2008).  In all

cases, the key is that the corporate form itself is abused.  As the New York Court of

Appeals stated in a widely-cited case: "The party seeking to pierce the corporate veil

must establish that the owners, through their domination, abused the privilege of doing

business in the corporate form to perpetrate a wrong or injustice against that party such

that a court in equity will intervene."  *Morris v. New York State Dep't of Taxation and*

*Fin.*, 82 N.Y.2d 135, 141-42, 632 N.E.2d 1157, 603 N.Y.S.2d 807 (1993), *see also Wm.*

*Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir.

1991); *In re InSITE Services Corp.*, LLC, 287 B.R. 79, 95-98 (Bankr. S.D.N.Y. 2002);

*Daniels v. CDB Bell, LLC*, __ S.W.3d __, 2009 WL 2059079 at * 6-7 (Ky.App. Jul. 17,

2009) (same) (Kentucky case).

    Based on the evidence of record, the Court concludes that the UK Defendants

used Brearly as part of a scheme or ruse to accomplish Warren's goals: have Williams

fight Tyson and possibly go on to secure a championship fight for Sports Network, while

avoiding any liability to Tyson and Straight Out. Under English law, Brearly's corporate

veil must be lifted, with the result that the UK Defendants are liable for the contractual

obligations that they undertook in Brearly's name in connection with the Fight.[20]

---

20 The parties have not, in their voluminous papers, given much consideration to the question of the
individual liability of the UK Defendants if Brearly's corporate veil were pierced.  Under the circumstances
it does not appear that any of the UK Defendants can avoid liability.  Simons appears to have been the
principal actor on behalf of Sports Network.  Sports Network is the primarily liable party.  Sports Network
at the time of the Fight was a partnership between Warren, individually, and Sports and Leisure.  Both
Warren and Sports and Leisure are therefore potentially liable for any wrong committed by the partnership.
Simons has not asserted that his personal liability should be excluded because he acted on behalf of a
company.  It appears equitable, accordingly, that the UK Defendants be deemed jointly and severally liable
for the damages assessed against Brearly.

### (ii) Straight Out

Plaintiff also claims that Webb abused the corporate form and that he used Straight Out as a device or facade to avoid liability.  There is no evidence to support this claim, and Plaintiff effectively abandoned it by not addressing the issue in the post-trial findings of fact and conclusions of law.

### D. Fraud

Plaintiff also asserts a claim of fraud against Straight Out and the UK Defendants. Under the applicable law of Kentucky, a plaintiff making a claim for fraud must prove six elements by clear and convincing evidence:

> That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Sallee v. Fort Knox Nat'l Bank, N.A. (In re Sallee)*, 286 F.3d 878, 895-96 (6th Cir. 2002); *see also Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky. App. 1978). "[S]uch proof may be developed by the character of the testimony, the coherency of the entire case as well as the documents, circumstances and facts presented." *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).

### (i) Plaintiff's claim against Straight Out

Plaintiff's allegation that Straight Out fraudulently induced Tyson to fight by misrepresenting its financial condition is completely unsupported by the evidence of record.  It is undisputed that nine days before the Fight Straight Out failed to post letters of credit securing Tyson's full purse and that Straight Out conveyed to all parties that it depended on the foreign distribution proceeds to comply with its outstanding obligations.

34

In fact, the Assignment Agreement and all negotiations preceding its execution were motivated by Straight Out's lack of financial resources. Tyson went forward with the Fight with knowledge of Straight Out's financial situation and cannot claim that Straight Out or Webb defrauded him.

### (ii) Fraud claims against the UK Defendants

As stated above, the UK Defendants misrepresented their relationship with Brearly and their intentions to perform under the Assignment Agreement. However, these are the only misrepresentations or actionable omissions that Plaintiff has sustained. Both of these misrepresentations or omissions go only to the security of Brearly's contractual obligations. Plaintiff could only have reasonably relied on them, or have been damaged by the non-disclosure, in connection with the Assignment Agreement. Thus, the only damages that Plaintiff could assert from this fraud claim are the same contract damages that are being imposed on the UK Defendants by virtue of the piercing of Brearly's corporate veil.

Many States do not recognize a cause of action for fraudulent contracting—*i.e.*, for a defendant's failure to disclose that it never intended to perform a contract. If there is a valid contract, the cause of action sounds in contract, not in fraud. *See Derven v. PH Consulting, Inc.*, 427 F.Supp. 2d 360, 370 (S.D.N.Y. 1996). Kentucky apparently allows such a cause of action to go to the jury. *See Davis v. Siemens Medical Solutions USA, Inc.,* 399 F.Supp.2d 785, 800 (W.D.Ky. 2005); *Schroerlucke v. Hall*, 249 S.W. 2d 130 (Ky. App. 1952), *Moseley v. Owensboro Municipal Housing Comm'n,* 252 S.W.2d 880, 881 (Ky. 1952). Nevertheless, there is no indication in the Kentucky cases that the plaintiff would be entitled to damages beyond those provided in the contract. Under the

circumstances, Plaintiff's fraud claim is duplicative of its claim that Brearly's contractual liability should be imposed on the UK Defendants by piercing Brearly's corporate veil. Plaintiff is not entitled to more than one recovery on its contractual claims, and there is no need to reach any of the other issues relating to the claim of fraud.[21]

### CONCLUSION

Plaintiff is directed to settle a judgment on 30 days' notice consistent with this opinion. The notice of settlement shall include a calculation of any interest Plaintiff claims; if the Kentucky Defendants assert that they should be entitled to a monetary recovery in this action, including for interest or costs and based on the Kentucky default judgment against Brearly or otherwise, they should file any papers in support thereof at least 20 days before the settlement date. Further, the parties have indicated that their success on the corporate veil issue might afford them a claim to an award of attorneys fees, based on applicable English law. A motion for any such relief shall also be filed at least 20 days before the settlement date. All papers in opposition should be filed at least 5 days before the settlement date. The Court will hold a further hearing on the issues of interest and attorneys fees if the parties request.

Dated: New York, New York
      August 19, 2009

                            */s/ Allan L. Gropper*
                        UNITED STATES BANKRUPTCY JUDGE

---

21 Plaintiff has also totally failed to support a claim for punitive damages, and it is dismissed.